# 25-2053-cv

## United States Court of Appeals
### *for the*
## Second Circuit

DANIEL LEE,

*Plaintiff-Appellant,*

— v. —

RICHARD GOLASZEWSKI, STEPHEN SWENTZEL,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## SUPPLEMENTAL APPENDIX

RUSSELL M. YANKWITT
JASON M. SWERGOLD
MICHAEL H. REED
YANKWITT LLP
*Attorneys for Defendants-Appellees*
140 Grand Street, Suite 705
White Plains, New York 10601
(914) 686-1500

CP COUNSEL PRESS    (800) 4-APPEAL • (390608)

i

## SUPPLEMENTAL APPENDIX TABLE OF CONTENTS

**Page**

Exhibit A to Defendants' Rule 56.1 Statement -
  Redacted Excerpts from the Deposition
  Testimony of Richard Golaszewski, dated
  November 28, 2023
  (See Sealed Vol. at SSA-1 - SSA- 24) ................... SA-1

Exhibit B to Defendants' Rule 56.1 Statement -
  Redacted Excerpts from the Deposition
  Testimony of Stephen Swentzel, dated
  November 30, 2023
  (See Sealed Vol. at SSA-25 - SSA-41) ................. SA-25

Exhibit C to Defendants' Rule 56.1 Statement -
  Redacted Excerpts from the Deposition
  Testimony of Daniel Lee, dated
  November 2, 2023
  (See Sealed Vol. at SSA-42 - SSA-87) ................. SA-42

Exhibit E to Defendants' Rule 56.1 Statement -
  Redacted Excerpts from the Deposition
  Testimony of Alison Franklin, dated
  February 22, 2024
  (See Sealed Vol. at SSA-88 - SSA-100) ............... SA-88

Exhibit F to Defendants' Rule 56.1 Statement -
  Redacted Email, dated March 2, 2021, with
  Attachment
  (See Sealed Vol. at SSA-101 - SSA-106) ............. SA-101

Exhibit G to Defendants' Rule 56.1 Statement -
  Excerpts from the Deposition Testimony of Rory
  Shaw, dated December 20, 2023........................... SA-107

ii

**Page**

Exhibit H to Defendants' Rule 56.1 Statement -
Redacted Email Chain, dated May 13, 2021, with
Attachments
(See Sealed Vol. at SSA-107 - SSA-162) .............. SA-113

Exhibit I to Defendants' Rule 56.1 Statement -
Email, dated May 13, 2021, with Redacted
Attachments
(See Sealed Vol. at SSA-163 - SSA-170) .............. SA-169

Exhibit J to Defendants' Rule 56.1 Statement -
Redacted Excerpts from the Deposition
Testimony of Avshalom Yitzhak Kalichstein,
dated January 31, 2024
(Sealed. See Sealed Vol. at SSA-171 -
SSA-192) ................................................ SA-177

Exhibit K to Defendants' Rule 56.1 Statement -
Redacted Excerpts from the Deposition
Testimony of Bennett Goodman, dated
January 30, 2024
(Sealed. See Sealed Vol. at SSA-193 -
SSA-214) ................................................ SA-199

Exhibit L to Defendants' Rule 56.1 Statement -
Redacted Email, dated July 6, 2021, with
Attachments
(Sealed. See Sealed Vol. at SSA-215 -
SSA-219) ................................................ SA-220

Exhibit M to Defendants' Rule 56.1 Statement -
Email Chain, dated December 28, 2021
(Sealed. See Sealed Vol. at SSA-220 -
SSA-225) ................................................ SA-225

Exhibit N to Defendants' Rule 56.1 Statement -
Redacted Email Chain, dated January 13, 2022
(See Sealed Vol. at SSA-226 - SSA-228) .............. SA-226

iii

**Page**

Exhibit O to Defendants' Rule 56.1 Statement -
Redacted Excerpts from the Deposition
Testimony of Michael Arpey, dated
January 22, 2024
(See Sealed Vol. at SSA-229 - SSA-237) .............. SA-229

Exhibit P to Defendants' Rule 56.1 Statement -
Agreement Among Daniel G. Lee, Richard
Golaszewski and Stephen Swentzel, dated
February 21, 2022
(Sealed. See Sealed Vol. at SSA-238 -
SSA-242) ................................................ SA-238

Exhibit Q to Defendants' Rule 56.1 Statement -
Redacted Excerpts from the Deposition
Testimony of Paul Knollmeyer, dated
January 4, 2024
(See Sealed Vol. at SSA-243 - SSA-256) .............. SA-239

Exhibit R to Defendants' Rule 56.1 Statement -
Excerpts from the Deposition Testimony of
William Bohnsack, dated February 14, 2024......... SA-253

Exhibit S to Defendants' Rule 56.1 Statement -
Redacted Excerpts from the Deposition
Testimony of Melvin Hibberd, dated
November 6, 2023
(See Sealed Vol. at SSA-257 - SSA-264) .............. SA-261

Exhibit T to Defendants' Rule 56.1 Statement -
Redacted Excerpts from the Deposition
Testimony of Jaime D'Almedia, dated
March 28, 2024
(See Sealed Vol. at SSA-265 - SSA-274) .............. SA-269

iv

**Page**

Exhibit U to Defendants' Rule 56.1 Statement -
  HUNTERPOINT00009501 Doc
  (Sealed. See Sealed Vol. at SSA-275 -
  SSA-452) ............................................................ SA-279

Exhibit V to Defendants' Rule 56.1 Statement -
  HUNTERPOINT00009605 Doc
  (Sealed. See Sealed Vol. at SSA-453 -
  SSA-470) ............................................................ SA-280

Exhibit W to Defendants' Rule 56.1 Statement -
  Letter from Pierre-Antoine de Selancy, to Dan,
  dated April 22, 2022
  (Sealed. See Sealed Vol. at SSA-471 -
  SSA-472) ............................................................ SA-281

Exhibit X to Defendants' Rule 56.1 Statement -
  Email, dated May 2, 2022, with Attachments
  (Sealed. See Sealed Vol. at SSA-473 -
  SSA-492) ............................................................ SA-282

Exhibit Y to Defendants' Rule 56.1 Statement -
  Email, dated May 2, 2022, with Attachments
  (Sealed. See Sealed Vol. at SSA-493 -
  SSA-511) ............................................................ SA-283

Exhibit AA to Defendants' Rule 56.1 Statement -
  Email, dated May 23, 2022
  (Sealed. See Sealed Vol. at SSA-512 -
  SSA-513) ............................................................ SA-284

Exhibit BB to Defendants' Rule 56.1 Statement -
  Email, dated July 8, 2022, with Attachments
  (Sealed. See Sealed Vol. at SSA-514 -
  SSA-551) ............................................................ SA-285

v

**Page**

Exhibit FF to Defendants' Rule 56.1 Statement -
   Email, dated September 27, 2022, with
   Attachments
   (Sealed. See Sealed Vol. at SSA-552 -
   SSA-571) ................................................................ SA-286

Exhibit GG to Defendants' Rule 56.1 Statement -
   Email, dated September 27, 2022, with
   Attachments
   (Sealed. See Sealed Vol. at SSA-572 -
   SSA-591) ................................................................ SA-287

Exhibit HH to Defendants' Rule 56.1 Statement -
   Declaration of Bennett Goodman, dated
   May 23, 2024 ........................................................ SA-288

Exhibit II to Defendants' Rule 56.1 Statement -
   Declaration of Avshalom Kalichstein, dated
   May 23, 2024 ........................................................ SA-291

Exhibit JJ to Defendants' Rule 56.1 Statement -
   Declaration of Michael Arpey, dated
   May 23, 2024 ........................................................ SA-294

SA-1

**EXHIBIT A**

SA-2

HIGHLY CONFIDENTIAL

Page 1

HIGHLY CONFIDENTIAL

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
---------------------------------x

DANIEL LEE,

                 Plaintiff,

        -against-          Civil Action No.
                        3:23-cv-00400

RICHARD GOLASZEWSKI and STEPHEN
SWENTZEL,

                 Defendants.

---------------------------------x

November 28, 2023

Deposition of RICHARD GOLASZEWSKI

Reported by: Joseph Danyo V

SY8233

SA-3

HIGHLY CONFIDENTIAL

Page 2

```
 1

 2                              November 28, 2023
                                10:31 a.m.
 3

 4

 5          Deposition of RICHARD GOLASZEWSKI, taken

 6    by Plaintiff, held at the offices of Brown Rudnick

 7    LLP, 7 Times Square, New York, New York, before

 8    Joseph Danyo V, a Shorthand Reporter and Notary

 9    Public within and for the State of New York.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



SA-4

HIGHLY CONFIDENTIAL

Page 3

```
 1
 2          A P P E A R A N C E S :
 3
 4          BROWN RUDNICK LLP
            Attorneys for Plaintiff
 5               7 Times Square
                 New York, New York 10036
 6
            By:   DYLAN KLETTER, ESQ.
 7                   dkletter@brownrudnick.com
                      -and-
 8
            BROWN RUDNICK LLP
 9               185 Asylum Street
                 Hartford, Connecticut 06103
10
            By:   JESSICA TANG, ESQ.
11                   jtang@brownrudnick.com
12
            YANKWITT LLP
13          Attorneys for Defendants and the Witness
                 140 Grand Street, Suite 705
14               White Plains, New York 10601
15          By:   RUSSELL M. YANKWITT, ESQ.
                  JASON M. SWERGOLD, ESQ.
16                   russell@yankwitt.com
                     jason@yankwitt.com
17
       Also Present:
18
            ANTON EVANGELISTA
19
                      ~oOo~
20
21
22
23
24
25
```

SA-5

HIGHLY CONFIDENTIAL

                                                      Page 31

1                    Golaszewski - Highly Confidential

2        had a meal.

3              Q.   Okay.  Did your kids play?  Did your

4        child play with Mr. Lee's kids?

5              A.   They played around each other.  Kids

6        that age don't really play together as much.

7              Q.   Okay.  Who is Pierre-Antoine

8        de Selancy?

9              A.   He's one of the founders of

10       17Capital.

11             Q.   Okay, and what was your relationship

12       with him?

13             A.   He was one of my bosses.

14             Q.   Okay, and how would you describe your

15       relationship with Pierre?

16             A.   It was professional.

17             Q.   What do you mean by that?

18             A.   So he worked in London.  I worked in

19       the States.  I'd see him before the pandemic a

20       couple of times a year.  Less so after that.  He

21       was on the investment committee.  He ran the

22       firm, so I'd chat to him sometimes a couple of

23       times a week, sometimes a couple of times a

24       month.

25             Q.   Okay.  How about Robert

SA-6

HIGHLY CONFIDENTIAL

Page 62

1              Golaszewski - Highly Confidential

2         A.   To your point here, I am inferring

3    it.

4         Q.   Okay, and you're inferring it with

5    respect to what you said in paragraph 20,

6    correct?

7         A.   Correct.

8         Q.   Okay.  If you go to paragraph 29.

9         A.   Okay.

10        Q.   You say "At an April 9th breakfast,

11   Kalichstein shared a draft document containing

12   high level speculative assumptions about

13   potential earnings in the event Swentzel, Lee and

14   I joined Hunter Point."  Do you see that?

15        A.   I do.

16        Q.   Why do you call them high level

17   speculative assumptions?

18        A.   Because, A, anything in our business

19   that goes out, I believe it went out ten years,

20   is a very long time.  Anything that talks about a

21   new business at a new firm, Hunter Point was

22   founded in 2020, there is really no assurance

23   that anything is going to work.  It had a lot of

24   fundraising assumptions.  It had a lot of

25   assumptions around when you would exit

SA-7

HIGHLY CONFIDENTIAL

Page 63

1              Golaszewski - Highly Confidential

2      investments, so when you have any one of those

3      going out that far that is, A, high level, and B,

4      highly speculative, when you have a

5      multiplicative approach of all those things

6      together, it's even more so.

7              Q.   Did you have any input on the exit

8      assumptions?

9              A.   Stephen and I had answered some

10     questions around investment pace.  Really more

11     about deployment, so when you would deploy the

12     capital.  Assuming it was there, kind of how much

13     could you deploy, which is really a question

14     about market size and market penetration.  And

15     the only things around exits were giving general

16     color around the rough maturity dates or target

17     durations of individual deals.

18             Q.   Okay.

19             A.   Deal types.

20             Q.   You said it was a new business at a

21     new firm, correct?

22             A.   Correct.

23             Q.   But you left 17Capital to join Hunter

24     Point to build the business at Hunter Point,

25     correct?

SA-8

HIGHLY CONFIDENTIAL

Page 71

1                    Golaszewski - Highly Confidential

2           you to tell you that he was fired or a different

3           call?

4                    A.   I think it was a different call.  We

5           spoke to him that Monday, the three of us, to

6           catch up about it more, and I think that was

7           then.

8                    Q.   Okay, and what did you discuss on the

9           April 25th Monday call?

10                   A.   So we said that --

11                   Q.   Well, who called who first?

12                   A.   I don't remember.

13                   Q.   Okay.  Did you and Stephen call Dan

14          or did Dan call and patch -- you guys patched the

15          third in?

16                   A.   Ultimately who was first and second

17          and third, I don't remember, but we had agreed to

18          speak.

19                   Q.   Okay.

20                   A.   So on that call we said that -- he

21          had told us, he had a lot of mean words for

22          17Capital, including he was going to destroy

23          them, and we also talked about our need to really

24          separate paths here.  We were concerned about the

25          non-solicit.  We needed to make sure that if

TransPerfect Legal Solutions
212-400-8845 · Depo@TransPerfect.com

SA-9

HIGHLY CONFIDENTIAL

Page 72

1              Golaszewski - Highly Confidential

2       either of us were going to pursue anything, that

3       it needed to be separate.  And we had asked Dan

4       if he had mentioned to Hunter Point or any other

5       firms about the termination yet.

6              Q.   And what did he say?

7              A.   At that point I don't believe he had

8       yet, but he after that call was going to.  We had

9       to nudge him a bit.

10             Q.   Nudge him to do what?

11             A.   To be open with Hunter Point and HPS

12      and Oak Hill Advisors that he was in fact

13      terminated.

14             Q.   Did you or Stephen discuss Mr. Lee's

15      termination with HPS at all?

16             A.   I did not.  I believe Stephen called

17      Scott Kapnick.

18             Q.   And what did he tell Scott?

19             A.   I wasn't on the call.

20             MR. YANKWITT:  Object to the form of

21             the question.

22             Q.   Did Mr. Swentzel tell you what he

23      told Scott Kapnick?

24             A.   He told me what he was going to tell

25      him was just that FYI, you're going to hear from

SA-10

HIGHLY CONFIDENTIAL

Page 75

1              Golaszewski - Highly Confidential

2       him?

3              A.   It is correct.  We told him that,

4       look, you were terminated, you're terminated for

5       what seems like bad reasons, and we need to

6       really separate things here.

7              Q.   Okay, and just as specifically as you

8       can, can you remember what you discussed about

9       Mr. Lee's attitude and behavior on the April 25th

10      call?

11             A.   I don't remember the exact words, no.

12             Q.   Do you remember generally what you

13      discussed with him regarding his attitude and

14      behavior?

15             A.   I do not.

16             Q.   Okay.  You then go on to say "We

17      would no longer discuss employment opportunities

18      with employers together with Lee."  Do you see

19      that?

20             A.   Yes.

21             Q.   Fair to say that, in your mind at

22      least, you had been discussing employment

23      opportunities with employers with Mr. Lee prior

24      to this point?

25             A.   We were discussing employment

SA-11

HIGHLY CONFIDENTIAL

Page 76

1              Golaszewski - Highly Confidential
2    opportunities.  There was no formal or legal
3    partnership.
4              Q.   Okay, but you acknowledge that you
5    were in discussions with Mr. Lee and Mr. Swentzel
6    with third parties prior to April 25th, correct?
7              A.   We had discussions about employment
8    with third parties.
9              Q.   You go on to say "Swentzel and I
10   further told Lee that we intend to withdraw from
11   the joint representation of Clifford Chance and
12   that we would execute individual engagement
13   letters with Sabin."  Do you see that?
14             A.   Um-hum.
15             Q.   And Sabin is the lawyer at Clifford
16   Chance?
17             A.   Correct.
18             Q.   Okay.  As best as you can recall,
19   what specifically did you tell Mr. Lee on the
20   April 25th call about Clifford Chance?
21             A.   We told him exactly what's here.  We
22   said that we need to separate paths here and make
23   sure everything is clean.  Therefore, it's best
24   to have individual engagement letters with Mr.
25   Sabin, which we then initiated.

SA-12

HIGHLY CONFIDENTIAL

Page 188

```
 1                Golaszewski - Highly Confidential
 2        don't to," although I think he means "do the deal
 3        without making it worth our collective while, so
 4        you're welcome!  Arpey has been odd with me of
 5        late."  Do you see that?
 6             A.   Yes.
 7             Q.   What was your understanding of what
 8        Dan was saying there?
 9             A.   So this text chain is really
10        contemplating who the potential buyers may be and
11        what we've heard or what we think.  Dan says if
12        it's Hunter, he means Hunter Point, or Stone, he
13        means Stone Point.  "They don't do the deal
14        without making it our collective while, so you're
15        welcome."  I think what he meant there or what I
16        recall that he meant there is, I think he's
17        effectively taking credit for having mentioned
18        the 17Capital U.S. team to them, so if one of
19        them made an investment or purchased the firm,
20        the firm being 17Capital, then because of what he
21        said or made them aware of, that the U.S. team
22        was great, we may get greater compensation, kind
23        of saying you're welcome.
24             Q.   Okay, and what did you respond?
25             A.   I responded "Get us paid, Dano."
```

SA-13

HIGHLY CONFIDENTIAL

Page 189

1              Golaszewski - Highly Confidential

2          Q.   And why did you say that?

3          A.   It was a snarky response that says it

4      would be great if we got paid if one of them

5      bought us.

6          Q.   And fair to say that Dan had set up

7      the meeting with Stone Point, correct?

8          A.   He set up the meeting, yes.

9          Q.   Okay, and Dan Lee had the

10     conversation with Hunter Point, correct?

11         A.   Against our will, yes.

12         Q.   Okay.  It doesn't quite feel against

13     your will by November of 2021 though, does it?

14         A.    No.  November of 2021, we had told

15     him there is no Buffalo Point.  We didn't want to

16     do any more meetings.  November of 2021 never

17     changed for me.  I can't speak for Stephen, but I

18     would think so, but it never changed for me that

19     I wasn't keeping my head down, working hard at

20     17Capital, doing deals, helping bring in capital.

21     That was my day job.  That's what I spent a

22     significant amount of my time outside my family

23     doing.

24         Q.   Okay, and after this point you met

25     Avi Kalichstein in Miami in January of 2022,

SA-14

HIGHLY CONFIDENTIAL

Page 193

```
 1              Golaszewski - Highly Confidential
 2      our ability to do the same business going
 3      forward.  I had an idea of who the parties were.
 4      I wasn't that excited about working for any of
 5      them.  Although I had an open mind there too.  I
 6      had a lot of economics at 17Capital.
 7              Q.   Okay, but before you were telling me
 8      that you had told Dan that you didn't want to
 9      explore any opportunities in mid-2021, correct?
10              A.   Correct.
11              Q.   Is it fair to say now by the end of
12      January 2022 you've changed your mind and you're
13      now open to reexploring opportunities with other
14      potential partners?
15              A.   I was --
16              MR. YANKWITT:  Object to the form of
17              the question.
18              A.   Yes.  I was more open to it.
19              Q.   Okay.  I hand you Exhibit 36.
20              (Plaintiff's Exhibit 36, Texts, was
21              so marked for identification, as of this
22              date.)
23              A.   Okay.
24              Q.   So this Exhibit 36 is a text chain
25      among you, Stephen and Dan, correct?
```

SA-15

HIGHLY CONFIDENTIAL

Page 269

1                    Golaszewski - Highly Confidential

2          A.   Avi was in sales mode, as normal,

3     ultimately concluded by giving us a physical

4     piece of paper that was kind of a form of or

5     draft term sheet for how the business could look,

6     and it had some outputs of whatever model that

7     they were running internally at Hunter Point.

8     That took into account some of our inputs and a

9     number of their inputs and kind of was more of a

10    marketing tool to spit out and say, very much

11    again in sales mode, saying this is what, you

12    know, if you did this, this is what the output of

13    that would be.

14         Q.   And in other words, if you raised

15    this amount of money and deployed this amount of

16    capital, this is how much money the three of you

17    will make.

18         A.   Yes.  Based on their form of term

19    sheet, this is what the business would be worth.

20    This is what the carry would be worth if every

21    single assumption hit.

22         Q.   Okay.

23         A.   Which is -- there are numerous of

24    them.

25         Q.   Okay.  Anything else discussed at

SA-16

HIGHLY CONFIDENTIAL

Page 286

1                Golaszewski - Highly Confidential

2          meaning they were using it to convince us.  We

3          knew, given our experience, that there's a ton of

4          variables here, and their job was to present

5          something that looked really good and really

6          enticing, and our job was to look at it and, you

7          know, you never had to arrive on something you

8          ultimately agreed with.  You had to be able to --

9          you know, I viewed my job there for myself as

10         looking at it and saying is this at all

11         interesting.

12               Q.   Rich, I just want to know if you took

13         any issue as you can recall with any of the

14         inputs that Hunter Point was using in the model.

15               MR. YANKWITT:  Object to the form of

16               the question.

17               A.   I thought a lot of --

18               Q.   Let me ask you a different question

19         because I want to make sure I get a good answer.

SA-17

HIGHLY CONFIDENTIAL

Page 287

1                    Golaszewski - Highly Confidential



20                    Q.    Back to my question, in the time

21          between the breakfast on April 9th and the time

22          you received a term sheet from Hunter Point,

23          which is around the beginning of May, did you

24          have any discussions with anyone at Hunter Point

25          that you believed any of their inputs in the

SA-18

HIGHLY CONFIDENTIAL

Page 305

1              Golaszewski - Highly Confidential

2       with the three of us, as we had been doing it

3       before?

4              A.   We didn't because we were each

5       talking about employment.  There was never a

6       partnership.  There was never -- we had said time

7       and time again to one another that like I don't

8       have to do this.  Stephen doesn't have to do

9       this.  Stephen said it as well, I remember, you

10      know, we don't all need to do any of these

11      opportunities.

12              One of us may decide that we don't

13      want to take the risk from a family perspective.

14      Even if 17Capital is not the optimal place, it's

15      a tough stage in life to take a risk like that.

16      We ultimately decided it was worth it, but it

17      wasn't an easy decision.

18              Q.   So back to my question, when Avi and

19      Bennett suggested about moving ahead with the two

20      of you but not Dan Lee at the time, did you tell

21      them no, we'd like to include Dan Lee as a part

22      of this, as we had been doing before?

23              A.   We did not explicitly.  It was after

24      he was fired, and we understood that they were

25      talking to him from a fundraising perspective

SA-19

HIGHLY CONFIDENTIAL

Page 309

1                  Golaszewski - Highly Confidential

2                  Q.   Do you know whether you've provided

3          that to your counsel?

4                  A.   I may have, I don't remember.  I

5          provided a lot of documents.

6                  Q.   Okay.

7                  MR. KLETTER:  We'll make a note on

8                  the record to follow up for the HPS offer

9                  that they received in the past.

10                 MR. YANKWITT:  Please put all

11                 requests in writing, and we will take them

12                 under advisement.

13                 Q.   Any other short-term visible

14         lucrative offers that you're referring to here

15         other than HPS?

16                 A.   Oak Hill Advisors verbally made us an

17         offer, but it wasn't that interesting.

18                 Q.   Okay, and who made that offer?

19                 A.   Bill Bohnsack.

20                 Q.   And when did he make, like how did he

21         make that offer?  I'm sorry.

22                 A.   Over the phone to me.

23                 Q.   To you individually or were you on

24         the phone with anyone else?

25                 A.   I believe it was to me individually.

SA-20

HIGHLY CONFIDENTIAL



Page 317

1                    Golaszewski - Highly Confidential

12                       MR. YANKWITT:  Object to the form of
13            the question.

SA-21

HIGHLY CONFIDENTIAL

Page 318

1                    Golaszewski - Highly Confidential

3              Q.    Explain what you mean by that.

4              A.    So in terms of, you know, it's easy

5         to write on a term sheet you'll have X percent of

6         carry and Y percent of NFRE, and if NFRE

7         increases, maybe you'll have a little bit more

8         than Y.  All those different terms you can list

9         in a term sheet, but ultimately they need to go

10        into an agreement, and we need to review that

11        agreement, understand how it works and make sure

12        that we as individuals aren't being treated the

13        wrong way and that we're protected so that other

14        things that are in here around, they can't kick

15        us out and things like that.  You know, trying to

16        protect our interests.

24                   MR. YANKWITT:  Sure.

**SA-22**

HIGHLY CONFIDENTIAL

Page 319

```
1              Golaszewski - Highly Confidential

3              MR. YANKWITT:  We're going to go
4       through the entire transcript, but yes.
5              THE WITNESS:  Okay.
6              MR. YANKWITT:  We're going to mark
7       things highly confidential, but good to
8       know that this is highly confidential.
9              THE WITNESS:  Yes.

16             You need to review the agreements,
17      and my point being that it's different than, you
18      know, when I was at Barclays and I joined Nomura,
19      I executed -- I read and executed their standard
20      agreement because I was a sales and trading
21      associate.  A, you don't have any ability to
22      negotiate, and B, it's pretty straightforward
23      what you're signing up to.
```

HIGHLY CONFIDENTIAL

Page 320

1                    Golaszewski - Highly Confidential



SA-24

HIGHLY CONFIDENTIAL

Page 333

1                    Golaszewski - Highly Confidential



14              MR. YANKWITT:  Object to the form of
15              the question.

SA-25

**EXHIBIT B**

Page 1

```
 1

 2      UNITED STATES DISTRICT COURT
        DISTRICT OF CONNECTICUT
 3      ---------------------------------x

 4      DANIEL LEE,

 5                          Plaintiff,

 6              -against-              Civil Action No.
                                      3:23-cv-00400
 7      RICHARD GOLASZEWSKI and STEPHEN
        SWENTZEL,
 8
                          Defendants.
 9      ---------------------------------x

10

11

12

13              November 30, 2023

14        Deposition of STEPHEN SWENTZEL

15

16

17

18      Reported by: Joseph Danyo V

19      SY8279

20

21

22

23

24

25
```

Page 2

```
 1

 2                                November 30, 2023
                                  10:04 a.m.
 3

 4

 5          Deposition of STEPHEN SWENTZEL, taken by

 6   Plaintiff, held at the offices of Brown Rudnick

 7   LLP, 7 Times Square, New York, New York, before

 8   Joseph Danyo V, a Shorthand Reporter and Notary

 9   Public within and for the State of New York.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SA-28

Page 3

1

2    A P P E A R A N C E S :

3

4        BROWN RUDNICK LLP
          Attorneys for Plaintiff
5            7 Times Square
          New York, New York 10036
6
          By:   DYLAN KLETTER, ESQ.
7

8
          YANKWITT LLP
9         Attorneys for Defendants and the Witness
             140 Grand Street, Suite 705
10           White Plains, New York 10601

11        By:   RUSSELL M. YANKWITT, ESQ.
                JASON M. SWERGOLD, ESQ.
12

13

14   Also Present:

15        ANTON EVANGELISTA, Videographer

16                    ~oOo~

17

18

19

20

21

22

23

24

25

SA-29

Page 113

1                          Swentzel

2    text Dan Lee says "Hire for BPC office buildout."

3    Do you see that?

4           A.   I do.

5           Q.   What does BPC stand for?

6           A.   I have no idea.

7           Q.   Does it stand for Buffalo Point

8    Capital?

9           A.   I was actually going to -- if I was

10   guessing, I would have thought Battery Park City

11   because that's where I live, but I have no idea.

12          Q.   Okay.  After your -- the day after

13   your dinner at The Brook, do you know why Dan is

14   talking about building an office for Buffalo

15   Point Capital?

16          A.   I have no idea.  I just know that he

17   sent us something from Baird Architects, who was

18   a guy that we met at The Brook.

19          Q.   And do you have any recollection as

20   you sit here today about talking with Dan about

21   building out an office for Buffalo Point?

22          A.   I have no recollection because we

23   never discussed building out an office for

24   Buffalo Point.

25          Q.   Okay.  When you got this text from

SA-30

Page 138

Swentzel

1
2    two months later, give or take, Dan said, guys,
3    I'm going to -- Bennett Goodman and Avi want to
4    speak on like I set up a meeting, and we said
5    absolutely no, we told you don't use our names.
6    Don't talk about us.  Like absolutely no.  So we
7    canceled the meeting at that time.  That was
8    how -- I mean I was aware of Hunter Point as a
9    firm because they kind of came with a big splashy
10   launch.
11           When they launched the firm, I
12   remember towards the tail end of 2020 they did
13   something like a webinar or something like that,
14   like a big announcement, and it was kind of big
15   news because the individuals were well known, and
16   I had met Bennett Goodman earlier in career and
17   was well aware of him and, but the first time
18   that I was kind of connected was then, but then
19   never met with them in any capacity until early
20   2022.
21           Q.   Okay, so what happened in early 2022?
22           A.   So 17Capital -- at that point I was
23   aware that 17Capital was in a sales process.
24   Probably going back to about sometime around
25   mid-2021, but I didn't know what that was.  I

Page 144

1                        Swentzel

2              MR. YANKWITT:  Object to the form of

3         the question.

4         A.   No, so at this point I -- well, it's

5    hard for me to -- I think I know Rich's view from

6    how he felt at this point, but I won't speak for

7    him.  I still hadn't made my mind up that I was

8    going to leave 17Capital, and I maintained on any

9    time that the three of us spoke about a

10   conversation with Hunter Point that like minds

11   were not made up to do anything.

12              We weren't doing this as a team,

13   we're doing this as individuals, that, you know,

14   one of us may decide to leave, the other two

15   might stay, so that we were individuals pursuing

16   this, and everyone was going to do what was right

17   for them, their family, their risk tolerances.

18   So we always went into it approaching it as

19   individuals, not as a team.

20        Q.   Okay, so you did not consider that

21   you, Dan and Rich were a team when speaking with

22   Hunter Point, fair?

23        A.   No.  That's fair.

24              MR. YANKWITT:  Object to the form of

25         the question.

Page 145

                              Swentzel

1

2              THE WITNESS:  Sorry.

3         Q.   Did you consider -- let's just, let

4    me just get that out so we have the right

5    terminology.  So you did not consider you, Dan

6    and Rich were a team when speaking with Hunter

7    Point, fair?

8              MR. YANKWITT:  Object to the form of

9         the question.

10             You can answer.

11        A.   I did not consider us to be a team.

12        Q.   Okay.  Did you consider that you,

13   Rich and Dan were partners when speaking with

14   Hunter Point?

15             MR. YANKWITT:  Object to the form of

16        the question.

17        A.   No.

18        Q.   Okay.

19        A.   We were certainly not partners.

20        Q.   After the Zoom with Bennett and Avi,

21   what was the next meeting that you had with

22   Hunter Point?

23        A.   The next that I recall -- and I --

24   the next that I recall was a meeting that we had

25   with Avi over Zoom.  I don't know the specifics

SA-33

Page 169

1                        Swentzel

2     partnership agreements, and we didn't hire

3     Michael Sabin to draft us limited partnership

4     agreements.  We never ever discussed with Michael

5     Sabin any sort of partnership, so when I read

6     lower case P partners, it's not something I -- if

7     it was capitalized, it's probably something that

8     would have rang more bells for me, but lower case

9     P partners is something I read as he could have

10    said individuals.  As representative of the

11    individuals would have had the same meaning.  Of

12    the group, it would have had the same meaning.

13    Pick anything.  It's not saying I don't think, I

14    still don't read this as anything more.

15          Q.   Did you have the opportunity to

16    review drafts of this engagement letter before

17    you signed it?

18          A.   I don't know.

19          Q.   Did --

20          A.   I reviewed the document before I

21    signed it, but I don't know what you mean by

22    drafts, I guess.

23          Q.   Like did you get a -- before you

24    signed it did you receive a copy of the

25    engagement letter?

Page 231

1                              Swentzel

2      for Dan Lee and same thing, the caveat to all of

3      this is, if I'm not mistaken and I'm just looking

4      at this now, but I think this all is assuming,

5      this is all of the NFRE, so what they deemed

6      Candle management here, this would not just be

7      for any one, two, three, four individuals.  This

8      is what essentially would be required to

9      compensate all of the team and future team as

10     well, so if I read this correctly, and I'm

11     reading this on the fly.

12                 MR. YANKWITT:  Take your time for you

13         to read it.

14         A.  Yes, so I think when I'm looking at

15     this, what's here is, I mean it's sloppy

16     labeling, I think is what it is, but Candle

17     management share of carry, what that is referring

18     to is the 50 percent of carry, and the way to

19     think about that is it's a split between the

20     house, being Hunter Point, and the team, which

21     would be the investment team dedicated to GPFS,

22     plus allocating beyond that, so someone like a

23     Melvin Hibberd would in all likelihood have a

24     carry -- carried interest allocation in these

25     funds.

SA-35

Page 232

1                          Swentzel

2                The VPs who were working across the

3    entire firm would have allocations of carried

4    interest inside of these funds.  So again, I put

5    very little stock in this.  Partially because it

6    was amongst all the other assumptions that are in

7    here.  It was probably haphazard the way it was

8    put together and presented, and the share of

9    NFRE, yes, I think that was what they effectively

10   were trying to use to entice Rich and I to join.

11          Q.   You agree with me that Candle

12   management is a capitalized term, correct?

13          A.   Yes.

14          Q.   And we already discussed in footnote

15   one that Candle management, capital C, capital M,

16   refers to the three existing management team

17   members, which you've testified are you, Rich and

18   Dan, correct?

19               MR. YANKWITT:  Objection.

20          A.   I don't know who Hunter Point

21   envisioned with that.  Again, I didn't write this

22   myself.  I didn't draft this.  I've had no input

23   on this, so.

24          Q.   Well, what other three people were

25   part of Project Candle at that time --

SA-36

Page 255

1                        Swentzel

2    of 17Capital?

3         A.    No.   The only thing I was aware of

4    was the performance review and bonus stuff that

5    he had spoken about from earlier in the year.   I

6    don't know the timing of those.

7         Q.    You were mentioning before a concern

8    about non-solicits.   Do you recall that?

9         A.    Yes.

10         Q.    And if I'm following correctly, once

11    Dan was no longer at 17Capital, there was a

12    concern over a legal risk that him having

13    conversations with you and Rich could violate his

14    non-solicit, correct?

15         A.    His being Dan's?

16         Q.    Yes.

17         A.    Yes.

18         Q.    Okay, and that could potentially get

19    all three of you in trouble.   Was that the

20    concern?

21              MR. YANKWITT:   Object to the form of

22         the question.

23         A.    I'm certainly not a lawyer or legal

24    expert, but what I wanted personally to avoid was

25    anything that would have made a potential

Page 288

1                              Swentzel



Page 289

1                          Swentzel



SA-39

Page 290

1                          Swentzel

2          Q.    Did you believe that in addition to

3    being hired as an employee, you were being hired

4    to form a new business?

Page 297

1                            Swentzel

2    

3              MR. YANKWITT:   Object to the form of

4         the question.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21              MR. YANKWITT:   Object to the form of

22         the question.

23

24

25

SA-41

Page 298

```
 1                        Swentzel
 2
 3
 4
 5
 6
 7
 8
 9            MR. YANKWITT:  Objection.
10            You can answer.
11
12
13
14
15
16
17            MR. KLETTER:  Anton, let's just go
18       off the record for a minute.
19            THE VIDEOGRAPHER:  Sure.
20            We are now off the record.  The time
21       on the video monitor is 5:52 p.m.
22       (Recess taken)
23            THE VIDEOGRAPHER:  We are now back on
24       the record.  The time on the video monitor
25       is 5:59 p.m.
```

**EXHIBIT C**

SA-43



1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
- - - - - - - - - - - - - - - - - - - -X
DANIEL LEE,
                              Plaintiff,

        -against-              Case No.:
                               3:23-cv-00400-OAW

RICHARD GOLASZEWSKI and
STEPHEN SWENTZEL,

                              Defendants.
- - - - - - - - - - - - - - - - - - - -X
                              November 2, 2023
                              10:00 a.m.


VIDEOTAPED DEPOSITION of DANIEL LEE, the Plaintiff herein,

taken pursuant to Court Order, and held at the offices

of Yankwitt, LLP, 140 Grand Street, Suite 705, White

Plains, New York 10601, before Angela Marcuccilli, a

Court Reporter and Notary Public of the State of New

York.



800.DAL.8779
dalcoreporting.com

2

```
1   A P P E A R A N C E S :

2

3       BROWN RUDNICK, LLP
             Attorneys for Plaintiff
4            185 Asylum Street
             Hartford, Connecticut 06103
5       BY:  DYLAN P. KLETTER, ESQ.

6


7

8       YANKWITT, LLP
             Attorneys for Defendants
             140 Grand Street, Suite 705
9            White Plains, New York 10601
        BY:  MICHAEL H. REED, ESQ.
10           JASON SWERGOLD, ESQ.
             RUSSELL YANKWITT, ESQ.
11           COREY BRISKIN, ESQ.

12

13

14

15

16      ALSO PRESENT:
             LANCE RIECK, VIDEOGRAPHER
17

18

19

20

21

22

23

24
```



SA-45

**DANIEL LEE**                                          3

1      IT IS HEREBY STIPULATED AND AGREED by and

2  between the attorneys for the respective parties

3  herein, that filing and sealing be and the same are

4  hereby waived.

5      IT IS FURTHER STIPULATED AND AGREED that all

6  objections, except as to the form of the question,

7  shall be reserved to the time of the trial.

8      IT IS FURTHER STIPULATED AND AGREED that the

9  within deposition may be signed and sworn to before

10  any officer authorized to administer an oath, with

11  the same force and effect as if signed and sworn to

12  before the Court.

13

14

15

16

17

18

19

20

21

22

23

24



**DANIEL LEE**                                                    8

```
1        Q.   What was the date on which you believe the
2   partnership was formed?
3        A.   Hard to recall a specific date given the
4   volume of our conversations, but you could lead up
5   to our dinner in April of 2021.
6        Q.   When was that dinner in April as best you
7   remember?
8        A.   Don't recall the exact date, but it was
9   early April.
10       Q.   Where was the dinner?
11       A.   The dinner was at a place in Manhattan
12   called "The Brook."
13       Q.   Is it your testimony that at the time of
14   this dinner at The Brook, the partnership had be
15   formed; correct?
16       A.   At the time of that dinner, correct, the
17   partnership had been formed.
18       Q.   Do you believe that the partnership had
19   been formed earlier or at the time of that dinner?
20       A.   Our discussions, multiple discussions,
21   leading up to that dinner, which was equally to prep
22   for our first substantive meeting with a
23   third-party.  We had discussed our shared vision for
24   being our own bosses, our shared vision for
```



```
 1   ownership of a new venture, our shared vision for
 2   equal partnership in the new business.
 3
 4               (The requested testimony was read back.)
 5
 6        Q.    Do you believe you formed the partnership
 7   earlier than the dinner or before?
 8        A.    Earlier.
 9        Q.    Okay.  When before the dinner do you
10   believe you formed the partnership?
11        A.    I can't recall.
12        Q.    Was it in April?  Was it in March?  Was it
13   a different time?
14        A.    I'd be speculating.
15        Q.    So just so I understand.  My question is,
16   when did the partnership form, and your answer is
17   you'd be speculating about a date; correct?
18        A.    I can't recall a date.
19        Q.    So the answer to my question is yes?
20             MR. KLETTER:  Objection to form.
21        A.    The answer is I can't recall a date.
22        Q.    Is there anything that you could use to
23   refresh your recollection as to when this
24   partnership was formed?
```



800.DAL.8779
dalcoreporting.com
DALCO

DANIEL LEE                                          10

```
 1       A.   Not that I can think of.
 2       Q.   Who was the Buffalo -- strike that.
 3            Who was Buffalo Point between?
 4       A.   Myself, Rich Golaszewski, and Stephen
 5  Swentzel.
 6       Q.   What led you to believe that a partnership
 7  between the three of you was formed?
 8       A.   Multiple discussions, agreement around our
 9  shared vision for ownership, again, being our own
10  bosses, being equal partners, and sharing in the
11  profits of a new venture, and sharing the losses of
12  a new venture.
13       Q.   How would you share in the profits, the
14  three of you?
15       A.   By sharing in the money we made via
16  growing a large and leading GP solutions platform.
17       Q.   What I mean is numerically.  Is it your
18  testimony that it was agreed to be an equal share
19  between the three of you or something else?
20       A.   It is my testimony that we agreed to share
21  equally in our profits and losses.
22       Q.   So it's your testimony that you and
23  Mr. Golaszewski and Mr. Swentzel agreed that each of
24  the three of you would get a third of the profits at
```



**DANIEL LEE**                                                 11

1    Buffalo Point; correct?

2         A.    Correct.

3         Q.    And it's your testimony that you and

4    Mr. Golaszewski and Mr. Swentzel agreed that each of

5    the three of you would share a third, a third, a

6    third in the losses of Buffalo Point; correct?

7         A.    Correct.

8         Q.    Did you have a partnership agreement?

9         A.    We had an oral partnership agreement.

10        Q.    Did you have a written partnership

11   agreement?

12        A.    We did not.

13        Q.    Did you have any agreement in any way with

14   Mr. Golaszewski and Swentzel that was memorialized

15   in writing?

16        A.    I can't recall.

17        Q.    Did you document the terms of the oral

18   partnership anywhere?

19        A.    Our multiple conversation seemed

20   sufficient.

21        Q.    Did you document the terms of the oral

22   agreement that you just referenced in writing?

23        A.    I --

24        Q.    Let me ask a different way.  Did you



SA-50

**DANIEL LEE**                                              12

1    document in writing the terms of the oral agreement

2    you just referred to?

3          A.    I did not.

4          Q.    Do you know if the oral agreement you just

5    referred to was documented in writing anywhere or by

6    anyone?

7          A.    I do not know.

8          Q.    What date did the partnership that you're

9    alleging existed, what date did that end?

10              MR. KLETTER:   Objection to form.

11         A.    The day they called me to tell me they had

12   ousted me from our discussions with their ultimate

13   partner.

14         Q.    What date was that?

15         A.    That was May 25th, the best I can recall,

16   of 2022.

17         Q.    Are you referring to a single conversation

18   on May 25th, 2022, or multiple conversations?

19         A.    Single.

20         Q.    By phone?

21         A.    By phone.

22         Q.    Who were the participants?

23         A.    Stephen Swentzel, Rich Golaszewski jointly

24   calling me.



SA-51

**DANIEL LEE** 15

1     A.    I did not.

2     Q.    Did you write down what happened on that

3  call at any point?

4     A.    I did not.

5     Q.    Are there any written records, to your

6  knowledge, to reflect what was said on the call?

7     A.    Not to my knowledge.

8     Q.    Mr. Lee, did the business that you contend

9  was the Buffalo Point partnership have a bank

10  account?

11     A.    It did not.

12     Q.    Did it have an office?

13     A.    It did not.

14     Q.    Did it have a website?

15     A.    It did not.

16     Q.    Did it have an email address?

17     A.    It did not.

18     Q.    Did the business you contend was Buffalo

19  Point have an accountant?

20     A.    It did not.

21     Q.    Did it have books and records?

22     A.    It did not.

23     Q.    Did it have a lawyer?

24     A.    It did.



SA-52

**DANIEL LEE**                                                    16

1        Q.    Who is that?

2        A.    Michael Sabin.

3        Q.    Did Buffalo Point have any stationery,

4    paper stationery?

5        A.    It did not.

6        Q.    Did it have a logo?

7        A.    No.

8        Q.    Did it have a line of credit?

9        A.    No.

10       Q.    Did it have any debt?

11       A.    No.

12       Q.    Did Buffalo Point have a telephone number?

13       A.    Nope.

14       Q.    Did it have a payroll company?

15       A.    It did not.

16       Q.    Did it have a chief financial officer?

17       A.    It did not.

18       Q.    Did it have a human resources director?

19       A.    It did not.

20       Q.    Did Buffalo Point have any employees?

21       A.    I did not.

22       Q.    Did -- you already testified that there

23   was no written partnership agreement; correct?

24       A.    Correct.



SA-53

DANIEL LEE                                17

1      Q.    Did Buffalo Point have any written

2   agreement between what you call the partners?

3      A.    We did not.

4      Q.    So there's no LLC agreement.  There was no

5   agreement of any kind written between the people you

6   contend were the partners; correct?

7      A.    Correct.

8      Q.    Did Buffalo Point have any contracts with

9   any people or businesses?

10     A.    There was an engagement letter with a

11  lawyer.

12     Q.    Other than that engagement letter, just

13  put that aside for the moment, did Buffalo Point

14  have any contracts with people or businesses?

15     A.    It did not.

16     Q.    Did Buffalo Point own any property?

17     A.    It did not.

18     Q.    Did it have an agent for service of

19  process?

20     A.    No.

21     Q.    Did Buffalo Point have any assets?

22     A.    Intellectual property.

23     Q.    What intellectual property asset did

24  Buffalo Point have?



**DANIEL LEE**                                    18

1      A.   Our collective knowledge and experience in

2   the market that we were seeking to build a business

3   in that made us attractive partners.

4      Q.   And so what you're referring to as

5   intellectual property is essentially the experience

6   of you and Mr. Swentzel and Mr. Golaszewski.   Am I

7   getting that right?

8      A.   Yes.

9      Q.   Did Buffalo Point have any other

10  intellectual property?

11     A.   Not that I can recall at this time.

12     Q.   Did Buffalo Point have any other assets?

13     A.   No.

14     Q.   Just to clarify, you said that the

15  intellectual property made you attractive partners.

16  And by that, you meant attractive to investors or

17  other businesses; correct?

18     A.   Both.

19     Q.   Okay.  Did Buffalo Point have any

20  liabilities?

21     A.   Yes.

22     Q.   What were Buffalo Point's liabilities?

23     A.   Accruing expenses.

24     Q.   What expenses did Buffalo Point accrue?



SA-55

**DANIEL LEE**                                                22

```
 1    Was there ever a discussion about that?
 2            MR. KLETTER:  Objection to form.
 3        A.   One of the -- can you restate the
 4    question, please.
 5        Q.   Was there ever a discussion either orally
 6    or in writing among the three of you that Buffalo
 7    Point, the business you're alleging existed, would
 8    reimburse the individuals for Clifford Chance's
 9    fees?
10        A.   Not in that form.
11        Q.   So is the answer to my question no?
12            MR. KLETTER:  Objection to form.
13        A.   Could you restate that question?
14            MR. REED:  Sure.  Madame Reporter, just
15        read it back to us, please.
16
17            (The requested testimony was read back.)
18
19        A.   No.
20        Q.   Mr. Lee, did Buffalo Point have a federal
21    tax ID number?
22        A.   It did not.
23        Q.   Did it have a state tax ID number?
24        A.   Did not.
```



SA-56

**DANIEL LEE**                                      23

1        Q.    Did Buffalo Point ever file a tax return?

2        A.    It did not.

3        Q.    Did it have an employee handbook?

4        A.    It did not.

5        Q.    Was Buffalo Point registered as a business

6   with the state of New York?

7        A.    It was not.

8        Q.    Was Buffalo Point registered as a business

9   in any state?

10       A.    It was not.

11       Q.    Was Buffalo Point registered with SEC?

12       A.    No.

13       Q.    Were any steps taken to prepare Buffalo

14  Point to be registered with SEC?

15       A.    No.

16       Q.    Did Buffalo Point prepare a form ADV?

17       A.    It did not.

18       Q.    And therefore Buffalo Point did not file a

19  form ADV; correct?

20       A.    Correct.

21       Q.    So it's your testimony that all that

22  Buffalo Point had was what you referred to as

23  intellectual property asset, which was knowledge and

24  experience of you, Mr. Golaszewski, and



SA-57

**DANIEL LEE**                                    62

```
1   other than your current business?
2        A.   No.
3        Q.   And we should just say, where are you
4   working right now?
5        A.   Oak Hill Advisors.
6        Q.   When were you hired to work at Oak Hill
7   Advisors?
8        A.   October of 2022.
9        Q.   What role were you hired for at Oak Hill?
10       A.   Managing director.
11       Q.   What do you do as managing director at Oak
12  Hill?
13       A.   My job is to start a GP solutions
14  financing business for our firm.
15       Q.   What is encompassed in that role?  What do
16  you have to do to start a GP financing solutions
17  business?
18       A.   You have to have an underwriting view.
19  You have to source transaction opportunities that
20  fit that underwriting view, and you have to fit that
21  to capital and make investments.
22       Q.   Has this GP -- is there a name for this
23  particular GP finance business within Oak Hill?
24       A.   We call it GP Solutions.
```



**DANIEL LEE**                                    94

1    I was certainly attracted to the prospects of

2    partnership with him, yes.

3         Q.    Why?

4         A.    Because he was a credible professional,

5    who was getting experience in an emerging market.

6         Q.    Emerging market being, just for the

7    record?

8         A.    Being GP Solutions, NAV lending, and

9    preferred equity transactions.

10        Q.    How would you define the term "emerging

11   market"?

12        A.    In this case, I would describe it as an

13   emerging sub-assets class within the private

14   markets.

15        Q.    What do you mean by "emerging"?

16        A.    New, gaining favor.

17        Q.    Was Mr. Swentzel viewed as a leader in the

18   NAV loan space?

19        A.    I can't say.

20        Q.    What other people in the industry had

21   Mr. Golaszewski and Mr. Swentzel's experience with

22   NAV loans, if you know?

23             MR. KLETTER:  Objection to form.

24        A.    I can't say.



SA-59

**DANIEL LEE**                                        109

1  time you remember communicating with either

2  Mr. Golaszewski or Swentzel about Buffalo Point?

3      A.   Yes.

4      Q.   Well, then, at least one of them would

5  not -- strike that.

6          It was -- strike that.

7          You say the "Buffalo Point team brings

8  expertise."  What is the expertise you're referring

9  to?

10     A.   We sort of mentioned around it a few times

11  here.  This investment strategy is new.  It's one of

12  the things that made it so exciting and so

13  interesting.  And so each of us had expertise that

14  few others did in the market.  There were a few

15  people that were talking to the institutional

16  investor community about these products and

17  strategies.  I was one of the few, and there were a

18  few people who were sourcing and educating the GP

19  market or the counter-party market on these

20  solutions.  And Stephen Swentzel and Rich

21  Golaszewski were two of the few.  So the expertise

22  was in the early days of an emerging exciting

23  investment opportunity.

24     Q.   By emerging and exciting, it was, to a



SA-60

**DANIEL LEE**                                      134

1    transactions.

2        Q.    You wouldn't be executing transactions at

3    Buffalo Point; correct?

4        A.    That was not envisioned.

5        Q.    When you said that you'd be sourcing

6    potential partners -- when you said you conceived of

7    the idea, which I asked you a couple of questions

8    ago, what you mean is the idea for a new business.

9    But the new business was just going to be doing what

10   you had been doing at 17Capital; correct?

11       A.    The new business was going to be

12   thematically similar, although was going to be under

13   our control as partners and owners.

14       Q.    Under your conception of your idea, what

15   was going to be different -- what about Buffalo

16   Point was different from 17Capital?  Start there.

17       A.    Initially, we were going to own it, and we

18   were going to control it.

19       Q.    I understand the ownership is different.

20   And how did you envision that your control of your

21   own business would result in differences from the

22   business that was then 17Capital, if any?

23       A.    I can't recall specifically, but we

24   certainly -- I couldn't imagine that we would have



SA-61

**DANIEL LEE**                                                        153

1    colloquial use of the word.  What I'm asking is, is

2    there any writing that you can point to where there

3    was an agreement to form a legal partnership between

4    the three of you?

5             MR. KLETTER:  Objection to form.

6        A.   Emails talking about our partnership,

7    talking about us as partners, talking, pitching.

8        Q.   Can you identify any particular email that

9    you're referring to?

10       A.   Not at this time.

11       Q.   Is there any document that says you're

12   going to be equal partners, that you're going to

13   share in the profits and losses?

14       A.   Not to my knowledge.

15       Q.   How important was this Buffalo Point

16   business to you?

17       A.   Extremely.

18       Q.   Why is that?

19       A.   I went into the working world, aspiring to

20   build something, lead something, be my own boss.

21   All of the mentors that I've had in my career have

22   been people who've done that.  And I've been looking

23   my entire career for that opportunity, the right

24   partners, at the right time, and the right market



1  through 2625.  What is this?

2      A.    This is an email that I'm sending to

3  another mentor of mine named John Barber, where I'm

4  sending him the Buffalo Point draft memo.  And I am

5  asking him if he has any interest in meeting us.

6      Q.    Did you ever tell George Cochran that you

7  were forming a legal partnership, but you hadn't put

8  it in writing?

9      A.    I did not.

10     Q.    Did you ever tell that to John Barber?

11     A.    I did not.

12     Q.    Did you ever tell it to anybody?

13     A.    I did not.  Not that I can recall.

14     Q.    On March 2nd, 2021, do you know at this

15 point, Mr. Golaszewski and Mr. Swentzel knew about

16 Buffalo Point?

17     A.    I can't recall with date specifics, but we

18 had discussed John Barber, and they -- yeah.

19     Q.    Did they know you were sending this to

20 John Barber?

21     A.    Without reference to the exact date

22 sequence, I believe.

23     Q.    Is your answer yes or I don't know or no?

24     A.    The answer is I cannot recall.



**SA-63**

**DANIEL LEE**                                    177

1      Q.    After this meeting with John Barber, did

2   Mr. Golaszewski and Mr. Swentzel tell you that they

3   had decided to stay at 17Capital?

4      A.    Yes, for the time.

5      Q.    They said that the meeting reaffirmed

6   their decision to stay; right?

7      A.    No.

8      Q.    After the meetings with Stone Point --

9   strike that.

10         After the meeting with Mr. Barber, did

11   Mr. Golaszewski and Mr. Swentzel tell you to stop

12   setting up meetings with them?

13      A.    We all agreed that if neither of those two

14   opportunities were going to be successful, that we

15   were going to wait a little bit.

16      Q.    So it's your view that at this point, the

17   partnership was on pause?

18      A.    I wouldn't say that.  It was my view that

19   the partnership was very much alive, but that we

20   were going to pick our spot.

21      Q.    Didn't they tell you to stop using their

22   names in any conversations you were going to have

23   about any kind of new business or job?

24      A.    And I did.



DANIEL LEE                                      185

```
 1   whether you had asked them if it was okay for you to
 2   send this document to Mike Arpey?
 3           MR. KLETTER:  Objection to form.
 4       A.   Not sure --
 5       Q.   Is it the testimony -- is it your
 6   testimony that you did not ask them if you could
 7   send this to Mike Arpey?  Is that the testimony?
 8           MR. KLETTER:  Objection to form.
 9       A.   I'm not sure I need their permission.
10       Q.   I'm not asking if you needed it.  I'm just
11   asking, did you?
12       A.   I did not ask them.
13       Q.   You also attach your resume; right?
14       A.   Yes.
15       Q.   You were doing -- strike that.
16           You were sending -- it's your position
17   that you were sending this memo to Mike Arpey on
18   behalf of Buffalo Point; right?
19       A.   Yes.
20       Q.   Why didn't you send the resume of Rich and
21   Steve?
22       A.   Mike asked for my resume.  And he did not
23   know who Mike and Steve were.
24       Q.   Did you ever tell --
```



**DANIEL LEE**                                          186

1        A.    Excuse me.  Who Steve and Rich were.

2        Q.    Did you ever -- did you tell Mike Arpey at

3    this time, I can't be sending you my resume by

4    myself.  I've got these partners; they need to be

5    included?  Did you ever say that to him in sum and

6    substance?

7        A.    Mike was asking for my resume for a

8    different purpose.

9        Q.    And what purpose was that?

10       A.    He wanted to refer me to a job and

11   introduce me to some person.

12       Q.    Did you say to him, I can't be doing that;

13   I've got these partners?

14       A.    I did not.

15       Q.    Did you tell Mr. Golaszewski and

16   Mr. Swentzel that -- strike that.

17             Subsequent to this May 13th email, did you

18   meet with Mr. Arpey?

19       A.    I don't recall.  We may have spoken.

20       Q.    Did you tell Mr. Golaszewski and

21   Mr. Swentzel that you were speaking with Mike Arpey

22   at this time?

23       A.    I recall telling them that Hunter Point

24   may have interest.  And I recall reaffirming to them



**DANIEL LEE**                                                    187

 1   that their names had been protected.
 2       Q.    And what did they say to you?
 3       A.    They said that they probably didn't want
 4   to have a meeting given the dynamics we had
 5   discussed.
 6
 7           MR. REED:  Plaintiff's Exhibit 19.  Copy
 8       for you, Counsel.  This is Bates Stamp 35 --
 9       Lee 3566.
10
11           (Lee Exhibit 19, TEXT W/PHOTO OF BOAT, was
12       marked for identification.)
13
14       Q.    And this is a text message chain.  Do you
15   recognize this?
16       A.    I do.
17       Q.    And you write "Buffalo Point Fund 2
18   closing gift."  What did you mean by that?
19       A.    Well, it was a picture of a boat that I
20   can't afford.
21       Q.    And what did you mean by Buffalo Point
22   Fund 2?
23       A.    When we successfully raised Buffalo Point
24   Fund 2, we'll all be able to afford a boat like the



DANIEL LEE                                    189

1        Q.   In fact, after the Zoom with Mike Arpey,

2    you told Mr. Golaszewski and Mr. Swentzel that you

3    spoke with him, and they screamed at you; true?

4        A.   Say that again.

5        Q.   You told Mr. Golaszewski and Mr. Swentzel

6    about this Zoom you had with Mike Arpey.  And their

7    response was to scream at you and say you shouldn't

8    have used their names without their permission;

9    true?

10       A.   False.

11       Q.   At this time, you told Mr. Swentzel and

12   Mr. Golaszewski you had set up a meeting for them at

13   Hunter Point; right?

14       A.   Not to my recollection.

15       Q.   Do you have any recollection that you

16   canceled any meetings with Hunter Point because

17   Mr. Swentzel and Golaszewski told you they didn't

18   want to participate?

19       A.   I -- I don't have any recollection of

20   that.

21            MR. REED:  I'm going to show you a

22       document we're going to mark as Plaintiff's

23       Exhibit 21, copy for counsel.  This is document

24       that's Bates Stamp Lee 3557 through 3558.



DANIEL LEE                                    195

1      A.    This is in July of 2021, correct.

2      Q.    Did you tell Mike Arpey that you were in a

3   partnership, and he needed to send your partner's

4   resumes as well?

5      A.    No, I did not.

6      Q.    At this point, did you let Mr. Swentzel

7   and Mr. Golaszewski know that you were talking with

8   Mike Arpey?

9      A.    I don't recall.

10      Q.    Do you recall discussing anything about

11   Buffalo Point with Mike Arpey in the latter half of

12   2021?

13      A.    I recall Mike reaching out with interest

14   in Buffalo Point.  And me telling him that there was

15   nothing to discuss at that time given that we were

16   waiting for the outcome or more clarity on the

17   outcome of the sale process of 17Capital.

18      Q.    When you say "you were waiting for more

19   clarity" -- excuse me.  What do you mean when you

20   say you were waiting for more clarity?

21      A.    We didn't know who was going to buy the

22   firm, how much of the firm they are going to buy,

23   and what an ultimate purchaser of the business was

24   going to do for the employees for alignment and



SA-69

**DANIEL LEE**                                              205

```
 1            (Lee Exhibit 23, 1/13/22 EMAIL, was marked
 2       for identification.)

 3

 4       Q.   What is this?
 5       A.   This is an email with me responding to
 6  Mike Arpey.  And Mike is asking me if I would meet
 7  with an affiliate firm of theirs who is looking for
 8  IR talent.
 9       Q.   Did you tell Mike, I can't do this; I got
10  a partnership going?
11       A.   At this time, I did not.
12       Q.   Did you ever tell Mike, I can't take any
13  opportunities you give me unless you give it to me
14  and my partners?
15       A.   I did not.
16       Q.   You write -- and this is January 13th,
17  2022.  Do you see that?
18       A.   I do.
19       Q.   And you write that the "17C review was
20  positive comp discussion forthcoming."  Do you see
21  that?
22       A.   I do.
23       Q.   What review were you referring to?
24       A.   My annual review.
```



SA-70

DANIEL LEE                              211

1    that depending on when this was at the conference.

2         Q.   And during that conversation with him,

3    what did you tell him about Mr. Golaszewski?

4         A.   I told him nothing about Mr. Golaszewski.

5         Q.   In this email -- on the next email up on

6    Lee 273 you write to Meghan Lucas and Andrew Short.

7    "I well send Rich to him in that block.  What's the

8    best time?"  So how did it come to be that you were

9    sending him Mr. Golaszewski if you hadn't previously

10   told Mike Arpey about Mr. Golaszewski?

11        A.   So in my meeting with Mr. Arpey, that

12   Meghan's email here refers to as it being a follow

13   up to Mike.  And I believe Avi was at the table as

14   well, as was Andrew, and as was another younger

15   member of their team.  They said Dan, we are going

16   to pursue something in the GP Solutions business.

17   And we're really excited about doing it with people

18   that you would bring to us.  And if your partners

19   would now be ready to meet with us, we would want to

20   meet them.  And I said, I'm not sure if we're ready

21   or not, and I'll call Rich, who was in Florida but

22   not even scheduled to be at this conference.  And

23   Rich drove to meet with Mike Arpey after saying,

24   yes, I think it's time we should meet.



**SA-71**

**DANIEL LEE**                                        218

1          A.    More excitement over the business, more

2     urgency over us joining, over us helping them with

3     the business plan, giving them more clarity, that we

4     wanted to partner with them and not somebody else.

5          Q.    Did you ever tell anyone at Hunter Point

6     that you were in a legal partnership with

7     Mr. Swentzel and Golaszewski?

8          A.    Not in those words, no.

9          Q.    You used the word "ownership"?

10          A.    Very pointedly.

11          Q.    Other than the Milos and the Porter House

12     dinner, what other meals, drinks, or outings did you

13     have with Hunter Point?

14          A.    We had a breakfast with Avi Kalichstein,

15     Rich Golaszewski, and Stephen Swentzel.

16          Q.    Where was that?

17          A.    That was at Jean-Georges.

18          Q.    Is that Nougatine in --

19          A.    Nougatine.

20          Q.    -- in Manhattan?

21          A.    Yes.

22          Q.    What do you remember being discussed at

23     Nougantine meeting?

24          A.    I remember being ecstatic, because we were



DANIEL LEE                                    219

1    presented with a proposal from a partner that would

2    have been the culmination of our desire to launch

3    and build this business together.

4        Q.    When you say "a partner," you're referring

5    to Hunter Point being the partner of Buffalo Point?

6        A.    Correct.

7        Q.    Was there any discussion that Hunter Point

8    would have a legal partnership with Buffalo Point?

9        A.    That's the intent.

10       Q.    Who did you communicate -- strike that.

11             Who at Hunter Point did you communicate

12   the intent that there be a legal partnership between

13   Buffalo Point and Hunter Point?

14       A.    Throughout all of our discussions with all

15   of our potential partners, I was very clear that we

16   would respond to offers that included ownership for

17   us as partners.  And that on our journey as

18   partners, we were looking to run a business, found a

19   business, own a business, and control the destiny of

20   that business.

21       Q.    Was the intention that you communicated

22   that you would be a partner of Hunter Point,

23   Mr. Swentzel would be a partner, and Mr. Golaszewski

24   would separately be a partner?



**DANIEL LEE**                                            240

1   issue with us contacting them to find out what you

2   discussed?

3        A.   I would imagine privilege is attached

4   there in those conversations.

5        Q.   But those were not conversations that you

6   had about your own personal circumstances.   It's

7   your testimony that was conversation you had about

8   Buffalo Point; correct?

9        A.   Correct.

10       Q.   Do you know if any one of these lawyers is

11  a corporate lawyer who does partnership agreements?

12       A.   I don't recall.

13       Q.   Did you ever ask Michael Sabin to prepare

14  a partnership agreement for you?

15       A.   I did not.

16       Q.   Do you know if Mr. Swentzel or

17  Mr. Golaszewski ever asked Michael Sabin to prepare

18  a partnership agreement for the Buffalo Point

19  partnership which you allege?

20       A.   I do not know.

21       Q.   Ultimately, Clifford Chance was retained;

22  right?

23       A.   Yes.

24       Q.   Was it retained by each of the three of



**DANIEL LEE**                                    242

1    put together a written partnership agreement?

2         A.    I trusted my partners, and I believed us

3    to be all negotiating in each other's best

4    interests.

5         Q.    So again, the answer as before is, trust?

6         A.    I trusted them.

7         Q.    Did you ever tell Michael Sabin that you

8    guys were in a legal partnership?

9         A.    I don't recall using those words to

10   Michael Sabin.

11        Q.    Did Michael Sabin ever ask you if you had

12   a legal partnership?

13        A.    I don't recall him asking that.

14        Q.    Did you ever tell Michael Sabin that you

15   had agreed -- you and Mr. Swentzel and Golaszewski

16   had agreed to share profits and losses equally?

17        A.    Yes.

18        Q.    When did you tell him that?

19        A.    When I negotiated our fee cap, and we

20   talked about keeping expenses down.

21        Q.    Oh, I have a separate question.  My

22   question is not about how you negotiated your

23   agreement with Clifford Chance.  My question is, did

24   you ever tell Michael Sabin that I have a Buffalo



SA-75

**DANIEL LEE**                                      245

```
 1             (Lee Exhibit 29, EMAIL W/K.TROY, was
 2        marked for identification.)
 3
 4        Q.    And then what is this?
 5        A.    This is me introducing my partners to
 6   Kathy.
 7        Q.    How did you know Kathy?
 8        A.    Hold on, let me read this, please.
 9        Q.    Sure.
10        A.    I was, best of my recollection, introduced
11   to Kathy by Scott Kapnick.  It's my belief that he
12   wanted her to get to the bottom of our restrictive
13   conveyance and to understand the legal landscape of
14   the possibility of joining HPS.
15        Q.    In connection with the legal landscape
16   discussion, did you ever tell Kathy Troy that you
17   had a legal partnership with Mr. Swentzel and
18   Golaszewski?
19        A.    I did not use those words.
20        Q.    Did you use those words with anybody else
21   at HPS?
22        A.    Not that I can recall.
23        Q.    Did -- so at the top, there's an email
24   from Kathy Troy to you, do you see that, dated
```



SA-76

**DANIEL LEE**                                      251

1   can't recall specifically.

2        Q.   Did you call the two of them together or

3   separately?

4        A.   I don't recall.

5        Q.   But you remember talking to both of them

6   Mr. Swentzel and Golaszewski on April 22nd, 2022?

7        A.   I don't recall if we certainly connected

8   that day, but --

9        Q.   What did you say?

10       A.   I would have delivered the news that I was

11  terminated.  But I can't recall the specifics of

12  what I said at that time.

13       Q.   Does it ring bell that you said that you

14  were going to destroy 17Capital?

15       A.   That does not ring a bell.

16       Q.   Did you say that?

17       A.   I do not recall saying that.

18       Q.   Do you remember one way or the other?

19       A.   I just told you that I do not recall

20  saying that.  That does not --

21       Q.   Did the termination have any effect on how

22  you and Mr. Swentzel and Golaszewski communicated

23  given the non-solicit issues that you had in your

24  agreements at 17Capital?



DANIEL LEE                                    252

1      A.    We did ultimately agree to be very careful

2  with our communications with respect to having one

3  of us outside of the firm and having the presence of

4  solicitation issues and the restricted covenants.

5      Q.    Do you think it would have been reasonable

6  for Mr. Swentzel or Golaszewski to have concerns

7  about being associated with you following a

8  for-cause termination?

9      A.    No, I don't know.  They never discussed it

10 with me.

11     Q.    The question is not did they discuss it.

12 The question is, do you think it would have been

13 reasonable for them to have concerns about working

14 with you following your termination for cause?

15     A.    I don't.

16     Q.    Did you think it would be reasonable for

17 Mr. Swentzel or Golaszewski to not want to have any

18 appearance of a professional association with you

19 after you were fired for cause?

20     A.    Can you restate that question?

21     Q.    Yeah.  Do you think it would have been

22 reasonable for Mr. Swentzel or Golaszewski to not

23 want to have even an appearance of a professional

24 association with you after you were fired for cause?



DANIEL LEE                                          273

1          A.    They were not written.

2          Q.    So no?

3          A.    So no.

4          Q.    How long was the Buffalo partnership --

5     Buffalo Point partnership supposed to last?

6          A.    Our business could have lasted

7     indefinitely.

8          Q.    Did you and Mr. Swentzel and Mr.

9     Golaszewski ever have an agreement about whether it

10    was supposed to be for a term or an indefinite

11    existence?

12         A.    Building a private market business is

13    meant to build a business for a very long time.

14         Q.    I'm not asking about a private market

15    business; I'm asking about you.

16         A.    Yeah.

17         Q.    My question is, did you and Mr. Swentzel

18    and Mr. Golaszewski have an agreement that Buffalo

19    Point was supposed to last for a certain term or

20    indefinitely, or was there no agreement about that?

21         A.    The building of our business was an

22    indefinite endeavor for all of us in our shared

23    vision.

24         Q.    Did the three of you ever agree that the



**DANIEL LEE**                                                    274

1  business would last for an indefinite time, or is

2  that just your gloss on what happened?

3      A.   That is our shared vision to build an

4  everlasting firm.

5      Q.   Was that shared vision ever communicated

6  to you by Mr. Swentzel and Golaszewski in words such

7  as, we want this partnership to last for a finite

8  period of time or indefinitely?  Were such words

9  ever spoken to you?

10     A.   We did not set a finite term for our

11 partnership.

12     Q.   Did you set any term at all for your

13 partnership?

14     A.   Building a business that we could retire

15 from.

16     Q.   Did you have a discussion in which you

17 directly addressed whether or not the Buffalo Point

18 would be existing indefinitely, or did you not have

19 such a discussion?

20     A.   It was always a plan to build something,

21 to not be a quick partnership.

22     Q.   Mr. Lee, are you understanding my

23 question?  Because you're not answering my question.

24     A.   I'm understand --



**DANIEL LEE**                                                   275

 1        Q.    My question is, did you ever have a
 2   specific discussion in which the term, either
 3   "indefinite" or "a finite period," of Buffalo Point
 4   was discussed?
 5        A.    I can't recall.
 6        Q.    Did Buffalo Point have any profits?
 7        A.    No.
 8        Q.    You said that there was an agreement that
 9   the profits would be shared equally between you and
10   Mr. Swentzel and Golaszewski; right?
11        A.    Correct.
12        Q.    Was that agreement ever memorialized in
13   writing?
14        A.    It was not.
15        Q.    How was that agreement made?
16        A.    That agreement was made in dozens of
17   discussions between the three of us about our shared
18   vision for building something in an exciting market
19   with a really impressive partner.
20        Q.    Was it ever mentioned in any text or email
21   that you know of?
22        A.    Not that I can recall.
23        Q.    Did you and Mr. Swentzel and Golaszewski
24   discuss specifically how the losses of Buffalo Point



SA-81

DANIEL LEE                                        276

1   would be allocated?

2        A.    Equally.

3        Q.    When did you have that discussion?

4        A.    We had that discussion over making sure

5   that as we were having meals and incidental expenses

6   together, we were sharing those.  And we had that

7   discussion when we engaged Clifford Chance and

8   agreed to share equally in the expenses related to

9   our joint representation.

10       Q.    Was what you say was an agreement to share

11  losses equally, was that ever reduced to writing in

12  any way?

13       A.    Not that I can recall.

14       Q.    Was there an agreement between you and

15  Mr. Swentzel and Golaszewski about who would have

16  control over the day-to-day operations of Buffalo

17  Point?

18       A.    That we would have joint control as

19  cofounding partners.  That was, again, the mission

20  from the outset.

21       Q.    How would this control work?  Did you have

22  any discussions about how the operation aligns?

23       A.    That the two of them would -- would be the

24  investment side of the house.  And then I would run



**DANIEL LEE**                                                 277

1    capital formation.  And jointly, we would run the

2    business, hiring of a team, setting of the strategy,

3    and importantly, negotiating and interfacing with

4    our ultimate partner.

5        Q.    Did you three discuss who would have the

6    power to hire?

7        A.    Not at a granular level.

8        Q.    Did the three of you discuss who would

9    have the power to fire employees?

10       A.    I don't recall.

11       Q.    Did the three of you have discussions

12   about who would be able to write checks for the

13   business?

14       A.    I don't recall.

15       Q.    Did you three have a discussion about who

16   would be issuing invoices for the business?

17       A.    I don't recall.

18       Q.    Did the three of you have a discussion

19   about who among you would be able to sign contracts

20   on behalf of Buffalo Point?

21       A.    I don't recall.

22       Q.    Did you have an agreement with

23   Mr. Swentzel and Mr. Golaszewski about how much

24   capital each of you would contribute to the



SA-83

**DANIEL LEE**                                           278

1   business?

2        A.   I don't recall.

3        Q.   Do you know whether you had any such

4   discussions either orally or in writing?

5             MR. KLETTER:  Objection to form.

6        A.   Can you rephrase that?  I don't follow.

7        Q.   Yeah.  Did you ever discuss in writing how

8   much each capital -- how much capital each of you

9   would contribute to the business?

10       A.   I don't recall that, no.

11       Q.   Did you ever have any discussion about how

12  much Hunter Point or Stone Point or HPS or anyone

13  else would contribute to your business?

14       A.   I don't recall specifics.  We in many ways

15  -- it's different with each partner.

16       Q.   I just want specifics.  I'm calling for

17  specifics.

18       A.   I can't recall specifics.

19       Q.   Was any capital ever contributed to the

20  business by anyone?

21       A.   Other than direct expenses prior to my

22  ouster, no, not by me.

23       Q.   Did you have an agreement with Mr.

24  Swentzel and Golaszewski about who would make loans



DANIEL LEE                                    280

1    any agreement with Mr. Swentzel or Golaszewski about

2    who would own the assets of Buffalo Point?

3         A.   I don't recall.

4         Q.   Did you ever express to Mr. Golaszewski

5    your intention that there be a legal partnership?

6         A.   Can you say that again?

7         Q.   Did you ever express an intention to

8    Mr. Golaszewski that there would be a legal

9    partnership as opposed to just using the word

10   "partnership"?

11             MR. KLETTER:  Objection to form.

12        A.   I don't -- I don't recall.

13        Q.   Did you ever express to Mr. Swentzel an

14   intention that you form a legal partnership?

15        A.   I don't recall asking that.

16        Q.   Do you recall discussing that with

17   Mr. Swentzel or --

18        A.   I can't recall.

19             MR. KLETTER:  Hold on.  Wait for him to

20        get the question out.

21        Q.   Do you recall discussing that with Mr.

22   Swentzel or Golaszewski?

23             MR. KLETTER:  Objection to form.

24        A.   I don't -- I don't recall.



**DANIEL LEE**                              299



19          MR. KLETTER:  Objection to form.

22          MR. REED:  Why don't we go off the record

23     for a second?

24



SA-86

**DANIEL LEE**                                    300

1          (A break was taken.)

2

3          VIDEOGRAPHER:  6:00, Unit Number 7.

4     Q.   Mr. Lee, do you have any understanding of

5  how long it would take a GP Solutions business to

6  turn a profit such that the management would start

7  to earn a carry?

8     A.   I do.

9     Q.   What is that understanding?

10    A.   Carry is separate from the PNL of the

11 business.  So your PNL comes from the capital that

12 you manage and the fees that it pays you, and your

13 carry is paid on the back end as your investments

14 perform.

15    Q.   What is your understanding of how long it

16 takes to get to the back end such that there's a

17 carry?

18    A.   Depends on the terms of the fund vehicle

19 that you raise, and it depends on the duration that

20 you hold your investments.



800.DAL.8779
dalcoreporting.com

SA-87

**DANIEL LEE**                                      301

███████████████████████████████████

███████████████████████████████████

████████████████████████████████████

████████████████████████

██        ███████████████████████

██        ███████

7            MR. REED:  Mr. Lee, I'm going to hand you

8       a document that's marked as Plaintiff's Exhibit

9       36, copy for counsel.  It's Bates Stamp 3678

10      through 3682.

11

12            (Lee Exhibit 36, SIGNAL LINK, was marked

13      for identification.)

14

15      Q.   Do you see this?

16      A.   I see this.

17      Q.   This is the chat between you and

18  Mr. Swentzel and Golaszewski?

19      A.   Appears to be.

20      Q.   If you go to page Lee 3679.

21      A.   Yes.

22      Q.   Second entry up from the bottom it says,

23  "I'm inviting you to install Signal, exclamation

24  point.  Here's the link."  Do you see that?



SA-88

**EXHIBIT E**

SA-89



ORIGINAL

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------X
DANIEL LEE,

                              PLAINTIFF,


      -against-          Case No.:

                    7:23-cv-10695-PMH


RICHARD GOLASZEWSKI and STEPHEN
SWENTZEL,

                    DEFENDANTS.
------------------------------------------X


              DATE:  February 22, 2024

              TIME:  9:06 A.M.




 VIDEOTAPED VIRTUAL DEPOSITION of the

Third-Party Plaintiff, ALISON FRANKLIN,

taken by the Defendant, pursuant to a Court

Order and to the Federal Rules of Civil

Procedure, before Miriam Schweke, a Notary

Public of the State of New York.



SA-90

2

```
 1
 2    A P P E A R A N C E S:
 3

 4    BROWN RUDNICK LLP
         Attorneys for the Plaintiff
 5       DANIEL LEE
         Times Square Tower
 6       47 7th Avenue, Suite #6536
         New York, New York 10036
 7       BY:  DYLAN KLETTER, ESQ.

 8
      YANKWITT LLP
 9       Attorneys for the Defendants
         RICHARD GOLASZEWSKI and STEPHEN
10       SWENTZEL,
         140 Grand Street, Suite 705
11       White Plains, New York 10601
         BY:  JASON SWERGOLD, ESQ.
12
13    HUGHES HUBBARD & REED LLP
         Attorneys for the Non-Party
14       ALISON FRANKLIN
         One Battery Park Plaza
15       New York, New York 10004
         BY:  ROBB PATRYK, ESQ.
16
17    ALSO PRESENT:
      Amina Hassan
18    Emad Shahin
      Jim Brady, Videographer
19             *         *         *
20
21
22
23
24
25
```



3

```
1
2     F E D E R A L   S T I P U L A T I O N S
3
4
5       IT IS HEREBY STIPULATED AND AGREED by and
6     between the counsel for the respective
7     parties herein that the sealing, filing and
8     certification of the within deposition be
9     waived; that the original of the deposition
10    may be signed and sworn to by the witness
11    before anyone authorized to administer an
12    oath, with the same effect as if signed
13    before a Judge of the Court; that an
14    unsigned copy of the deposition may be used
15    with the same force and effect as if signed
16    by the witness, 30 days after service of
17    the original & one copy of same upon
18    counsel for the witness.
19
20      IT IS FURTHER STIPULATED AND AGREED that
21    all objections except as to form, are
22    reserved to the time of trial.
23
24              *     *     *     *
25
```



```
 1              A. FRANKLIN
 2   reflected in this offer letter?
 3        A.    Yes, it would have.
 4        Q.    And what were his -- what was
 5   17Capital hiring Dan Lee to do with respect
 6   to their fund raising in North America?
 7        A.    His key responsibilities were
 8   to find new investors to raise capital from
 9   those investors into a fund and to also
10   help support, build the investor relations
11   and fund raising team within North America.
12        Q.    And prior to his hiring -- so
13   it says here his start date is March 30,
14   2020, prior --
15        A.    Uh-huh.
16        Q.    -- to that date, who was -- who
17   at 17Capital was trying to find new
18   investors in North America?
19        A.    That would have been
20   Pierre-Antoine de Selancy, he's our
21   managing partner and co-founder.  As well,
22   Robert de Corainville, he's also one of our
23   managing partners.  He was head of the U.S.
24   office as well.  And Richard and Stephen
25   would also be looking at supporting the
```



```
1                    A. FRANKLIN
2   this was a new role within the U.S. office
3   and, therefore, how he could add value
4   quickly.  Because the team was global, we
5   have two seasoned professionals in investor
6   relations in London who he was struggling
7   to integrate, form a relationship with and
8   wanted additional feedback to help him with
9   both of those things.
10       Q.    Do you know why he was
11  struggling to form a relationship with the
12  two seasoned investor relations
13  professionals in London?
14       A.    I do.
15       Q.    And why was that?
16       A.    Because of his management
17  style.
18       Q.    What do you mean by because --
19  and by his, you mean Dan Lee's management
20  style?
21       A.    I do.  Yes, because of Dan
22  Lee's management style.
23       Q.    Okay.  What was Dan Lee's
24  management style?
25       A.    He was described to me as
```



SA-94

```
 1                      A. FRANKLIN
 2     someone who was quite dictatorial, who
 3     could be quite blunt, quite rude, quite
 4     pushy, someone who's difficult to get on
 5     with.
 6          Q.    And who described him to you
 7     that way?
 8          ██    ████████████████████
            ████████████████████████
            ██    ██████████████████
            ██    ███████████████████████
            ██    █████████████████████████
13          Q.    Sure.  And what are their
14     names?
15          ██    █████████████████████████
16     We can send again the names over.
17          Q.    Who did you speak with in order
18     to get the feedback that is contained in
19     the document that's on the screen,
20     Exhibit 3?
21          A.    From memory it was ████████
      ██    ██████ who I've just spoken about; it was
23     Rich and Steve; and the others I don't
24     recall.
25          Q.    Do you remember what ████████
```



SA-95

61

```
 1                    A. FRANKLIN
 2          now 10:31.
 3          (Whereupon, an off-the-record
 4          discussion was held.)
 5     THE VIDEOGRAPHER:  We'll go back on
 6          the record.  The time is 10:32.
 7               MR. SWERGOLD:  And, Miriam,
 8          would you be able to read back the
 9          last question and Miss Franklin's
10          answer up until the point where we
11          stopped?
12               (Whereupon, the referred to
13          question and answer were read back by
14          the Reporter.)
15               THE VIDEOGRAPHER:  Back on the
16          record.  The time is 10:36.
17          Q.   Okay, Miss Franklin, was there
18     anything else that you wanted to add to
19     that answer or was that it?
20          A.   That was it, thank you.
21          Q.   Okay.  All right.  In --
22     scratch that.  During the time period that
23     Dan Lee was at 17Capital, so March 2020 to
24     April 2022, what percentage of capital
25     raised in North America can be attributed
```



SA-96

62

```
1                    A.  FRANKLIN
2    to Dan's efforts?
3         A.    O.
4         Q.    Who was responsible -- so let
5    me -- let me back up for a second.  Did
6    17Capital raise capital in -- for North
7    America from March 2020 to April 2022?
8         A.    Did they -- can you repeat the
9    question, sorry?
10        Q.    Sure.  Did 17Capital raise
11   capital in North America during the time
12   period March 2020 to April 2022?
13        A.    They did.
14        Q.    Who was responsible then for
15   raising that capital?
16        A.    It was Pierre-Antoine de
17   Selancy, Robert de Corainville, and
18   Richard.
19        Q.    And you said that -- you said
20   at the outset that in preparing to testify
21   today you spoke with Martin and Augustin
22   specifically about this topic, correct?
23        A.    That's correct, yes.
24        Q.    What -- what did Martin tell
25   you about Dan's role in the -- in the funds
```



SA-97

65

```
 1              A. FRANKLIN
 2   that he was there?
 3           MR. KLETTER:   Objection to
 4       form.
 5       A.    No.
 6       Q.    And then what did Augustin tell
 7   you about Dan's role in fund raising?
 8       A.    Augustin confirmed Martin's
 9   view that Dan had 0 percentage impact on
10   the fund that was raised.
11       Q.    Was there ever a time where Dan
12   was responsible for 17Capital losing an
13   investment that was -- that an investor had
14   committed to making?
15       A.    I don't know.
16       Q.    Do you know whether there was
17   an investor that pulled a $125 million
18   investment around the time that 17Capital
19   was sold?
20       A.    I don't.
21       Q.    During the time that Dan was at
22   17Capital, were -- were people that Dan
23   reported to telling him that he needed to
24   start to become directly responsible for
25   bringing in investments?  Or sorry,
```



SA-98

100

```
 1                A. FRANKLIN
 2   April 22nd, 2022?
 3        A.    I, myself, was not in that
 4   meeting, but I did prepare the script for
 5   him to have the conversation with Dan Lee?
 6        Q.    Was it an in-person
 7   conversation, phone, Zoom?
 8        A.    From what I recall, it was on
 9   Teams.
10        Q.    So having prepared the script,
11   what was -- what were the points that you
12   prepared for Pierre-Antoine to --
13        A.    Yeah.
14        Q.    -- say to Dan?
15        A.    There were two reasons why we
16   were terminating.  The first one was
17   because he has not raised any capital or
18   onboarded or brought in any new investors;
19   and the second reason was because of his
20   management style and him obviously not
21   being able to integrate into the
22   organization.
23        Q.    Did you speak with
24   Pierre-Antoine after he spoke with Dan?
25        A.    I don't recall specifically.
```



1                    A. FRANKLIN

2    quickly, does this -- is this the

3    confidentiality agreement that Dan signed

4    when he started his employment?





800.DAL.8779
dalcoreporting.com


SA-101

**EXHIBIT F**

SA-102

| | |
|---|---|
| **From:** | dlee@hillhousecapitalholdings.com |
| **To:** | Rory Shaw |
| **Subject:** | [EXTERNAL] Preferred equity and NAV lending opportunity |
| **Date:** | Tuesday, March 2, 2021 10:13:41 AM |
| **Attachments:** | Buffalo Point Opportunity_CONFIDENTIAL.pdf |

Rory,

Attached as discussed is an overview of the current opportunity as we see it. Let me know any thoughts or questions.

Best,

Dan

# Daniel G. Lee III

## Hillhouse Capital Holdings, LLC

Greenwich, CT

Cell: ▮▮▮▮▮▮▮▮

*dlee@hillhousecapitalholdings.com*

SA-103

**DRAFT**                                    **HIGHLY CONFIDENTIAL & TRADE SECRET**

## Conceptual Memo - Project Buffalo Point
*Backing a team poised for growth, investing at the intersection of private equity secondaries and credit.*

**Thesis:** *The popularity and growth potential of the preferred equity and NAV finance market provides an attractive backdrop and a de-risked entry point for a firm interested in backing and building a secondary private equity business. The Buffalo Point team ("BP" or "the team") is highly experienced within this subset of the market and would benefit from a partner with extensive financial services and private credit expertise.*

<u>**Executive Summary**</u>

Buffalo Point brings demonstrable experience in sourcing and structuring superior risk adjusted exposures in preferred equity and private credit transactions focused on private equity market counterparties. These financing opportunities are being driven by strong macro trends deriving, in part, from the increasing capital intensity of the broader private markets.

The team originates preferred equity and NAV loan transactions that provide flexible liquidity and accretive financing solutions to General and Limited Partners, their funds, and their management companies. These transactions do not take single company risk and sit in senior positions secured by diversified portfolios of assets held by these funds, or by fees, carry, and other assets at the management company level.

The BP team targets unlevered IRRs of 12-15% and unlevered MOICs of 1.2x-1.5x in preferred equity transactions; and unlevered IRRs of 8-10% and unlevered MOICs of 1.2x-1.3x in credit transactions, each against very low LTVs of 15-40% and 5-25% respectively.

<u>**The Market Opportunity**</u>

Buffalo Point seeks exposure to transaction structures that it has experience in sourcing, structuring, executing, and exiting:

- Non-dilutive management company financings that offer an attractive alternative to the GP stakes market.
- Fund level financings that provide growth capital and liquidity solutions to funds out of callable LP capital.
- Financings of underlying LP portfolios to accelerate liquidity.
- Financings of continuation vehicles and portfolios of single asset transactions.

The Buffalo Point team has been at the forefront of the North American business of a firm that has originated over sixty similar investments totaling over $3.5 billion in deployment, the bulk of which has occurred in the last four years. The platform's track

1

SA-104

**DRAFT**                                    **HIGHLY CONFIDENTIAL & TRADE SECRET**

record across over thirty realized transactions is a 16% gross unlevered IRR and a 1.4x gross unlevered MOIC, with no losses.

Buffalo Point team members have led the sourcing and execution for seven preferred equity transactions, deploying ~$700 million with North American GPs and global strategic investors, since March of 2019.

The teams historic underwriting ethos is intended to be maintained on the Buffalo Point platform, with a renewed focus on market dominance in North America.

The market for originating Buffalo Point's transactions is robust and growing, particularly in North America, where adoption is continuously gaining traction from large and high-quality counterparties. The team actively cultivates, originates, and executes transactions with high-quality and increasingly blue-chip private equity investors. Today, the average deal size in the team's pipeline is over $150 million, however attractive opportunities of varying sizes are frequently sourced.

The team actively manages its origination pipeline. Deal flow is not exclusively dependent on intermediaries, with ~60% of historic opportunities having been proactively shaped in bilateral discussions with counterparties. To drive this effort, the Buffalo Point team conducted an estimated seven hundred North American deal flow meetings in the last twelve months.

The team believes the right strategic partner would possess the ability to enhance origination, a fundamental component of the business.

**Limited Partner and Institutional Investor Interest**

As the market for transactions grows, it has been supported by growing institutional investor interest. The Buffalo Point team believes that while broad based investor interest is still early in its development, it will rise to a scale like that of its forbearer, the traditional secondary market. Hence, it is a compelling time to position a platform to take advantage of this market opportunity.

For example, US Public Pensions and other large institutions are still not broadly invested in the space. Though capital is beginning to flow, comparatively few dedicated firms have secured commitments from the institutional community to pursue preferred equity and NAV loans. Buffalo Point believes there is space in the market to create a firm with a dominant presence.

LP commitments often come from private debt allocations where the Buffalo Point strategy provides comparable (unlevered) returns but superior down-side protection to that of mezzanine or direct lending. The team sees active interest from LPs and believes that the market is in the earlier innings of increased investor allocation.

The team also believes that as LPs gain more awareness of the superior down-side protection embedded in this strategy, especially versus their existing private credit

2

SA-105

**DRAFT**                                        **HIGHLY CONFIDENTIAL & TRADE SECRET**

portfolios; allocations should increase significantly. It is Buffalo Point's intent to be best positioned to take advantage of this shift.

Buffalo Point has extensive existing dialogues with North American LPs, large global allocators, and the gatekeeper community. The team believes that in addition to raising traditional committed LP capital, a substantial opportunity exists to provide customized solutions and separately managed accounts to large and sophisticated pools of capital. The team has experience responding to these demands and in working with investors seeking to build and implement these programs.

### Other Opportunities to Innovate

The team also believes there are untapped opportunities that would unlock additional value for investors. The team has thus far been unable to leverage these strategies at their current firm but believes they should be considered as part of the Buffalo Point platform.

For instance, the insurance and credit markets provide a compelling backdrop for the creation of structured products that provide leverage, on a pooled basis, to underlying Limited Partners or to create back leverage structures on a deal-by-deal basis. Such structures would boost returns on preferred equity transactions to a range more comparable to buyouts, with shorter durations and considerably less risk.

Buffalo Point believes this would further expand the universe of available capital from LPs. LPs who are well versed in BP's core markets, are seeking higher returns, and are willing to accept levered structures or instruments to get there.

The team is attracted to strategic partners who possess the ability to help build and enhance these initiatives.

### The Team

The Buffalo Point team consists of three founding partners and two mid-level investment professionals, each with experience across diverse private markets disciplines all strongly relevant to preferred equity and NAV financing of private equity portfolios, including:

- Limited Partners
- Secondary Investors
- Bank Lending platforms
- Fundraising and Investor Relations
- Insurance and Institutional Asset Management

Other candidates, who would create further value for the Buffalo Point platform, have been identified. Each possess senior private markets experience with strong, actionable, and impactful relationships across our global industry.

3

SA-106

**DRAFT**                                    **HIGHLY CONFIDENTIAL & TRADE SECRET**

## Conclusion

While this market has been developing for over fifteen years, the lack of a clear market leader amongst a small yet diverse group of dedicated market participants suggests there is an advantage to being the most aggressive asset gatherer, and the most creative product innovator. The Buffalo Point team believes its approach to building a multi-product platform, that serves a diverse set of global investors across a range of structures, is a differentiating feature that positions it for success.

Lastly, the Buffalo Point team believes that a strategic partnership with an organization steeped in all aspects of its core markets and the markets presenting further opportunities to innovate, would be highly compelling and would accelerate the successful creation of a multi-billion-dollar market leader in the preferred equity and NAV financing market.

4

CONFIDENTIAL
Lee (SP)_00005

SA-107

**EXHIBIT G**

ORIGINAL

1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
-----------------------------------------------X
DANIEL LEE,

                              Plaintiff,

    -against-


RICHARD GOLASZEWSKI and
STEPHEN SWENTZEL,

                              Defendants.

Civil Action No.: 3:23-cv-00400

-----------------------------------------------X

                  December 20, 2023
                  2:00 p.m.


    30(b)(6) DEPOSITION of RORY SHAW on

behalf of STONE POINT CAPITAL, via

videoconference, taken by the respective

parties, pursuant to Subpoena, held at the

above-mentioned time and place before

Emily Nicholson, a Notary Public for and

within the State of New York


800.DAL.8779
dalcoreporting.com
DALCO

SA-109

2

```
 1     A P P E A R A N C E S :

 2

 3

       BROWN RUDNICK LLP
 4     Attorneys for Plaintiff
        185 Asylum Street
 5      Hartford, Connecticut 06103
       BY:  DYLAN KLETTER, ESQ.
 6

 7     YANKWITT LLP
       Attorneys for Defendants
 8      140 Grand Street, Suite 705
        White Plains, New York 10601
 9     BY:  JASON SWERGOLD, ESQ.

10

11     SMITH GAMBRELL & RUSSELL, LLP
       Attorneys for Witness
12      1301 Avenue of the Americas, 21st Floor
        New York, New York 10019
13     BY:  SEAN T. KEELY, ESQ.

14

15    ALSO PRESENT:
      JOSHUA GOLDMAN, ESQ. - IN-HOUSE COUNSEL AT
16    STONE POINT CAPITAL

17
      COREY BRISKIN,  ESQ. - YANKWITT LLP
18

19

20

21

22

23

24
```



SA-110

**RORY SHAW**                                                    **3**

1      IT IS HEREBY STIPULATED AND AGREED by and

2   between the attorneys for the respective parties

3   herein, that filing and sealing be and the same are

4   hereby waived.

5

6      IT IS FURTHER STIPULATED AND AGREED that all

7   objections, except as to the form of the question,

8   shall be reserved to the time of the trial.

9

10      IT IS FURTHER STIPULATED AND AGREED that the

11   within deposition may be signed and sworn to before

12   any officer authorized to administer an oath, with

13   the same force and effect as if signed and sworn to

14   before the Court.

15

16

17

18

19

20

21

22

23

24



SA-111

**RORY SHAW**                                          25

1    ordinary course of business of finding investment

2    opportunities.

3              Q.    Did you have any follow-up

4    conversation with Dan after reading this memo?

5              A.    I don't recall.

6              Q.    All right.  If you go to Page 3 of the

7    memo, there's a heading called "The Team."  Do you

8    see that?

9              A.    Yes.

10             Q.    Do you see where it says that the team

11   consists of three founding partners?

12             A.    Yes.

13             Q.    When you read this memo, did you have

14   any idea whether or not this was referring to a legal

15   partnership or not?

16             A.    I did not.

17             Q.    Is "partner" a word that you use in

18   your sort of everyday work at Stone Point Capital?

19             MR. KEELY:  Objection to the

20             form.  It's vague.

21             You can answer.  Is "partner"

22             a word you use every day in your

23             work at Stone Point?

24             THE WITNESS:  Sure.



SA-112

RORY SHAW                                              33

1    for me, whether it's team or partner.

2              Q.    So just to be clear, prior to writing

3    this e-mail, did you ever see for example a

4    partnership agreement among Dan Lee and whoever else

5    he's referring to?

6              A.    I did not.

7              Q.    Did you ever have a conversation with

8    Dan Lee or anybody else that he was in a partnership,

9    a legal partnership regarding this opportunity?

10             A.    I did not.

11             Q.    Did you ever have a conversation with

12   Dan Lee that he was working with other people and

13   they were going to split their profits and losses?

14             A.    I did not.

15             Q.    Do you see where it says -- it's kind

16   of like two-thirds of the way down, starting on the

17   left side, "The market for this product is not as

18   mature as the broader secondaries or GP stakes

19   market, but recognition from investors and product

20   users is increasing."  Do you see that?

21             A.    Yes.

22             Q.    What did you mean by that?

23             MR. KEELY:  Objection; form.

24             You can answer.



SA-113

**EXHIBIT H**

From:        dlee@hillhousecapitalholdings.com
Sent:        Thu 5/13/2021 4:53 PM (GMT-00:00)
To:          marpey@michaelarpey.com
Cc:
Bcc:
Subject:     RE: Interesting fund opportunity
Attachments: Buffalo Point Opportunity_CONFIDENTIAL.pdf; Bedrock MHC Partners III L.P..pdf; DANIEL
             G LEE RESUME_MAY 2021.pdf

Mike,

Great catch up! Too much to talk about but all very good, of course.

Forgot to mention that I also caught up with Yosh this week at your encouragement. Great guy with a
great mind. Very fun getting to know him better.

Attached for various follow up:

- . * Recent resume for Brian Frank and of course, you.
- . * "Buffalo Point" Conceptual Memo. Highly sensitive, as I know you appreciate!
- . * Bedrock Fund III Deck (Manufactured housing opportunity $500k minimum – would welcome
  you, and others as well that you think could be interested)
    - o * Frist portfolio sold in entirety to Apollo for 3.0x/48% gross. Most investor have
      upsized substantially throughout Fund II and now Fund III
    - o * Vertically integrated firm - both the investing and operating.
    - o * Strong footprint in the target markets - While the deck says 66% we believe it will be
      closer to 75% of assets that are 55+ in FL
    - o * Proven strategy to realize value with a portfolio premium - While we believe these
      are very strong assets from a risk adjusted return basis underwriting to a low-mid teens
      gross return, the institutional appetite for portfolio is significant and it seems unlikely
      that will change
    - o * Lower Middle Market Focus - Fund III will continue our strategy of targeting assets
      that have the characteristics to be valuable in a portfolio but on an individual basis are
      below the radar of the larger institutions focusing on the space.  We feel this gives us a
      great basis if there would be a potential portfolio exit

# Daniel G. Lee III
## Hillhouse Capital Holdings, LLC

Greenwich, CT
Cell: ▮▮▮ ▮▮▮▮▮
*dlee@hillhousecapitalholdings.com*

**From:** Mary Lee Praetz mpraetz@hunterpointcapital.com
**Sent:** Monday, May 3, 2021 6:50 PM
**To:** dlee@hillhousecapitalholdings.com
**Subject:** Re: Interesting fund opportunity

SA-115

Sounds good Dan.  I will send over an invite.

Mary Lee Praetz
The Office of Michael Arpey
██████████

---

**From:** dlee@hillhousecapitalholdings.com <dlee@hillhousecapitalholdings.com>
**Sent:** Monday, May 3, 2021 5:52:02 PM
**To:** Mary Lee Praetz <mpraetz@hunterpointcapital.com>
**Subject:** RE: Interesting fund opportunity

Lets do 11 on the 13th?

# Daniel G. Lee III
## Hillhouse Capital Holdings, LLC

**Greenwich, CT**
Cell: ████ ████████
*dlee@hillhousecapitalholdings.com*

**From:** Mary Lee Praetz <mpraetz@hunterpointcapital.com>
**Sent:** Monday, May 3, 2021 11:32 AM
**To:** dlee@hillhousecapitalholdings.com
**Subject:** RE: Interesting fund opportunity

Good morning Dan,

I hope you had a nice weekend.  Mike just advised me that he may be traveling next week Monday-Wednesday.  So, to avoid having to move this call would Thursday or Friday of next week work for you?  Mike could do the following:

May 13:  8AM-12noon / 1-2PM
May 14:  9-10AM

Thank you so kindly Dan and enjoy your Monday.

Mary Lee
██████████

**From:** dlee@hillhousecapitalholdings.com <dlee@hillhousecapitalholdings.com>
**Sent:** Friday, April 30, 2021 4:05 PM
**To:** Mary Lee Praetz <mpraetz@hunterpointcapital.com>
**Subject:** RE: Interesting fund opportunity

CONFIDENTIAL

SA-116

How about after 3PM on the 10th or 2-4 on the 11th?

# Daniel G. Lee III
**Hillhouse Capital Holdings, LLC**

Greenwich, CT
Cell: ▮▮▮▮
*dlee@hillhousecapitalholdings.com*

**From:** Mary Lee Praetz <mpraetz@hunterpointcapital.com>
**Sent:** Friday, April 30, 2021 2:27 PM
**To:** Dan Lee <dlee@hillhousecapitalholdings.com>
**Subject:** RE: Interesting fund opportunity

Hi Dan,

No worries at all. Let's look at the week of May 10. Mike is on the road next week. Let me know if you have some time that week.

Thanks a bunch and have a great weekend.

Mary Lee
▮▮▮▮

**From:** Dan Lee <dlee@hillhousecapitalholdings.com>
**Sent:** Thursday, April 29, 2021 10:07 PM
**To:** Mary Lee Praetz <mpraetz@hunterpointcapital.com>
**Subject:** Re: Interesting fund opportunity

Hey Mary Lee!

Long time! I am well. Weird year! Hope its been good for you. I cant do that time tomorrow (Friday) but I am hopeful if you provide windows next week I can make it work.

Daniel G. Lee III
Hillhouse Capital Holdings, LLC

▮▮▮▮

*dlee@hillhousecapitalholdings.com*

CONFIDENTIAL

SA-117

On Apr 29, 2021, at 8:50 PM, Mary Lee Praetz <mpraetz@hunterpointcapital.com> wrote:

Hi Dan,

How are you?  I hope this note finds you and your family well.  Mike could do a "catch-up" with you tomorrow afternoon.  He will be in a car driving from DC to NY, if you don't mind doing a call, he can do this tomorrow between 4-5PM.  Also, happy to look at other times if the suggested time does not work with your schedule.

Thank you Dan.

Mary Lee
█████████

**From:** Michael Arpey <marpey@hunterpointcapital.com>
**Sent:** Thursday, April 29, 2021 2:02 PM
**To:** dlee@hillhousecapitalholdings.com
**Cc:** Mary Lee Praetz <mpraetz@hunterpointcapital.com>
**Subject:** Re: Interesting fund opportunity

MaryLee, Can you set up a call for Dan and I to speak.

Get Outlook for iOS
_____
**From:** dlee@hillhousecapitalholdings.com <dlee@hillhousecapitalholdings.com>
**Sent:** Thursday, April 29, 2021 7:58:51 AM
**To:** marpey@hunterpointcapital.com <marpey@hunterpointcapital.com>
**Subject:** RE: Interesting fund opportunity

Perfect, sounds good – Let me know how best to proceed. We are due for a catch up anyway…but would be good also for you to hear the story from the horse's mouth!

## Daniel G. Lee III
Hillhouse Capital Holdings, LLC

Greenwich, CT
Cell: ████  ████████
_dlee@hillhousecapitalholdings.com_

**From:** Michael Arpey <marpey@hunterpointcapital.com>
**Sent:** Wednesday, April 28, 2021 5:21 PM
**To:** dlee@hillhousecapitalholdings.com
**Subject:** Re: Interesting fund opportunity

CONFIDENTIAL

Look forward to discussing this with you.

Get Outlook for iOS [aka.ms]

**From:** dlee@hillhousecapitalholdings.com <dlee@hillhousecapitalholdings.com>
**Sent:** Wednesday, April 28, 2021 4:46:10 PM
**To:** Michael Arpey <marpey@hunterpointcapital.com>
**Subject:** Interesting fund opportunity

Mike,

Hope you're well – I wanted to invite you to consider participating personally with me in a fund that I have been involved with for the past many years, and may have already mentioned to you. Bedrock MHC Partners is focused on acquisitions of Manufactured Housing Communities in the US sunbelt that is run by two close friends of mine, Paul Gojkovic and John Barber of Cohesive Capital.

I've been investing with Paul since Fund I where we recently sold the portfolio to a blue chip PE firm, achieving gross / net  returns of 3.0x / 2.3x Multiple of Capital and 48.2% / 36.2% IRR.

Paul is now finishing investing Fund II and moving on to raising Fund III. Paul has scaled his team and refined his strategy along the way. As a result of this and the success deploying two prior funds, he now enjoys a very strong market position.

Many LPs are upsizing in Fund III, most of whom are senior PE and finance executives, some of whom I suspect you may know.

Happy to set you up directly with Paul and John if this sounds at all interesting.

The Fund III deck is attached.

Lets catch up soon either way!

Best,

Dan

## Daniel G. Lee III
Hillhouse Capital Holdings, LLC

Greenwich, CT
Cell: ██████ █████████
dlee@hillhousecapitalholdings.com

CONFIDENTIAL

SA-119

Hunter Point Capital Email Notice: This email and its contents and attachments are confidential, may be privileged or otherwise subject to legal restrictions and are intended solely for the use of the intended addressee. This email is neither an offer nor the solicitation of an offer to purchase or sell any securities or investments. Securities of any Fund managed by Hunter Point Capital LP ("HPC") are offered to selected investors only by means of a complete offering memorandum and related subscription materials which contain significant additional information about the terms of an investment in the Fund (such documents, the "Offering Documents"). Any decision to invest must be based solely upon the information set forth in the Offering Documents, regardless of any information investors may have been otherwise furnished, including this presentation. This information is strictly confidential and may not be reproduced or redistributed in whole or in part nor may its contents be disclosed to any other person without the express consent of HPC. Please notify the sender immediately if you have received this email in error and promptly destroy this email and all attachments thereto. The sender is unaware of any virus or similar defect that might affect a computer system on which this email or any attachment is opened, but Hunter Point Capital LP does not assume liability by reason of sending this message for any damages that may result from its access. Please satisfy yourself as to the safety of any attachments before opening.

CONFIDENTIAL

SA-120

**DRAFT**                                                     **HIGHLY CONFIDENTIAL & TRADE SECRET**

### Conceptual Memo - Project Buffalo Point

*Backing a team poised for growth, investing at the intersection of private equity secondaries and credit.*

**Thesis:** *The popularity and growth potential of the preferred equity and NAV finance market provides an attractive backdrop and a de-risked entry point for a firm interested in backing and building a secondary private equity business. The Buffalo Point team ("BP" or "the team") is highly experienced within this subset of the market and would benefit from a partner with extensive financial services and private credit expertise.*

### Executive Summary

Buffalo Point brings demonstrable experience in sourcing and structuring superior risk adjusted exposures in preferred equity and private credit transactions focused on private equity market counterparties. These financing opportunities are being driven by strong macro trends deriving, in part, from the increasing capital intensity of the broader private markets.

The team originates preferred equity and NAV loan transactions that provide flexible liquidity and accretive financing solutions to General and Limited Partners, their funds, and their management companies. These transactions do not take single company risk and sit in senior positions secured by diversified portfolios of assets held by these funds, or by fees, carry, and other assets at the management company level.

The BP team targets unlevered IRRs of 12-15% and unlevered MOICs of 1.2x-1.5x in preferred equity transactions; and unlevered IRRs of 8-10% and unlevered MOICs of 1.2x-1.3x in credit transactions, each against very low LTVs of 15-40% and 5-25% respectively.

### The Market Opportunity

Buffalo Point seeks exposure to transaction structures that it has experience in sourcing, structuring, executing, and exiting:

- Non-dilutive management company financings that offer an attractive alternative to the GP stakes market.
- Fund level financings that provide growth capital and liquidity solutions to funds out of callable LP capital.
- Financings of underlying LP portfolios to accelerate liquidity.
- Financings of continuation vehicles and portfolios of single asset transactions.

The Buffalo Point team has been at the forefront of the North American business of a firm that has originated over sixty similar investments totaling over $3.5 billion in deployment, the bulk of which has occurred in the last four years. The platform's track

1

                                                     LEE_00002691

SA-121

**DRAFT**                                                                    **HIGHLY CONFIDENTIAL & TRADE SECRET**

record across over thirty realized transactions is a 16% gross unlevered IRR and a 1.4x gross unlevered MOIC, with no losses.

Buffalo Point team members have led the sourcing and execution for seven preferred equity transactions, deploying ~$700 million with North American GPs and global strategic investors, since March of 2019.

The teams historic underwriting ethos is intended to be maintained on the Buffalo Point platform, with a renewed focus on market dominance in North America.

The market for originating Buffalo Point's transactions is robust and growing, particularly in North America, where adoption is continuously gaining traction from large and high-quality counterparties. The team actively cultivates, originates, and executes transactions with high-quality and increasingly blue-chip private equity investors. Today, the average deal size in the team's pipeline is over $150 million, however attractive opportunities of varying sizes are frequently sourced.

The team actively manages its origination pipeline. Deal flow is not exclusively dependent on intermediaries, with ~60% of historic opportunities having been proactively shaped in bilateral discussions with counterparties. To drive this effort, the Buffalo Point team conducted an estimated seven hundred North American deal flow meetings in the last twelve months.

The team believes the right strategic partner would possess the ability to enhance origination, a fundamental component of the business.

**Limited Partner and Institutional Investor Interest**

As the market for transactions grows, it has been supported by growing institutional investor interest. The Buffalo Point team believes that while broad based investor interest is still early in its development, it will rise to a scale like that of its forbearer, the traditional secondary market. Hence, it is a compelling time to position a platform to take advantage of this market opportunity.

For example, US Public Pensions and other large institutions are still not broadly invested in the space. Though capital is beginning to flow, comparatively few dedicated firms have secured commitments from the institutional community to pursue preferred equity and NAV loans. Buffalo Point believes there is space in the market to create a firm with a dominant presence.

LP commitments often come from private debt allocations where the Buffalo Point strategy provides comparable (unlevered) returns but superior down-side protection to that of mezzanine or direct lending. The team sees active interest from LPs and believes that the market is in the earlier innings of increased investor allocation.

The team also believes that as LPs gain more awareness of the superior down-side protection embedded in this strategy, especially versus their existing private credit

2

SA-122

**DRAFT**                                    **HIGHLY CONFIDENTIAL & TRADE SECRET**

portfolios; allocations should increase significantly. It is Buffalo Point's intent to be best positioned to take advantage of this shift.

Buffalo Point has extensive existing dialogues with North American LPs, large global allocators, and the gatekeeper community. The team believes that in addition to raising traditional committed LP capital, a substantial opportunity exists to provide customized solutions and separately managed accounts to large and sophisticated pools of capital. The team has experience responding to these demands and in working with investors seeking to build and implement these programs.

**Other Opportunities to Innovate**

The team also believes there are untapped opportunities that would unlock additional value for investors. The team has thus far been unable to leverage these strategies at their current firm but believes they should be considered as part of the Buffalo Point platform.

For instance, the insurance and credit markets provide a compelling backdrop for the creation of structured products that provide leverage, on a pooled basis, to underlying Limited Partners or to create back leverage structures on a deal-by-deal basis. Such structures would boost returns on preferred equity transactions to a range more comparable to buyouts, with shorter durations and considerably less risk.

Buffalo Point believes this would further expand the universe of available capital from LPs. LPs who are well versed in BP's core markets, are seeking higher returns, and are willing to accept levered structures or instruments to get there.

The team is attracted to strategic partners who possess the ability to help build and enhance these initiatives.

**The Team**

The Buffalo Point team consists of three founding partners and two mid-level investment professionals, each with experience across diverse private markets disciplines all strongly relevant to preferred equity and NAV financing of private equity portfolios, including:

- Limited Partners
- Secondary Investors
- Bank Lending platforms
- Fundraising and Investor Relations
- Insurance and Institutional Asset Management

Other candidates, who would create further value for the Buffalo Point platform, have been identified. Each possess senior private markets experience with strong, actionable, and impactful relationships across our global industry.

3

SA-123

**DRAFT**                                          **HIGHLY CONFIDENTIAL & TRADE SECRET**

## Conclusion

While this market has been developing for over fifteen years, the lack of a clear market leader amongst a small yet diverse group of dedicated market participants suggests there is an advantage to being the most aggressive asset gatherer, and the most creative product innovator. The Buffalo Point team believes its approach to building a multi-product platform, that serves a diverse set of global investors across a range of structures, is a differentiating feature that positions it for success.

Lastly, the Buffalo Point team believes that a strategic partnership with an organization steeped in all aspects of its core markets and the markets presenting further opportunities to innovate, would be highly compelling and would accelerate the successful creation of a multi-billion-dollar market leader in the preferred equity and NAV financing market.

4

Case 7:23-cv-10695-PMH    Document 82-8    Filed 11/11/24    Page 12 of 56    PRIVILEGED AND CONFIDENTIAL



BEDROCK
COMMUNITIES

# Bedrock MHC Partners III, L.P.

INVESTMENTS IN SUNBELT U.S. MANUFACTURED HOUSING COMMUNITIES

April 2021

CONFIDENTIAL

LEE_00002695

PRIVILEGED AND CONFIDENTIAL

CONFIDENTIAL

LEE_00002696

# Table of Contents

| | |
|---|---|
| Executive Summary | 3 |
| Manufactured Housing Community Investing Market | 4 |
| Bedrock Communities | 7 |
| Bedrock MHC Partners III, L.P. | 17 |
| Appendix: | |
| ▲ Value Creation Case Studies | 22 |
| ▲ Fund I & Fund II Portfolio Detail | 28 |
| ▲ Sunbelt | 32 |
| ▲ Historical Interest Rates & Spreads | 36 |
| ▲ Key Term Glossary | 38 |

2

PRIVILEGED AND CONFIDENTIAL

# Executive Summary

**MHC Investing Highlights**

▲ Manufactured Housing Communities ("MHCs") have distinct characteristics which make for a potentially highly attractive investment

▲ Unique ownership structure in which tenants own their home but rent land from community-owners, limiting capex requirements and creating a particularly "sticky" tenant base

– Despite challenges in other real estate asset classes, Bedrock achieved 99% collections in 2020

– Tenants at age-restricted ("55+") communities benefit from a steady source of income

▲ Additional dynamics include potential tax benefits to investors, structurally limited supply, and a fragmented market, largely "mom-and-pop" owned

**Evolution of Bedrock**

▲ Bedrock has invested heavily in its team and has demonstrated its ability to acquire and manage a large portfolio across a wide geographic area

– 23 current employees, with 7 supporting sourcing, execution, and portfolio management and 16 focused on property management

▲ Bedrock has developed deep relationships in the MHC community in the Southeastern U.S.

– Sourced opportunities representing over $1.6 billion in property value since inception

▲ Sold Fund I portfolio, achieving gross / net[1] returns of **3.0x / 2.3x Multiple of Capital and 48.2% / 36.2% IRR**, demonstrating the team's ability to create value and illustrating market demand for assembled portfolios of institutional quality communities

**Fund III Strategy**

▲ Build a portfolio of largely 55+ MHCs primarily in Florida, but also in the larger Sunbelt region, at attractive prices, with the opportunity for meaningful operational improvements

▲ Targeting $100 million of Limited Partner capital, **in addition to more than $10 million commitment from the General Partner**, creating strong alignment of interests

See page 13 for full performance history.
(1) Represents the net amount to Limited Partners after all fees and expenses including carried interest paid to General Partner

CONFIDENTIAL

3

LEE_00002697

Case 7:23-cv-10695-PMH    Document 82-8    Filed 11/11/24    Page 15 of 56    PRIVILEGED AND CONFIDENTIAL

# Manufactured Housing Community Investing Market

CONFIDENTIAL

LEE_00002698

PRIVILEGED AND CONFIDENTIAL

CONFIDENTIAL

# Manufactured Housing Community Investing Market

MHCs have unique ownership structures and favorable market dynamics for investment

## Unique Ownership Structure

▲ Community owner owns the **land**, tenant owns the **home** and rents the lot ("pad") from the community owner

▲ "Mobile Home" moniker is largely a misnomer as home relocation is typically uneconomic ($5k-10k to move a home that is often worth less than $25k)

## Large & Fragmented Market

▲ Over 15,000 communities in the United States[1][2]

▲ Approximately 14,000 communities have "mom-and-pop" owners[1][2]

▲ Some large institutions have been consolidators, but still only own an estimated 8% of the market[1][2]

## Attractive Supply/Demand

▲ Very few new communities constructed

– Most municipalities block development through zoning

– Strong not in my backyard ("NIMBY") community opposition due to stigma

▲ Stable and growing demand for low-income housing through all economic cycles

▲ Attractive home-ownership option for fast-growing U.S. senior population

(1) Source: JLT Associates Consulting
(2) Only includes communities with 50 pads or more

LEE_00002699

PRIVILEGED AND CONFIDENTIAL

# Manufactured Housing Community Investing Market (Cont'd)

Favorable MHC market dynamics drive potential for strong and growing income and cash flows while preserving favorable tax characteristics

## Ability for Consistent Income Growth

▲ Supply/demand dynamics, combined with the unique ownership structure drives stable tenant base and consistent ability to grow income

▲ Equity Lifestyle Properties ("ELS"), the country's largest nationwide MHC owner, has grown its same-store NOI every quarter over the past 20 years (even through the 2001-2003 and 2008-2010 recessionary periods)

## Limited Capital Expenditure

▲ Community owner is only responsible for the maintenance of landscaping, infrastructure and amenities for common areas

▲ Tenant is responsible for all maintenance of their owned home (i.e., roof, A/C, etc.)

▲ Ownership of land does not require as much upkeep expense or exhibit the same long-term value depreciation as constructed real estate

## Attractive Tax Attributes

▲ Despite reduced physical wear-and-tear vs. constructed residential properties, tax code still allows for realizing depreciation benefit for tax purposes through accelerated depreciation

▲ Despite producing significant current cash flow (once a community reaches stabilized NOI), the properties are projected to produce minimal, if any, taxable income during the fund hold period

CONFIDENTIAL

LEE_00002700

Case 7:23-cv-10695-PMH   Document 82-8   Filed 11/11/24   Page 18 of 56   PRIVILEGED AND CONFIDENTIAL

# Bedrock Communities

LEE_00002701

PRIVILEGED AND CONFIDENTIAL

CONFIDENTIAL

# Bedrock Evolution

Bedrock has significantly expanded its team, experience and capabilities

**2015**

**2020**

## Team

**2015**
- 1 member

**2020**
- 8 members supporting sourcing, execution, and portfolio management[1]
- 26 members focused on property management[1]

## Experience

**2015**
- 1 (55+ age-restricted) community purchased prior to launching Fund I

**2020**
- 20 communities / 3,055 total pads purchased and managed across Fund I and Fund II[2]
  - Sold 8 communities / 1,168 pads
- Significant geographic reach across the state of Florida
- Executed first 100% all-age community acquisition

## Capabilities

**2015**

*Core Plus* Strategy
- Attractive purchase price
- Moderate rent increases
- Minimal capital improvement projects

**2020**

*Value-Add* Strategy
- Attractive purchase price
- Significant mark-to-market rent increases
- Targeted material capital improvement projects
- Modest occupancy increases

(1) Prior to sale of Fund I portfolio. Current headcount includes 7 members supporting sourcing, execution, and portfolio management and 16 property team members
(2) Includes the Keystone Portfolio (3 communities / 478 pads), which is currently under contract with the deposit projected to go non-refundable 4/22/21

LEE_00002702

PRIVILEGED AND CONFIDENTIAL

# Bedrock Value Creation Playbook

Bedrock has a proven playbook to take its communities from "mom-and-pop" to institutional-quality which creates significant equity value



**Sourcing The Right Deals**
- Small-to-medium sized communities from mom-and-pop owners
- Purchase at attractive valuation relative to stabilized NOI

**The Path to Stabilized NOI**
- Bring rent to market rates
- Refurbish clubhouse, amenities and common areas
- Pass-through utility costs to tenants
- Renovate and sell vacant park-owned homes / fill vacant pads
- Rigorous expense management

**Additional Value Creation**
- Continued market rent growth
- Best-in-class community management
- Cash-out refinancing based on stabilized NOI
- Opportunity for cap rate compression due to improved community quality or potential portfolio premium

Value

Hold Period

9

PRIVILEGED AND CONFIDENTIAL

# Hypothetical Illustrative Projected Property Gross Return Profile(1)(2)(3)



Note: This chart shows a hypothetical future investment. It assumes that the investment will be made as indicated, and that the investment will perform as indicated. Although Bedrock believes the assumptions in the charts are reasonable, there can be no assurance that any Fund investment will be profitable or realized at similar returns. The financial projections set forth herein are subject to great uncertainty.

(1) Illustrative Projected Property Gross Return Profile is based on projected cash flows of a single hypothetical deal and is not based on historical returns
(2) Illustrative Projected Property Gross Return Profile is based on projections made for a property assuming 7.5% compound annual growth in NOI, 60% Loan-to-Value, 4.3% in-place cap rate at acquisition (we believe this equates to a 5.5% acquisition cap rate based upon our projected stabilized NOI after 2.5 years of ownership), 5.5% exit cap rate (investment terms typical of a Fund II acquisition). Upside terminal value reflects a 5.0% exit cap rate. Refinancing assumes upside of loan to 80% of original purchase price at the end of year 2. IRR from Cash Flow Generation is based on the IRR assuming exit at the entry purchase price including CapEx reserves and working capital
(3) Projected Gross IRR does not reflect the deduction of the Management Fee, the Carried Interest distributions, or other fees and expenses, all of which will decrease the return experienced by an investor; and cannot be utilized to predict the return on an investment in the Fund

CONFIDENTIAL

LEE_00002704

10

Case 7:23-cv-10695-PMH    Document 82-8    Filed 11/11/24    Page 22 of 56    PRIVILEGED AND CONFIDENTIAL

# Examples of Before and After Renovations

11

**Before**







**After**







Clubhouse Kitchen

Signage

Park-Owned Home Kitchen

CONFIDENTIAL

LEE_00002705

PRIVILEGED AND CONFIDENTIAL

# Bedrock's Sourcing & Deal Flow

Bedrock Communities has spent years building relationships with key members of the MHC market leading to strong deal flow since inception

**Total Opportunities Sourced**
*For-sale communities reviewed*
$1,600,000,000[1]  100.0%

**Limited Review**
*Conducted diligence of market conditions*
$1,100,000,000[1]  68.8%

**Opportunities Underwritten**
*Created projections & analyzed returns*
$800,000,000[1]  50.0%

**Offers Made**
*Made offer to purchase community*
$350,000,000[1]  21.9%

**Closed**
*Purchased community*
$132,000,000[1][2]  8.3%

**Service Providers**
Active networking with top attorneys, appraisers, and vendors

**Brokers**
Active coverage of the property and mortgage brokerage community

**Greater Certainty of Close**
Fund structure provides an advantage over other buyers in the non-institutional market due to availability of capital

**Owners**
Build & maintain relationships with potential future community sellers

**Outbound Marketing**
Built a database of compelling opportunities in target markets

(1)  Deal value represents total value including both equity and debt
(2)  Includes $21.5 million attributable to the Keystone Portfolio, which is currently under contract with the deposit projected to go non-refundable 4/22/21

12

LEE_00002706

PRIVILEGED AND CONFIDENTIAL

# Summary Track Record

| $ in millions except per pad, which is $000s | Fund I | Fund II[1] |
|---|---|---|
| Fund Size | $22.9 | $45.2 |
| Vintage | 2016 | 2018 |
| Pads | 1,168 | 1,887 |
| Acquisition Price | $54.4 | $77.6 |
| Acquisition Price/Pad | $47 | $41 |
| Invested Capital | $20.4 | $33.6 |
| Debt Outstanding | – | $49 |
| Loan-to-Value[2] | – | 54% |
| Blended Average Interest Rate | – | 4.6% |
| Total Distributions | $60.4 | $4.1[3] |
| Carrying Value[4] | $0.9 | $37.6[3] |
| Total Value | $61.3 | $41.7[3] |
| Realized Gross Multiple[5] | 2.96x | 0.18x[3] |
| Unrealized Gross Multiple[4][5] | 0.05x | 1.17x[3] |
| Total Gross[5] / Net[6] Multiple | 3.01x / 2.34x | 1.34x / 1.15x[3] |
| Gross[5] / Net[6] IRR | 48.2% / 36.2% | 23.4% / 12.5%[3] |

Note: Past performance is not necessarily indicative of future results and there can be no assurance that the Fund will achieve comparable results, achieve its investment objective or avoid losses.

(1) Except for Gross Multiple and Gross IRR, metrics include the Keystone Portfolio, which is currently under contract with the deposit projected to go non-refundable 4/22/21
(2) Based on Total Enterprise Value used in calculating the Carrying Value
(3) Reflects projected return of capital from an in-process refinancing of a property in Fund II (estimated close April 2021)
(4) The Carrying Value and Unrealized Gross Multiple are unrealized. Accordingly, there is no guarantee that the unrealized gross return numbers will be met, and any financial projections are subject to great uncertainty
(5) All the Gross Multiples and the Gross IRR do not reflect the deduction of the Management Fee, the Carried Interest distributions, or other fees, costs and expenses, which in the aggregate could be substantial, and lower the gross returns
(6) Represents the net amount to Limited Partners after all fees and expenses including carried interest paid to General Partner

13

CONFIDENTIAL

LEE_00002707

PRIVILEGED AND CONFIDENTIAL

CONFIDENTIAL

LEE_00002708

14

# Management Overview

## Paul Gojkovich III

*Managing Partner*

Paul is the founder and Managing Partner of Bedrock. He is responsible for overseeing Bedrock's day-to-day management as well as its investment activity. Paul has overseen the acquisition of approximately 3,100 MHC pads to-date which are valued at approximately $190 million. He has spent the past seven years building relationships with key MHC market participants, including active networking with top attorneys, appraisers and accountants in the MHC space and actively covering the property and mortgage brokerage community to remain a first call when new opportunities arise. Prior to forming Bedrock, Paul spent nine years as a Newmark Knight Frank, most recently as a Managing Director in the capital group in Newmark's New York City headquarters. Paul has experience in both real estate operations and underwriting and has structured over $1.0 billion in transactions. Paul received B.A. in Political Science from Duke University and attended the Brunswick School in Greenwich, Connecticut.

## John R. Barber

*Chairman*

John is the Chairman of Bedrock. He assists in overseeing investment activity and is a member of the Investment Committee as well as the Board of Managers. John has overseen the acquisition of approximately 3,100 MHC pads to-date which are valued at approximately $190 million.

In addition to his role at Bedrock, John is the Managing Partner of Cohesive Capital Partners. Cohesive Capital Partners is a leading private equity co-investment firm which has raised over $1 billion in equity capital. Prior to Cohesive, John was the Managing Partner of Citi Private Equity ("CPE"), which he co-founded in 2000. In this role, John managed approximately $13 billion of capital and oversaw the direct equity, direct mezzanine and fund investments globally for CPE and its affiliates while managing a team of 115 investment professionals and 50 total professionals in New York and London. John sat on the investment committees of CPE, Citi Alternative Investments, Citi Mezzanine Partners, CCP II, Citi Real Estate Partners and also on the Management Committee of Citi Alternative Investments.

Before co-founding CPE in 2000, John served at Salomon Smith Barney as a Managing Director and Deputy Head of the Financial Entrepreneurs Group, Head of the Private Equity Group, a member of the Equity Commitment Committee and as a senior member of the Equity Capital Markets Group. Prior to joining Salomon Smith Barney in 1995, John was a Managing Director at Kidder Peabody & Co. where he was Head of the Equity Capital Markets Group and a member of the firm's Commitment Committee. Prior to Kidder Peabody, John started his career at Drexel Burnham Lambert where he held various capital markets roles over seven years. He received a B.A. from Tufts University magna cum laude.

PRIVILEGED AND CONFIDENTIAL

CONFIDENTIAL

15

# Management Overview



## Rhonda Stroud

*Executive Vice President & Head of Property Management*

Rhonda is an Executive Vice President and is the head of property management at Bedrock Communities. She is a 20-year veteran in the property management industry with 17 years of experience in multifamily property management. Rhonda is based in Tampa and is responsible for leading a team of 18 property management and maintenance employees. Prior to joining Bedrock Communities Rhonda was a regional manager at SPM Property Management for three years where she oversaw 12 properties consisting of over 2,500 apartment units. Before joining SPM, Rhonda was a regional property manager at Mid-America Apartment Communities for eight years where she oversaw 12 properties consisting of over 3,000 apartment units. Prior to Mid-America, Rhonda was a multi-site property manager at Laramar Group for four years.



## Nabil Eliya

*Chief Financial Officer*

Nabil is the Chief Financial Officer of Bedrock Communities and is responsible for all accounting related matters at the fund and property level. Nabil is a CPA with over 20 years of accounting experience, which includes experience with the implementation of infrastructures for both newly launched funds and well-established organizations, creating controls, making essential changes to operations and institutionalizing processes. Prior to joining Bedrock Communities, Nabil was CFO at Carbonado Capital, a Blackstone-funded hedge fund, and CFO at Hunter Peak Investments, a hedge fund which Nabil helped launch. Prior to Hunter Peak Investments, Nabil worked at Centerbridge Partners as a Controller. Nabil received his B.A. in Accounting from Pace University where he graduated cum laude.

## Matt Boettger

*Senior Associate*

Matt is a Senior Associate at Bedrock Communities where he works on property investments and asset management. Prior to joining Bedrock Communities, Matt was an Analyst at Blackstone where he worked on the investment management of over 200 retail centers and 90 senior housing properties across multiple investment vehicles. Matt received a B.B.A. in Finance from The University of Texas at Austin.

LEE_00002709

PRIVILEGED AND CONFIDENTIAL

CONFIDENTIAL

# Bedrock Team

Bedrock Communities has 23 team members, consisting of 7 members supporting sourcing, execution, and portfolio management and 16 members focused on property management



Paul Gojkovich
*Managing Partner and Investment Committee Member*

John Barber
*Chairman and Investment Committee Member*

Rhonda Stroud
*Head of Property Management*

Nabil Eliya
*CFO*

Matt Boettger
*Senior Associate*

Dale Bennett
*Maintenance Director*

Tammy Vick
*Accounts Payable Associate*

Mari Mercado
*District Manager*

*7 Property Managers & 9 Property Staff*

## Service Providers

| LeverPoint | CohnReznick | Lutz, Bobo & Telfair | Rosenberg & Estis | First Republic |
|---|---|---|---|---|
| *Fund Administrator* | *Audit* | *Property Legal* | *Fund Legal* | *Bank* |

16

LEE_00002710

Case 7:23-cv-10695-PMH    Document 82-8    Filed 11/11/24    Page 28 of 56    PRIVILEGED AND CONFIDENTIAL

# Bedrock MHC Partners III, L.P.

17

LEE_00002711

**SA-141**

Case 7:23-cv-10695-PMH   Document 82-8   Filed 11/11/24   Page 29 of 56   PRIVILEGED AND CONFIDENTIAL

# Fund III Strategy

For Fund III, Bedrock plans to continue and build upon the learnings and successes from Fund I & Fund II

**Community Management**
*Hands-on best-in-class management*

**Value Creation**
*Rent increases, occupancy increases, expense management, moderate capex*

**Type**
*Projected >66% age-restricted and <34% all-age communities*

**Location**
*Projected >75% in Florida and <25% in attractive eastern sunbelt MSAs*

**Size**
*Focus on small and medium-sized communities (projected 25-30 communities and 4,500 - 5,500 pads)*

**Fund III**
**Building Blocks**

18

LEE_00002712

PRIVILEGED AND CONFIDENTIAL

# Fund III – Capitalizing on a Broader Opportunity

Utilizing the learnings from investing Fund I and Fund II, Fund III is in a strong position to create additional value by deploying a larger fund and expanding further into the Sunbelt while adding all-age communities into the portfolio

**Expanded Sunbelt Geographic Footprint**



- ▲ Florida remains attractive with its significant concentration of MHCs, many of which are 55+
- ▲ Lower taxes and regulations enable a pro-business culture and draw private-sector growth
- ▲ Warm weather, population migration, and employment trends create attractive MHC opportunities in selected Sunbelt locations
- ▲ During the Fund II investment period, Bedrock has evaluated opportunities in Chattanooga, Charleston, and Savannah, among others, and has developed a strong understanding of the markets outside of Florida

**Adding All-Age Communities**

- ▲ Much larger supply of all-age MHCs
- ▲ Bedrock has evaluated and invested in all-age communities as part of the Fund II portfolio
- ▲ Slightly different diligence process for all-age communities, but the drivers of success (i.e., capital improvements, mom-and-pop sellers, location, limited supply) are the same
- ▲ Focus where employment and population trends drive strong demand

CONFIDENTIAL

LEE_00002713

PRIVILEGED AND CONFIDENTIAL

# Key Acquisition Metrics

Bedrock utilizes specific guidelines to build a portfolio with strong and stable annual cash flows and to position the portfolio for maximum potential sale value



| | Fund I | Fund II[1] | Fund III Target |
|---|---|---|---|
| Target Gross Underwritten Property IRR[2][3] | 16.6% | 17.1% | 14-17% |
| Loan-to-Value | 67% | 63% | 60-75% |
| Age-Restricted | 100% | 94% | >66% |
| Occupancy | 91% | 87% | >75% |
| % Discount to Market Rent | 17% | 23% | >10% |
| % Park-Owned Homes[4] | 4% | 7% | <15% |

(1) Includes the Keystone Portfolio, which is currently under contract with the deposit projected to go non-refundable 4/22/21
(2) Projected Gross Underwritten Property IRR based on multi-year cash flow projection, including projected financing, projected rent levels, projected operating expenses, projected proceeds from future disposition at a projected cap rate and future NOI and other material projections. See page 13 for actual IRR results
(3) Projected Gross Underwritten Property IRR does not reflect the deduction of the Management Fee, the Carried Interest distributions, or other fees and expenses, all of which will decrease the return experienced by an investor; and cannot be utilized to predict the return on an investment in the Fund
(4) Includes permanent rental structures (single family houses/cottages/etc.)

PRIVILEGED AND CONFIDENTIAL

# Summary of Principal Terms

| | |
|---|---|
| **The Fund** | Bedrock MHC Partners III, L.P. |
| **Target Fund Size[1][2]** | $100,000,000 |
| **General Partner** | Bedrock MHC Partners III (GP), LLC |
| **Commitment Period** | Commencing with the initial payment of Fund Management Fees and ending three years after the initial payment of Fund Management Fees, with a one-year extension option at the discretion of the General Partner |
| **Fund Life** | Ten years from the end of the Commitment Period, with two one-year extension options at the discretion of the General Partner |
| **Fund Management Fee** | During the Commitment Period, 2.0% per annum of aggregate amount of commitments of the Fund's limited partners. Thereafter, 1.5% on invested capital of unrealized investments |
| **Acquisition Fee** | 1.0% of the purchase price of each asset paid upon acquisition |
| **Property Management Fee** | 4.0% of the gross annual income |
| **Carried Interest & Preferred Return** | 15.0% carried interest (with catch-up) after distributions sufficient to provide an 8.0% Preferred Return 20.0% carried interest (with catch-up) after distributions sufficient to provide a 12.0% Preferred Return |
| **Minimum L.P. Commitment[3]** | $500,000 |
| **General Partner Commitment** | The General Partner, its affiliates and their employees will commit, directly and/or indirectly, **more than $10,000,000 in aggregate**, of which Bedrock's Managing Partner, Paul Gojkovich, will commit at least $3,000,000 and Bedrock's Chairman, John Barber, will commit at least $5,000,000 |

(1)  Excluding the General Partner Commitment
(2)  General Partner can elect to commence the operation of the Fund with such smaller amount as the General Partner determines in its sole discretion
(3)  General Partner can accept any lesser amounts in its sole discretion

21

LEE_00002715

# Appendix: Value Creation Case Studies

22

CONFIDENTIAL

LEE_00002716

PRIVILEGED AND CONFIDENTIAL

# Fund I Value-Creation Highlight – Portfolio Sale

Bedrock has significant experience purchasing communities that can be aggregated to create an attractive institutional-quality portfolio that benefits from cap rate compression (i.e., a portfolio premium) as evidenced by the gross / net[1] 3.0x / 2.3x multiple of capital and 48% / 36% IRR achieved in Fund I over an average 3.2-year hold period

▲ Bedrock purchased 8 properties in Fund I during 2017-2018 for $54.4 million ($47k per pad)

▲ Bedrock was able to increase total NOI across the 8 properties by 18% over the 3.2-year average hold period, representing a 5.5% compound annual growth rate - all properties outperformed original projections

▲ Bedrock was able to improve the quality of the communities through active management and capital expenditures on infrastructure and amenities

– Renovation of clubhouses, shuffleboard courts, swimming pools, etc.

– Repaved roads and replaced sewer systems/lines and electrical pedestals, etc.

▲ Bedrock sold the 8-property portfolio for $95.7 million ($82k per pad), which reflected a blended-average 4.1% cap rate, with the buyer assuming the in-place mortgages at a blended-average interest rate of 4.7%

▲ While interest rates compressed between the various acquisitions and the portfolio sale, Bedrock believes a bulk of the cap rate compression came from the spread between purchasing smaller, non-institutional-quality assets on a one-off basis from mom-and-pop sellers, improving the properties and offering them for sale as an aggregated portfolio of institutional-quality assets

(1) Represents the net amount to Limited Partners after all fees and expenses including carried interest paid to General Partner

23

LEE_00002717

PRIVILEGED AND CONFIDENTIAL

CONFIDENTIAL

LEE_00002718

Case 7:23-cv-10695-PMH     Document 82-8     Filed 11/11/24     Page 35 of 56

# Fund I Value-Creation Highlight – Lucerne Lakeside

**Value Enhancement:**

- ▲ Hired new on-site manager to enforce rules & regulations and streamline operations
- ▲ Installed new lakeside furniture and grills providing new area to congregate
- ▲ Upgraded dock to allow for more resident boats
- ▲ Connected to city water from well water
- ▲ Passed through water, sewer and trash costs to residents
- ▲ Refinanced property and distributed 72% of initial equity to investors, 14 months after initial acquisition



Upgraded Boat Dock

**Property Performance**

| | At Acq. | Current | vs. At Acq. | vs. vs. Market |
|---|---|---|---|---|
| Date | Apr 2017 | Feb-2021 | | |
| Lot Rent | $419 | $493 | $74 / 17.8% | |
| Utility Passthrough | – | 42 | $42 | |
| RE Tax Passthrough | – | – | – | |
| Gross Rent | $419 | $535 | $116 / 27.8% | – |
| Occupancy | 97.1% | 97.1% | – | – |
| Vacant POH | – | – | – | – |

**Returns Summary ($000s)**

| | |
|---|---|
| Distributions | $6,495 |
| Carrying Value | 111 |
| Total Value | $6,606 |
| **Gross Multiple** | |
| Realized | 2.9x |
| Unrealized | 0.0x |
| Total | 3.0x |
| Gross IRR | 52% |

Note: The Value Creation Highlights and Case Studies are meant to be illustrative and are only a portion of the relevant Fund's portfolio. See page 13 and the accompanying Notes for the performance of the entire Fund.

24

PRIVILEGED AND CONFIDENTIAL

CONFIDENTIAL

# Fund II Value Creation Highlight – Citrus Center

Value Enhancement:

▲ Hired new on-site manager to enforce rules & regulations and streamline operations

▲ Renovated the clubhouse and added new amenities including a billiards room, gym and library

▲ Renovated and sold six homes that were vacant at acquisition along with 14 homes that were vacated since acquisition

▲ Removed six vacant park-owned homes that were beyond repair in preparation for purchasing new homes to either rent or sell

▲ Passed through water, sewer and increase in property taxes to tenants



Renovated Entrance

## Property Performance

| | At Acq. | Current | vs. At Acq. | vs. Market |
|---|---|---|---|---|
| Date | Nov-2018 | Feb-2021 | | |
| Lot Rent | $410 | $410 | $0 / 0.0% | |
| Utility Passthrough | 37 | 76 | $39 | |
| RE Tax Passthrough | – | 46 | $46 | |
| Gross Rent | $447 | $532 | $85 / 19.0% | (7%) |
| Occupancy | 87.3% | 89.0% | 175 bps | |
| Vacant POH | 12 | – | (12) | |

## Returns Summary ($000s)[1]

| | |
|---|---|
| Distributions | $3,350 |
| Carrying Value | 4,674 |
| Total Value | $8,024 |
| **Gross Multiple** | |
| Realized | 0.7x |
| Unrealized | 0.9x |
| Total | 1.6x |
| Gross IRR | 24% |

Note: The Value Creation Highlights and Case Studies are meant to be illustrative and are only a portion of the relevant Fund's portfolio. See page 13 and the accompanying Notes for the performance of the entire Fund.

(1) Reflects projected return of capital from an in-process refinancing (estimated close April 2021)

25

LEE_00002719

PRIVILEGED AND CONFIDENTIAL

# Fund II Value Creation Highlight – Little Manatee

Value Enhancement:

➤ Hired new on-site manager to enforce rules & regulations and streamline operations

➤ Removed 17 dilapidated homes and renovated 20 salvageable homes (all have been sold); in the process of renovating additional homes

➤ Purchased three brand new Champion homes that were installed and ready for sale March 2021

➤ Gut renovated the clubhouse and recreation center to include a billiards room, ping pong room, gym, and library

➤ Built a fenced-in dog park

➤ Created a gated concrete boat storage area and started charging for storage

➤ Installed new lakeside furniture and grills providing new area to congregate

➤ Replaced the failing seawall and rebuilt the dock and piers

➤ Completely rebuilt the water and sewer systems and replaced 75% of the electrical pedestals

➤ Passed through property tax increase to tenants

| Property Performance | | | |
|---|---|---|---|
| | At Acq. | Current | vs. At Acq. vs. Market |
| Date | Sep-2019 | Feb-2021 | |
| Lot Rent | $360 | $423 | $63 / 17.5% |
| Utility Passthrough | – | – | – |
| RE Tax Passthrough | – | 7 | $7 |
| Gross Rent | $360 | $430 | $70 / 19.3%    (14%) |
| Occupancy | 58.8% | 70.3% | 1,152 bps |
| Vacant POH | 40 | 12 | (28) |



Renovated Clubhouse



New Homes

Note: The Value Creation Highlights and Case Studies are meant to be illustrative and are only a portion of the relevant Fund's portfolio. See page 13 and the accompanying Notes for the performance of the entire Fund.

CONFIDENTIAL

LEE_00002720

PRIVILEGED AND CONFIDENTIAL

# Fund II Case Study – All-Age Community

## Emerald Lake:

▲ Emerald Lake was Bedrock's first acquired all-age community

▲ Although location is an important factor for age-restricted communities, it is more important for all-age communities

▲ Some of Bedrock's major considerations for evaluating the purchase of Emerald Lake were:

 – 4 miles south of I-4, which connects Tampa and Orlando

 – 30 miles southwest of downtown Orlando and 16 miles southwest of Disney World

 – Strong industrial presence and continued growth within 10-mile radius

   • Amazon and Walmart (1,500 workers) opened new construction warehouses in 2015 and 2017, respectively

   • FedEx (600 workers) and UPS opened new fulfillment centers in 2016 and 2019, respectively

   • Many other fulfillment centers/warehouses including Mohawk Industries, Huttig Building Products, CTDI, Ford, CVS, Kuehne & Nagel, XPO Logistics, Inline Distributing Company, and Nestle Water

 – Other large employers in the city center 5 miles south that employ lower-income workers

   • Grocery stores: Walmart Supercenter, Winn-Dixie and two Publix stores

   • Other retailers: Lowe's, Walgreens, Dollar General, KFC, Taco Bell, Popeye's, Pizza Hut, etc.

   • Medical related businesses: clinic, ER, various specialists, veterinary, etc.

Note: The Value Creation Highlights and Case Studies are meant to be illustrative and are only a portion of the relevant Fund's portfolio. See page 13 and the accompanying Notes for the performance of the entire Fund.

CONFIDENTIAL

# Appendix: Fund I & Fund II Portfolio Detail

28

LEE_00002722

# Portfolio Map



Dogwood Acres[1]

Singing Forest

Hibiscus Estates

Sunny Pines

**Orlando**

Emerald Lake

Lucerne Lakeside

Fish Haven

Lake Bonny

Citrus Center Colony

Winter's[1]

Colonial Village

**Tampa**

Lake Center Lake

Georgetowne Manor

Rose Lake

Crescent Lake

River Haven

Little Manatee Isles

Porpoise Park[1]

Lake Bon Bon

Tall Pines

Port St. Lucie

**West Palm Beach** ➡

Ocean Tide

Fund I

Fund II

Note: Fund I properties were sold on 2/26/2021.

(1)  Part of the Keystone Portfolio, which is currently under contract with the deposit projected to go non-refundable 4/22/21

29

CONFIDENTIAL

LEE_00002723

PRIVILEGED AND CONFIDENTIAL

# Fund I Portfolio At Acquisition

Bedrock MHC Partners L.P. utilized specific guidelines to build a portfolio with strong and stable annual cash flows and to position the portfolio for maximum potential sale value

**Owned Properties**

*$ in millions*

*Note: Metrics reflect status at acquisition*

| # | Property | City | Type | Total Pads | Acquisition Date | Invested Equity | Loan-to-Value | Park-Owned Homes [1] | | Occupancy [2] | Discount to Market Rent |
|---|----------|------|------|-----------|-----------------|-----------------|---------------|-----|-------------------|-----------|-------------------------|
| | | | | | | | | # | % of Total Pads | | |
| 1) | Luceme Lakeside | Winter Haven | 55+ | 140 | Apr-2017 | $2.2 | 76% | -- | -- | 97% | 10% |
| 2) | Georgetowne Manor | Lakeland | 55+ | 188 | Apr-2017 | 2.8 | 67% | 11 | 6% | 93% | 19% |
| 3) | Tall Pines | Fort Pierce | 55+ | 257 | Sep-2017 | 3.8 | 68% | 7 | 3% | 81% | 21% |
| 4) | Hibiscus Estates | Mount Dora | 55+ | 154 | Dec-2017 | 2.2 | 74% | 2 | 1% | 100% | 6% |
| 5) | Sunny Pines | Mount Dora | 55+ | 58 | Dec-2017 | 1.3 | 65% | 1 | 2% | 100% | -- |
| 6) | Fish Haven | Auburndale | 55+ | 89 | Feb-2018 | 1.8 | 60% | 11 | 12% | 85% | 3% |
| 7) | Rose Lake Estates | Tampa | 55+ | 203 | Sep-2018 | 4.8 | 61% | 2 | 1% | 95% | 29% |
| 8) | Lake Bon Bon | Pinellas Park | 55+ | 79 | Sep-2018 | 1 6 | 63% | 10 | 13% | 87% | 10% |
| **Total Fund I** | | | 100% 55+ | 1,168 | | $20.4 | 67% | 44 | 4% | 91% | 17% |
| **Target** | | | >66% 55+ | | | | 60-75% | | <20% | >80% | >10% |

(1) Includes permanent rental structures (single family houses/cottages/etc.)
(2) Excludes RV sites due to seasonal nature of occupancy

30

CONFIDENTIAL

PRIVILEGED AND CONFIDENTIAL

# Fund II Portfolio at Acquisition

Bedrock MHC Partners II, L.P. utilized specific guidelines to build a portfolio with strong and stable annual cash flows and to position the portfolio for maximum potential sale value

**Owned Properties**
*$ in millions*
*Note: Metrics reflect status at acquisition*

| # | Property | City | Type | Total Pads | Acquisition Date | Invested Equity | Loan-to-Value | Park-Owned Homes [1] | | Occupancy [2] | Discount to Market Rent |
|---|----------|------|------|------------|------------------|-----------------|---------------|-----|-----|-----------|-----|
| | | | | | | | | # | % of Total Pads | | |
| 1) | Citrus Center Colony | Lakeland | 55+ | 228 | Nov-2018 | $5.0 | 54% | 12 | 5% | 87% | 12% |
| 2) | Singing Forest | Floral City | 55+ | 190 | Jun-2019 | 3.2 | 59% | – | – | 100% | 24% |
| 3) | Ocean Tide | Riviera Beach | Mixed [3] | 307 | Jun-2019 | 2.6 | 81% | 34 | 11% | 97% | 37% |
| 4) | Little Manatee Isles | Ruskin | 55+ | 165 | Sep-2019 | 2.6 | 82% | 40 | 24% | 59% [4] | 23% |
| 5) | Crescent Lake | Riverview | 55+ | 140 | Sep-2019 | 2.3 | 70% | 2 | 1% | 89% | 9% |
| 6) | Lake Bonny | Lakeland | 55+ | 106 | Oct-2019 | 2.4 | 58% | – | – | 100% | 14% |
| 7) | River Haven | Ruskin | 55+ | 61 | Nov-2019 | 1.4 | 56% | 2 | 3% | 98% | 14% |
| 8) | Colonial Village | Lakeland | 55+ | 104 | Jul-2020 | 1.9 | 50% | 2 | 2% | 84% | 36% |
| 9) | Emerald Lake | Davenport | All-Age | 108 | Oct-2020 | 2.1 | 69% | 30 | 28% [5] | 100% | 30% |
| 10) | Dogwood Acres [6] | Ocala | 55+ | 184 | May-2021 | 4.2 | 39% | 5 | 3% | 51% | 29% |
| 11) | Porpoise Park [6] | Seminole | 55+ | 32 | May-2021 | 0.9 | 69% | – | – | 100% | 1% |
| 12) | Winter's [6] | Zephyrhills | 55+ | 262 | Aug-2021 | 5.1 | 65% | 6 | 2% | 91% | 18% |
| **Total Fund II** | | | 94% 55+ | 1,887 | | $33.6 | 63% | 133 | 7% | 86% | 23% |
| **Target** | | | >66% 55+ | | | | 60-75% | | <20% | >80% | >10% |

(1) Includes permanent rental structures (single family houses/cottages/etc.)

(2) Excludes RV sites due to seasonal nature of occupancy

(3) Ocean Tide has two parcels; one parcel is 55+ and the other parcel is all-age

(4) There were 40 vacant park-owned homes at acquisition that needed renovation before they could be occupied; assuming all 40 homes are occupied, the property occupancy would increase to 83%

(5) All park-owned homes were occupied at acquisition; half are rentals and half were purchased by the tenant with seller financing (the notes were included in the sale and are now owned by Fund II)

(6) Part of the Keystone Portfolio, which is currently under contract with the deposit projected to go non-refundable 4/22/21

CONFIDENTIAL

LEE_00002725

# Appendix: Sunbelt

CONFIDENTIAL

LEE_00002726

PRIVILEGED AND CONFIDENTIAL

CONFIDENTIAL

# Key Sunbelt Trends

The ongoing and rapid growth of the U.S. Sunbelt, driven by lower taxes, superior climate, and an aging population, create favorable tailwinds for investment in the region

## Sunbelt Population Growth[1]



Population Growth (millions)

'15-'20: Sunbelt 8.9 (+7.5%), Non-Sunbelt 5.2 (+2.6%)
'20-'25: Sunbelt 7.7 (+6.0%), Non-Sunbelt 4.6 (+2.2%)

■ Sunbelt   ▨ Non-Sunbelt

## Key Trends

▲ Lower taxes and regulations enable a pro-business culture and draw private-sector growth

▲ Over the last decade, total employment in the Sunbelt region grew by 22% versus 15% in the non-Sunbelt[2]

▲ Attractive destination for rapidly-growing aging population

▲ The population of people aged 65 and older in the U.S. is expected to grow 17% from 2020 to 2025[1]

▲ The Sunbelt now holds 37% of the 65+ age cohort, as warmer weather and lower taxes make it an attractive destination for retirees[1]

(1)   Source: Environmental Systems Research Institute
(2)   Source: Bureau of Economic Analysis

33

LEE_00002727

PRIVILEGED AND CONFIDENTIAL

CONFIDENTIAL

34

# Thriving Metropolitan Areas in Sunbelt

The top 10 markets for population growth are all in the Sunbelt and in states likely to be targeted as part of the Fund III strategy

| Top Ten Markets | 5-Year Cumulative Population Growth |
|---|---|
| Austin, TX | 9.2% |
| Orlando, FL | 8.8% |
| Tampa, FL | 8.3% |
| Raleigh, NC | 7.9% |
| Jacksonville, FL | 7.5% |
| Las Vegas, NV | 7.1% |
| Phoenix, AZ | 6.8% |
| Charlotte, NC | 6.7% |
| Nashville, TN | 6.1% |
| San Antonio, TX | 5.6% |

| Bottom Ten Markets | 5-Year Cumulative Population Growth |
|---|---|
| Chicago, IL | (3.3%) |
| New York, NY | (2.8%) |
| Los Angeles, CA | (2.4%) |
| Milwaukee, WI | (1.8%) |
| Cleveland, OH | (1.1%) |
| San Jose, CA | (1.1%) |
| St. Louis, MO | (1.0%) |
| Detroit, MI | (0.7%) |
| Baltimore, MD | (0.7%) |
| Pittsburgh, PA | (0.7%) |

Source: US Census

LEE_00002728

PRIVILEGED AND CONFIDENTIAL

# Significant Opportunity Remains in Florida

Florida continues to be an attractive market to invest in the Sunbelt for Fund III due to its size and attractive demographic characteristics, as well as Bedrock's experience



## Benefits of Florida MHC Market

➤ 2015-2020 population CAGR of 1.8% – double the national average, and 7th fastest CAGR of all states[1]

➤ Low existing state and local taxes combined with 2017 tax reform produced population and economic growth

➤ Second largest 55+ population at 7.5 million, or 34.9% of total residents[1] provides large base of potential tenants for age-restricted communities

➤ Estimated 1,392 communities in Florida, of which 873 are age-restricted[2][3]

★ Denotes current or prior Bedrock-owned community including three communities in the Keystone Portfolio, which is currently under contract with the deposit projected to go non-refundable 4/22/21

(1) Source: Environmental Systems Research Institute
(2) Source: JLT Consultants
(3) Only includes communities with 50 pads or more

CONFIDENTIAL

35

LEE_00002729

Case 7:23-cv-10695-PMH   Document 82-8   Filed 11/11/24   Page 47 of 56   PRIVILEGED AND CONFIDENTIAL

# Appendix: Historical Interest Rates & Spreads

36

CONFIDENTIAL

LEE_00002730

Case 7:23-cv-10695-PMH    Document 82-8    Filed 11/11/24    Page 48 of 56    PRIVILEGED AND CONFIDENTIAL

CONFIDENTIAL

LEE_00002731

# Historical Spreads

MHC REIT cap rates versus 10-Year UST show that while MHC cap rates are correlated to the 10-Year UST, they are not as interest rate sensitive as evidenced by Equity Lifestyle Properties' relatively flat implied cap rate of ~3%



Source: Bloomberg (Equity Lifestyle Properties and Sun Communities) and Federal Reserve Economic Data (10-Year UST)
Note: Sun Communities' implied cap rate has trended down over time more than Equity Lifestyle Properties' implied cap rate; this can largely be attributed to Sun Communities' acquisition activity which has improved their average holdings.

37

Case 7:23-cv-10695-PMH   Document 82-8   Filed 11/11/24   Page 49 of 56   PRIVILEGED AND CONFIDENTIAL

# Appendix: Key Term Glossary

CONFIDENTIAL

LEE_00002732

PRIVILEGED AND CONFIDENTIAL

# Key Term Glossary

| | |
|---|---|
| **Manufactured Housing Community ("MHC")** | Property which provides homesites and utility connections for tenants to place their manufactured homes. The property can also provide amenities for tenants' use |
| **Pad** | A lot or homesite that is available for a tenant to place a home |
| **55+** | Identifying term for properties where at least 80% of the tenants must be at least 55 years old |
| **All-Age Community** | Property which is not age-regulated |
| **Amenities** | Public area for the use of tenants, i.e., clubhouse, shuffleboard courts, pool, gazebo, boat docks |
| **On-Site Manager** | Property employee who assists in the day-to-day operations including: collecting rent, liaising with tenants and reporting to ownership on third-party vendors |
| **Occupancy** | The percentage of pads occupied by rent-paying tenants |
| **Park-Owned Homes ("POH")** | Homes which are owned by the community owner and are either vacant, being rented by a tenant, or being occupied by a community employee |
| **Gross Internal Rate of Return ("IRR")** | The projected IRR over a 5-year property hold period |
| **Cap Rate** | Unleveraged property return based on relevant net operating income |

39

CONFIDENTIAL

LEE_00002733

PRIVILEGED AND CONFIDENTIAL

CONFIDENTIAL

# Disclaimer

This information is for illustration and discussion purposes only and is not intended to be, nor should it be construed or used as investment, tax or legal advice, or an offer to sell, or a solicitation of any offer to buy, an interest in any private investment fund managed by Bedrock Communities MGMT, LLC (the "Manager"), including Bedrock MHC Partners III, L.P. (the "Fund"). Any offer or solicitation of an investment in the Fund may be made only by delivery of the Fund's confidential offering documents (collectively, the "Memorandum") to qualified investors, which Memorandum would contain material information not contained herein and which would supersede this information in its entirety. Prospective investors should rely solely on the Memorandum in making any investment decision. An investment in the Fund is not suitable for all investors. Before making any investment in the Fund, you should thoroughly review the Memorandum with your financial and tax advisors to determine whether an investment in the Fund is suitable for you in light of your investment objectives and financial situation. You should not rely in any way on this information.

The Fund has no operating history and has no performance history, as it has not yet closed its first investment. No representation is made that the Fund will or is likely to achieve its objectives, that the Manager's investment process or risk management will be successful, or that any investor will make any profit or will not sustain losses. Past performance is not indicative of future results.

All Gross IRRs referred to herein do not reflect the deduction of the Management Fee, the Carried Interest distributions, or other fees and expenses, all of which will decrease the return experienced by an investor; and cannot be utilized to predict the return on an investment in the Fund.

Any descriptions involving investment process, investment examples, statistical analysis, investment strategies or risk management techniques are provided for illustration purposes only, will not apply in all situations, may not be fully indicative of any present or future investments, may be changed in the discretion of the Manager and are not intended to reflect performance. Portfolio characteristics, leverage policies and targets and other portfolio limits reflect guidelines only and are implemented, and may change, in the discretion of the Manager. Investments are selected by, and will vary in the discretion of, the Manager and are subject to availability and market conditions, among other factors.

Return targets or objectives, if any, are used for measurement or comparison purposes and only as a guideline for prospective investors to evaluate the Fund's investment strategies and accompanying information. Targeted returns reflect subjective determinations by the Manager based on a variety of factors, including, among others, investment strategy, prior performance of similar products (if any), risk tolerance and market conditions. Performance may fluctuate, especially over short periods. Targeted returns should be evaluated over the time period indicated and not over shorter periods. Targeted returns are not intended to be actual performance and should not be relied upon as an indication of actual or future performance.

Any opinions, assumptions, assessments, statements or the like ("Statements") regarding future events or which are forward-looking, including regarding portfolio characteristics, constitute only subjective views, are based upon expectations or beliefs, should not be relied on, are subject to change due to a variety of factors, including fluctuating market conditions, and involve inherent risks and uncertainties, both general and specific, many of which cannot be predicted or quantified and are the beyond the Fund's or the Manager's control. For example, the use of the words "believe", "expect", "anticipate", "plan", "will", "intend" or other similar expressions identifies a forward-looking statement. Future evidence and actual results (including the actual composition and investment characteristics of the Fund's portfolio) could differ materially from those set forth in, contemplated by, or underlying these statements. In light of these risks and uncertainties, there can be no assurance that these statements are now or will prove to be accurate or complete in any way. The Manager undertakes no responsibility or obligation to revise or update such statements.

LEE_00002734

PRIVILEGED AND CONFIDENTIAL

# Disclaimer (cont'd)

This information is as of the date indicated, reflects present intention, is not complete, is subject to change, and does not contain material information regarding the Fund, including important risk disclosures. Certain information has been provided by third-party sources and, while believed to be reliable, has not been independently verified by the Manager and its accuracy or completeness cannot be guaranteed. None of the service providers shall assume or otherwise have any responsibility or any liability whatsoever to recipients, recipients' affiliates, or any of recipients' affiliates' directors, officers, managers, employees or representatives resulting from the use of the information and material contained in this presentation.

The Fund is a private investment fund that is NOT subject to the same regulatory requirements as mutual funds, including mutual fund requirements to provide certain periodic and standardized pricing and valuation information to investors. Investment in the Fund may involve a high degree of risk and its performance may be volatile. Such risks may include, without limitation, risk of adverse or unanticipated market developments, risk of default and risk of illiquidity. Interests in the Fund will not be registered under the U.S. Securities Act of 1933, as amended, or any state or non-U.S. securities laws, or with any non-U.S. securities regulator, and the Fund will not be registered under the U.S. Investment Company Act of 1940, as amended.

The securities described herein have not been recommended by any U.S. federal or state or other non-U.S. securities commission or regulatory authority, including the Securities and Exchange Commission. Furthermore, the foregoing authorities have not confirmed the accuracy or determined the adequacy of this document. Any representation to the contrary is a criminal offense.

This information is confidential, is intended only for intended recipients and their authorized agents. By accepting such information, the recipient agrees that it will, and it will cause any of its directors, partners, officers, employees and representatives, to use such information only to evaluate its potential interest in the Fund and for no other purpose and will not divulge any such information to any other party. Any reproduction or circulation of such information, in whole or in part, is prohibited.

Notes to Public Company Data

The Public Company Data shown on pages 6 and 35 reflect actual investment opportunities of third parties that the Manager has evaluated but do not and will not represent actual Fund investments. They are shown for illustration and discussion purposes only. No assurance can be made that the Fund will be able to locate investment opportunities like those shown, allocate its assets to opportunities at desired levels, or structure investments with desired terms. Further, no assurance can be made that any particular investment will make any profit or will not sustain losses. This information should not be used to predict the return of any investment or an investment in the Fund and should not be relied upon in any way.

CONFIDENTIAL

LEE_00002735

PRIVILEGED AND CONFIDENTIAL

# Disclaimer (cont'd)

## Notes to Related Case Studies

The investment examples shown on pages 3, 8, 11, 12, 13, 19, 22 through 25, 27, 28, 29, and 33 reflect investments made by either Bedrock MHC Partners L.P. or Bedrock MHC Partners II, L.P. while managed by Manager pursuing a strategy similar to that which the Manager plans to pursue for the Fund. The Fund does not and is not expected to participate in these investments. It should not be assumed that these investments have been or will be profitable, or that recommendations made by the Manager in the future will be profitable or will achieve the target return of the investments described herein. The IRR and Cap Rates referred to herein do not reflect the deduction of any advisory fees or expenses and do not reflect the return experienced by any investor in the investment example.

The Fund's portfolio is expected to contain a larger number of investments than the examples provided herein and accordingly, this example is not intended to represent overall portfolio performance that may be expected to be achieved. This is being provided for illustrative and information purposes only, should not be relied upon, does not represent, and is not indicative of, the Fund's actual or future performance or the results that may be achieved by an investor in the Fund. No representation is made that the Fund would have made this investment if it had been in existence at the time or that it will make similar investments in the future.

## Notes to Projected Model Performance

Projected property performance results of the Manager's investment strategy shown on page 10 may be considered hypothetical because they represent the results of an unfunded model account for a single hypothetical property investment and do not reflect the actual investment returns of any investor's account. The chart assumes that the investments will be made as indicated by this single hypothetical property investment and that the investments will perform as indicated by this single hypothetical property investment. Although the Manager believes the assumptions in the chart are reasonable, there can be no assurance that the Fund will make the similar number or type of investments to this single hypothetical property investment, or that any investments that are made will be profitable or realized any similar multiples. The financial projections set forth herein are subject to great uncertainty. Investments pursuant to the projected model results by this single hypothetical property investment and the Fund's portfolio will not be identical. Hypothetical results have inherent limitations, some of which are described herein, including that they do not reflect the Fund's or an investor's actual investments and therefore do not reflect the impact that economic and market factors, including concentration, lack of opportunities and market disruptions, may have on investment decisions for the Fund. There may be sharp differences between the projected results shown by this single hypothetical property investment and the actual results that the Fund or any investor may achieve. Because the model account of this single hypothetical property investment is unfunded, the amount of the Fund's assets at any time also may have a different impact on the management of the Fund. No representation is made that the Fund's performance or portfolio will be the same as the model of this single hypothetical property investment. To the extent there are any material differences between the Manager's management of the Fund and the model of this single hypothetical property investment, the projected model performance results are not representative and they may have no illustration value.

CONFIDENTIAL

LEE_00002736

Case 7:23-cv-10695-PMH    Document 82-8    Filed 11/11/24    Page 54 of 56    PRIVILEGED AND CONFIDENTIAL



650 Fifth Avenue
16th Floor
New York, NY 10019
646-844-2151

43

CONFIDENTIAL

LEE_00002737

# DANIEL G. LEE, III

danielglee3@yahoo.com
Greenwich, CT 06830 | ▮▮▮▮

## Private Equity | Fundraising | Investor Relations

*Senior private equity professional with experience across products, sectors, investor types, geographies, and funding structures. A diverse set of global investor relationships and a natural affinity for cultivating and enhancing them. Strong leadership and diplomacy with a proven track record of setting priorities, generating momentum, and driving fundraising results with a commitment to facilitating strategic progress.*

- **Building a market presence and executing on a fundraising pipeline** for 17Capital in North America and with large global investors. >$2.0 Billion in capital raising opportunities identified, closed or closing since March 2020.
- **Institutionalizing and optimizing** 17Capital's global and regional fundraising and investor relations strategy and team.
- **Reformulated capital formation strategy** for Aethon Energy. Beat initial fundraising target by 3x, and accelerated the firms growth and acquisition strategy, raising $1.2 billion for 13 discrete acquisitions creating one of the largest, highest margin natural gas companies in North America.
- **Beat initial target, drove fundraising strategy and investor demand** for $1.1 billion Aquiline Financial Services Fund III L.P.

## Career Experience

**Head of Fundraising and Investor Relations, North America**
**17Capital LLP**, London, UK and New York, NY                    **March 2020 to present**
*$5.5 billion AUM Private Equity Firm*
**Developing the firms capital base in North America and enhancing the global fundraising and investor relations strategy.**

- Building and executing on a fundraising pipeline for 17Capital in North America and with large global investors.
- Closed first significant US based institutional capital for the firm, including an influential gatekeepers and customized mandates.
- >$2.0 Billion in capital raising opportunities identified, closed or closing since March 2020.
- Secured extension on $2.1 billion target Fund 5 and ability to increase hard-cap to meet growing opportunity set.
- Launching 17Capital's first credit fund, targeting £1.5 billion.
- Entreprenurialy drive business development by sourcing investment opportunities from and building partnerships with North American GP and LPs.

**Head of Fundraising and Investor Relations**
**AETHON ENERGY MANAGEMENT, LLC**, New York, NY and Dallas, TX                    **2015 to 2020**
*$2.5 billion AUM Energy Private Equity Firm / Operating Platform*
**Reformulated capital formation strategy for Aethon. Beat initial fundraising target by 3x, and accelerated the firms acquisition strategy, raising $1.2 billion to fund 13 discrete acquisitions.**

- Joined Aethon in April 2015 to lead strategy development and execution for all private equity capital formation initiatives.
- Set forth the plan to transform a historically family-backed business into a hybrid private equity firm / energy operating platform with institutional scale.
- Raised $1.2 billion in private equity capital, funding 13 discrete asset acquisitions, and creating one of the largest, highest margin natural gas companies in North America.
- Closed over $550 million in committed capital in 2019 to establish a new direct investment vehicle.
- Previously developed and executed a direct and co-investment fundraising strategy, generating substantial interest, and raising in excess of $600 million through 2016 to pursue a basin consolidation opportunity.
- Created value through conceiving and leading GP led secondary sale opportunities, cultivation of anchors, investors, and placement agents for follow on vehicles, co-investments, and separate accounts.

SA-168

# DANIEL G. LEE, III Greenwich, CT 0683█████

PG 2 of 2

**Director of Investor Relations**
**AQUILINE CAPITAL PARTNERS, LLC**, New York, NY                          2013 to 2015
*$4.5 billion AUM financial services Private Equity firm*
**Beat initial target, drove fundraising strategy and investor demand for $1.1 billion Aquiline Financial Services Fund III L.P.**

- Responsible for leading fundraising and investor relations.
- Cultivated and maintened relationships with new and existing limited partners, investment consultants, and placement agents.
- Set and executed fundraising strategy for $1.1 billion Fund III including: premarketing, placement agent selection, target identification and overall process management.
- Secured and closed new investors.
- Stewarded and strengthened existing relationships leading to upsized commitments.
- Created value through conceiving and leading co-investment syndication and complex secondary transfer opportunities.

**Director of Investor Relations & Business Development**
**FALCONHEAD CAPITAL**, New York, NY                          2011 to 2012
*$500 million AUM Consumer focused Private Equity firm*
**Created and executed fundraising strategy, generating initial interest in $350 million Falconhead Capital Partners III, L.P.**

- Responsible for fundraising, investor relations, and business development for a $500 million middle market private equity firm.
- Primary fundraising contact for $350 million Fund III.
- Led responses to detailed investor inquiries and managed an Associate and a Vice President.
- Established internal investor relations infrastructure, created and maintained marketing materials, streamlined the LP due diligence responses, actively managed investor communications protocols.
- Orchestrated the implementation of a CRM system.

**Vice President, Distribution and GP Origination**
**Champlain Advisors**, Greenwich, CT                          2009 to 2010
*Boutique Private Equity Placement Agent*
**Sourced mandate with a $315 million capital raising opportunity**

- Responsible for developing and maintaining relationships with North American limited partners.
- Assisted in general partner origination duties including sourcing, screening, and analysis.
- Executed project management and advisory duties including document preparation and due diligence.

**Analyst**
**Fox-Pitt, Kelton**, Chicago, IL                          2005 to 2008
*Financial Institutions Investment Banking*
**Supported deal execution and origination efforts for global financial services M&A advisory business**

- Performance of fundamental quantitative and qualitative analysis in support of both live and prospective M&A and capital raising transactions in the insurance and financial services sectors.
- Supported origination and execution efforts for the U.S. Equity Capital Markets business.

## Education

B.A., Government & Religious Studies— St. Lawrence University, Canton, NY                          2005

## Nonprofit Leadership

Alumni Executive Council, ST. LAWRENCE UNIVERSITY, Canton, NY                          2014 to 2020
Chairman of the Membership Committee

LEE_00002739

SA-169

**EXHIBIT I**

SA-170

| | |
|---|---|
| **From:** | Michael Arpey |
| **Sent:** | Thursday, May 13, 2021 1:40 PM EDT |
| **To:** | Bennett Goodman; Avshalom Kalichstein; Brad Coleman |
| **Subject:** | Highly Confidential |
| **Attachments:** | Buffalo Point Opportunity_CONFIDENTIAL.pdf, DANIEL G LEE RESUME_MAY 2021.pdf |

All, I spoke to my Dan Lee who is my friend at 17 Capital today. His resume is attached. There is a group preparing to spin out of 17 Capital due to some of the issues I have described with Pierre-Antoine. Please see the Buffalo Point Opportunity Document. It may be interesting for us to meet this group of people as we think about offering this strategy in the future. Dan indicated that there is huge demand for NAV lending and preferred equity but that Pierre-Antoine lacked the management ability to grow beyond where there they are today. I am happy to discuss this. We have to keep this strictly confidential. Thank you

**HIGHLY CONFIDENTIAL**

SA-171

**DRAFT**                                                                  **HIGHLY CONFIDENTIAL & TRADE SECRET**

### Conceptual Memo - Project Buffalo Point
*Backing a team poised for growth, investing at the intersection of private equity secondaries and credit.*

**Thesis:** *The popularity and growth potential of the preferred equity and NAV finance market provides an attractive backdrop and a de-risked entry point for a firm interested in backing and building a secondary private equity business. The Buffalo Point team ("BP" or "the team") is highly experienced within this subset of the market and would benefit from a partner with extensive financial services and private credit expertise.*

### Executive Summary

Buffalo Point brings demonstrable experience in sourcing and structuring superior risk adjusted exposures in preferred equity and private credit transactions focused on private equity market counterparties. These financing opportunities are being driven by strong macro trends deriving, in part, from the increasing capital intensity of the broader private markets.

The team originates preferred equity and NAV loan transactions that provide flexible liquidity and accretive financing solutions to General and Limited Partners, their funds, and their management companies. These transactions do not take single company risk and sit in senior positions secured by diversified portfolios of assets held by these funds, or by fees, carry, and other assets at the management company level.

The BP team targets unlevered IRRs of 12-15% and unlevered MOICs of 1.2x-1.5x in preferred equity transactions; and unlevered IRRs of 8-10% and unlevered MOICs of 1.2x-1.3x in credit transactions, each against very low LTVs of 15-40% and 5-25% respectively.

### The Market Opportunity

Buffalo Point seeks exposure to transaction structures that it has experience in sourcing, structuring, executing, and exiting:

- Non-dilutive management company financings that offer an attractive alternative to the GP stakes market.
- Fund level financings that provide growth capital and liquidity solutions to funds out of callable LP capital.
- Financings of underlying LP portfolios to accelerate liquidity.
- Financings of continuation vehicles and portfolios of single asset transactions.

The Buffalo Point team has been at the forefront of the North American business of a firm that has originated over sixty similar investments totaling over $3.5 billion in deployment, the bulk of which has occurred in the last four years. The platform's track

1

SA-172

**DRAFT**                                                    **HIGHLY CONFIDENTIAL & TRADE SECRET**

record across over thirty realized transactions is a 16% gross unlevered IRR and a 1.4x gross unlevered MOIC, with no losses.

Buffalo Point team members have led the sourcing and execution for seven preferred equity transactions, deploying ~$700 million with North American GPs and global strategic investors, since March of 2019.

The teams historic underwriting ethos is intended to be maintained on the Buffalo Point platform, with a renewed focus on market dominance in North America.

The market for originating Buffalo Point's transactions is robust and growing, particularly in North America, where adoption is continuously gaining traction from large and high-quality counterparties. The team actively cultivates, originates, and executes transactions with high-quality and increasingly blue-chip private equity investors. Today, the average deal size in the team's pipeline is over $150 million, however attractive opportunities of varying sizes are frequently sourced.

The team actively manages its origination pipeline. Deal flow is not exclusively dependent on intermediaries, with ~60% of historic opportunities having been proactively shaped in bilateral discussions with counterparties. To drive this effort, the Buffalo Point team conducted an estimated seven hundred North American deal flow meetings in the last twelve months.

The team believes the right strategic partner would possess the ability to enhance origination, a fundamental component of the business.

**Limited Partner and Institutional Investor Interest**

As the market for transactions grows, it has been supported by growing institutional investor interest. The Buffalo Point team believes that while broad based investor interest is still early in its development, it will rise to a scale like that of its forbearer, the traditional secondary market. Hence, it is a compelling time to position a platform to take advantage of this market opportunity.

For example, US Public Pensions and other large institutions are still not broadly invested in the space. Though capital is beginning to flow, comparatively few dedicated firms have secured commitments from the institutional community to pursue preferred equity and NAV loans. Buffalo Point believes there is space in the market to create a firm with a dominant presence.

LP commitments often come from private debt allocations where the Buffalo Point strategy provides comparable (unlevered) returns but superior down-side protection to that of mezzanine or direct lending. The team sees active interest from LPs and believes that the market is in the earlier innings of increased investor allocation.

The team also believes that as LPs gain more awareness of the superior down-side protection embedded in this strategy, especially versus their existing private credit

2

**DRAFT**                                    **HIGHLY CONFIDENTIAL & TRADE SECRET**

portfolios; allocations should increase significantly. It is Buffalo Point's intent to be best positioned to take advantage of this shift.

Buffalo Point has extensive existing dialogues with North American LPs, large global allocators, and the gatekeeper community. The team believes that in addition to raising traditional committed LP capital, a substantial opportunity exists to provide customized solutions and separately managed accounts to large and sophisticated pools of capital. The team has experience responding to these demands and in working with investors seeking to build and implement these programs.

### Other Opportunities to Innovate

The team also believes there are untapped opportunities that would unlock additional value for investors. The team has thus far been unable to leverage these strategies at their current firm but believes they should be considered as part of the Buffalo Point platform.

For instance, the insurance and credit markets provide a compelling backdrop for the creation of structured products that provide leverage, on a pooled basis, to underlying Limited Partners or to create back leverage structures on a deal-by-deal basis. Such structures would boost returns on preferred equity transactions to a range more comparable to buyouts, with shorter durations and considerably less risk.

Buffalo Point believes this would further expand the universe of available capital from LPs. LPs who are well versed in BP's core markets, are seeking higher returns, and are willing to accept levered structures or instruments to get there.

The team is attracted to strategic partners who possess the ability to help build and enhance these initiatives.

### The Team

The Buffalo Point team consists of three founding partners and two mid-level investment professionals, each with experience across diverse private markets disciplines all strongly relevant to preferred equity and NAV financing of private equity portfolios, including:

- Limited Partners
- Secondary Investors
- Bank Lending platforms
- Fundraising and Investor Relations
- Insurance and Institutional Asset Management

Other candidates, who would create further value for the Buffalo Point platform, have been identified. Each possess senior private markets experience with strong, actionable, and impactful relationships across our global industry.

3

SA-174

**DRAFT**                                                    **HIGHLY CONFIDENTIAL & TRADE SECRET**

## Conclusion

While this market has been developing for over fifteen years, the lack of a clear market leader amongst a small yet diverse group of dedicated market participants suggests there is an advantage to being the most aggressive asset gatherer, and the most creative product innovator. The Buffalo Point team believes its approach to building a multi-product platform, that serves a diverse set of global investors across a range of structures, is a differentiating feature that positions it for success.

Lastly, the Buffalo Point team believes that a strategic partnership with an organization steeped in all aspects of its core markets and the markets presenting further opportunities to innovate, would be highly compelling and would accelerate the successful creation of a multi-billion-dollar market leader in the preferred equity and NAV financing market.

4

SA-175

# DANIEL G. LEE, III

danielglee3@yahoo.com
Greenwich, CT 06830 | ▮▮▮▮▮▮

## Private Equity | Fundraising | Investor Relations

*Senior private equity professional with experience across products, sectors, investor types, geographies, and funding structures. A diverse set of global investor relationships and a natural affinity for cultivating and enhancing them. Strong leadership and diplomacy with a proven track record of setting priorities, generating momentum, and driving fundraising results with a commitment to facilitating strategic progress.*

- **Building a market presence and executing on a fundraising pipeline** for 17Capital in North America and with large global investors. >$2.0 Billion in capital raising opportunities identified, closed or closing since March 2020.

- **Institutionalizing and optimizing** 17Capital's global and regional fundraising and investor relations strategy and team.

- **Reformulated capital formation strategy** for Aethon Energy. Beat initial fundraising target by 3x, and accelerated the firms growth and acquisition strategy, raising $1.2 billion for 13 discrete acquisitions creating one of the largest, highest margin natural gas companies in North America.

- **Beat initial target, drove fundraising strategy and investor demand** for $1.1 billion Aquiline Financial Services Fund III L.P.

## Career Experience

### Head of Fundraising and Investor Relations, North America

**17Capital LLP**, London, UK and New York, NY    **March 2020 to present**
*$5.5 billion AUM Private Equity Firm*
**Developing the firms capital base in North America and enhancing the global fundraising and investor relations strategy.**

- Building and executing on a fundraising pipeline for 17Capital in North America and with large global investors.

- Closed first significant US based institutional capital for the firm, including an influential gatekeepers and customized mandates.

- >$2.0 Billion in capital raising opportunities identified, closed or closing since March 2020.

- Secured extension on $2.1 billion target Fund 5 and ability to increase hard-cap to meet growing opportunity set.

- Launching 17Capital's first credit fund, targeting E1.5 billion.

- Entreprenurialy drive business development by sourcing investment opportunities from and building partnerships with North American GP and LPs.

### Head of Fundraising and Investor Relations

**AETHON ENERGY MANAGEMENT, LLC**, New York, NY and Dallas, TX    **2015 to 2020**
*$2.5 billion AUM Energy Private Equity Firm / Operating Platform*
**Reformulated capital formation strategy for Aethon. Beat initial fundraising target by 3x, and accelerated the firms acquisition strategy, raising $1.2 billion to fund 13 discrete acquisitions.**

- Joined Aethon in April 2015 to lead strategy development and execution for all private equity capital formation initiatives.

- Set forth the plan to transform a historically family-backed business into a hybrid private equity firm / energy operating platform with institutional scale.

- Raised $1.2 billion in private equity capital, funding 13 discrete asset acquisitions, and creating one of the largest, highest margin natural gas companies in North America.

- Closed over $550 million in committed capital in 2019 to establish a new direct investment vehicle.

- Previously developed and executed a direct and co-investment fundraising strategy, generating substantial interest, and raising in excess of $600 million through 2016 to pursue a basin consolidation opportunity.

- Created value through conceiving and leading GP led secondary sale opportunities, cultivation of anchors, investors, and placement agents for follow on vehicles, co-investments, and separate accounts.

# DANIEL G. LEE, III Greenwich, CT 06830 | █████████

PG 2 of 2

### Director of Investor Relations
**AQUILINE CAPITAL PARTNERS, LLC**, New York, NY

2013 to 2015

*$4.5 billion AUM financial services Private Equity firm*

**Beat initial target, drove fundraising strategy and investor demand for $1.1 billion Aquiline Financial Services Fund III L.P.**

- Responsible for leading fundraising and investor relations.
- Cultivated and maintened relationships with new and existing limited partners, investment consultants, and placement agents.
- Set and executed fundraising strategy for $1.1 billion Fund III including: premarketing, placement agent selection, target identification and overall process management.
- Secured and closed new investors.
- Stewarded and strengthened existing relationships leading to upsized commitments.
- Created value through conceiving and leading co-investment syndication and complex secondary transfer opportunities.

### Director of Investor Relations & Business Development
**FALCONHEAD CAPITAL,** New York, NY

2011 to 2012

*$500 million AUM Consumer focused Private Equity firm*

**Created and executed fundraising strategy, generating initial interest in $350 million Falconhead Capital Partners III, L.P.**

- Responsible for fundraising, investor relations, and business development for a $500 million middle market private equity firm.
- Primary fundraising contact for $350 million Fund III.
- Led responses to detailed investor inquiries and managed an Associate and a Vice President.
- Established internal investor relations infrastructure, created and maintained marketing materials, streamlined the LP due diligence responses, actively managed investor communications protocols.
- Orchestrated the implementation of a CRM system.

### Vice President, Distribution and GP Origination
**Champlain Advisors,** Greenwich, CT

2009 to 2010

*Boutique Private Equity Placement Agent*

**Sourced mandate with a $315 million capital raising opportunity**

- Responsible for developing and maintaining relationships with North American limited partners.
- Assisted in general partner origination duties including sourcing, screening, and analysis.
- Executed project management and advisory duties including document preparation and due diligence.

### Analyst
**Fox-Pitt, Kelton,** Chicago, IL

2005 to 2008

*Financial Institutions Investment Banking*

**Supported deal execution and origination efforts for global financial services M&A advisory business**

- Performance of fundamental quantitative and qualitative analysis in support of both live and prospective M&A and capital raising transactions in the insurance and financial services sectors.
- Supported origination and execution efforts for the U.S. Equity Capital Markets business.

## Education

**B.A., Government & Religious Studies**— St. Lawrence University, Canton, NY

2005

## Nonprofit Leadership

**Alumni Executive Council, ST. LAWRENCE UNIVERSITY, Canton, NY**

2014 to 2020

Chairman of the Membership Committee

HUNTERPOINT00000112

**EXHIBIT J**

Page 1

1

2      UNITED STATES DISTRICT COURT

3      SOUTHERN DISTRICT OF NEW YORK

4      ------------------------------------x

5      DANIEL LEE,

6                    Plaintiff,        Civil Action

7         -against-                    No. 7:23-cv-

8      RICHARD GOLASZEWSKI and         10695-PMH

9      STEPHEN SWENTZEL,

10                   Defendants.

11     ------------------------------------x

12     (PORTIONS OF THIS DEPOSITION HAVE BEEN

13     DESIGNATED HIGHLY CONFIDENTIAL, ATTORNEYS'

14     EYES ONLY.)

15                         Seven Times Square

16                         New York, New York

17                         January 31, 2024

18                         10:19 a.m.

19

20          Videotaped deposition of AVSHALOM

21     YITZHAK KALICHSTEIN, pursuant to Subpoena, before

22     Maureen McCormick, a Notary Public of the State of

23     New York.

24

25     Job No: 8572

SA-179

Page 2

```
 1

 2    A P P E A R A N C E S:

 3

 4         BROWN RUDNICK LLP

 5         Attorneys for the Plaintiff

 6              Seven Times Square

 7              47th Floor

 8              New York, New York 10036

 9         BY:  DYLAN KLETTER, ESQ.
                dkletter@brownrudnick.com
10

11         YANKWITT LLP

12         Attorneys for the Defendants

13              140 Grand Street, Suite 705

14              White Plains, New York 10601

15         BY:  RUSSELL YANKWITT, ESQ.
                russell@yankwitt.com
16

17         TEIN MALONE

18         Attorneys for the Witness

19              3156 SW 27th Avenue

20              Coconut Grove, Florida 33133

21         BY:  MICHAEL TEIN, ESQ.
                tein@teinmalone.com
22

23

24

25
```

Page 3

1

2    A P P E A R A N C E S: (Cont'd)

3

4         ALSO PRESENT:

5              PAUL BAKER, Videographer

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 52

1                    A. Kalichstein

2    make loans to their funds.

3        Q.    Are the loans to the funds referred to

4    as NAV loans?

5        A.    They are.

6        Q.    Are the loans to the managers referred

7    to as preferred equity loans?

8        A.    We are calling them preferred

9    solutions.  They don't have a common name.

10   [redacted]

11

12

13

14

15            MR. TEIN:  So you can give a number if

16            the number is not confidential.

17   [redacted]

18

19

20

21

22

23

24

25

Page 82

A. Kalichstein



16        Do you see that?

17    A.    I do.

18    Q.    Why did you want to meet Dan and his

19 partners?

20        MR. TEIN:  Object to form.

21    A.    I spend most of my time -- not most, a

22 lot of my time evaluating people, meeting people,

23 talking about what they're doing.

24        As this appeared to me to be a

25 strategy that we would eventually want to get

Page 83

```
 1                    A. Kalichstein

 2    into, I thought I'd meet the people who were

 3    considering leaving 17 Capital.

 4    ████████████████████████████████████████

 5    ████████████████████████████████████████

 6    ████████████████████████████████████████

 7    ████████████████████████████████████████

 8         A.    Yes.

 9               MR. TEIN:  Form.

10         Q.    What?

11    ████████████████████████████████████████

12    ████████████████████████████████████████

13    ████████████████████████████████████████

14    ████████████████████████████████████████

15    ████████████████████████████████████████

16    ████████████████████████████████████████

17    ████████████████████████████████████████

18    ████████████████████████████████████████

19               MR. TEIN:  If those discussions are

20         pursuant to an NDA or a similar

21         confidentiality agreement, I'd like you to

22         let me know.

23               THE WITNESS:  They would be.

24  DI           MR. TEIN:  At this point, I'm going to

25         instruct you not to answer it, and if you
```

SA-184

Page 87

1                    A. Kalichstein

2    Hunter Point 00005783.

3         A.    Thank you.

4              (Plaintiff's Exhibit 115, Document

5         Bearing Bates No. Hunter Point 00005783,

6         marked for identification.)

11        Q.    And who is Patricia Tanner?

12        A.    She was my assistant at the time.

17        Q.    Did you review the Buffalo Point memo?

18        A.    No.

19        Q.    Did you review Dan Lee's resume?

20        A.    Yes.

21        Q.    Why did you review his resume, but not

22    the Buffalo Point memo?

23        A.    I don't know, but I never saw the

24    Buffalo Point memo.

25        Q.    Did Ms. Tanner print out the Buffalo

Page 123

1                           A. Kalichstein



Page 128

1                              A. Kalichstein



SA-187

Page 129

1              A. Kalichstein



8        Q.    Others in the market had tried and
9    successfully raised and deployed capital for these
10   strategies, correct?
11       A.    A few.

22       Q.    In your discussions with Steve and
23   Rich about the deployment inputs, do you believe
24   you ultimately reached a consensus about what the
25   most reasonable numbers to use would be for

Page 132

1                         A. Kalichstein



Page 176



Page 183



SA-191

Page 190

1           A. Kalichstein

2                Stephen and Rich were playing it, as I

3    mentioned earlier, close to vest, so I didn't

4    know -- I was trying to gauge whether -- how

5    interested they really were.

6        Q.    You testified earlier that you didn't

7    like Dan Lee from the start, correct?

8        A.    Yes, yes.

9        Q.    Why did you invite him to this

10   breakfast?

11       A.    This courtship process was

12   complicated, because we didn't need Dan.  We had a

13   perfectly functional A team of fundraisers on our

14   own.  We needed Stephen and Rich, because they

15   were the deal guys, but we didn't know how Stephen

16   and Rich felt about Dan, so it was possible that

17   if they wanted to bring Dan along with them, that

18   we'd have to try to find a home for Dan in our

19   firm somehow, and it didn't become clear to me

20   until later that they didn't need Dan for their

21   business.

22       Q.    When you say it became clear to you

23   later, did Stephen and Rich tell you that?

24       A.    They did after Dan was fired.

25   ████████████████████████████████████████████

Page 191

1                    A. Kalichstein



19          MR. TEIN:  When you're done with this

20      exhibit, I'd like to take a five-minute

21      break.

22          MR. KLETTER:  I'm not done.

23      Q.    Did Hunter Point ever propose to enter

24  into a partnership with Steve, Dan and Rich?

25      A.    No.

SA-193

Page 219

2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3     Q.    You then mention that you want to

4 figure out, "Figure out the Dan component."

5           Do you see that?

6     A.    Yes.

7     Q.    What does that mean?

8     A.    As I mentioned earlier, we didn't

9 really have a use for Dan, and I was trying to

10 discern whether Stephen and Rich wanted him to be

11 part of Hunter Point or not, and if they had

12 wanted him to be part of Hunter Point, then I was

13 going to have to think really hard whether we

14 could find a place for him, whether he would fit

15 from a personality standpoint.

16           He would have had to work on Mike

17 Arpey's team in fundraising, but that was a

18 question for me, so when he got fired, that's a

19 huge red flag in our business, because most people

20 who just aren't good performers are allowed to

21 resign, so when you get fired, something bad

22 happened typically.

23           I didn't know any of the details

24 related to Dan other than that, so there was a

25 process that was unfolding about figuring out

Page 220

2   whether Stephen and Rich wanted Dan, and our

3   telling Stephen and Rich that we didn't really

4   care for Dan, and by this point that had obviously

5   come out in the open, but I don't recall exactly

6   when those conversations happened.  Somewhere

7   after Dan was fired and before this date.

8        Q.    When you say out in the open, you mean

9   amongst you and Steve and Rich?

10       A.    Steve and Rich.  Yes.  I'm sorry.

11       Q.    And when that conversation was out in

12  the open with you, Stephen and Rich, what did they

13  say?

14       A.    They said they didn't need him for the

15  business that we wanted to hire them to run, and

16  they were concerned about the reputational damage

17  in any case of having someone who was fired be

18  part of the -- of any initiative, so the

19  conversation then turned to who was going to

20  deliver the news to Dan.

21       Q.    And so why would there be reputational

22  damage to Dan if the entire premise of Candle was

23  going to be for Steve, Dan and Rich to leave 17

24  Capital and join Hunter Point?

25            MR. TEIN:  Form.

SA-195

Page 221

2  A. The reputational damage I mentioned

3 would have been to us to hire someone who had been

4 fired for some kind of bad behavior.

5   We take our reputations incredibly

6 seriously and wouldn't want to risk damaging

7 our -- our relationships within investors or our

8 -- in public by hiring someone who was tainted.

9  Q. Was there a press release from 17

10 Capital that they had terminated?

11  A. Not to my knowledge.

12  Q. When the conversation with you, Steve

13 and Rich turned to who's going to deliver the news

14 to Dan, what was that conversation like?

15  A. Can you be more specific, please?

16  Q. Well, you -- if I heard your testimony

17 correct, the conversation among you, Steve and

18 Rich turned to who's going to deliver the message

19 to Dan that he's no longer part of Project Candle.

20   Do I hear you correctly?

21  A. Yes.

22  Q. What was that conversation like among

23 you, Steve and Dan?

24   I'm sorry.  What was the conversation

25 like among you, Steve and Rich?

Page 223



2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

SA-197

Page 243

2          A.    I did.

3          Q.    What did you and Dan Lee discuss on

4    that call?

5          A.    Dan spewed the most vile ad hominem

6    attacks on me and my company I've experienced in

7    30 years in business, you know, calling out my

8    moral fiber, my morale compass.

9                He'd never want to work with me,

10   screaming and yelling.  And that was upsetting,

11   and I tried to calm him down, which was

12   ineffective.

13               Mr. Arpey was standing next to me.  I

14   was outside at the time on my cell phone, so Mr.

15   Arpey kind of tried to suggest to me to keep

16   myself under control, which I tried to do, but I

17   did say to Dan that I didn't want to be spoken to

18   that way, and that once he cooled down, I'd be

19   happy to speak with him again, and then we hung up

20   the phone.

21               He said -- sorry.  He said, "I think

22   that would be best," or something to that effect.

23         Q.    After you said that?

24         A.    After I said I don't wish to be spoken

25   to this way.  Once you cool down -- this is not



Page 248

2    kindness.

3        Q.    Did you ever have a discussion with

4    Mike Arpey after your conversation with Mr. Lee

5    about whether Hunter Point would hire Mr. Lee in

6    some capacity?

```
                                                    Page 1

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   -----------------------------------x

 3   DANIEL LEE,

 4              Plaintiff,          Civil Action

 5      -against-                   No. 7:23-cv-

 6   RICHARD GOLASZEWSKI and        10695-PMH
     STEPHEN SWENTZEL,
 7              Defendants.

 8   -----------------------------------x

 9   (PORTIONS OF THIS DEPOSITION HAVE BEEN
     DESIGNATED HIGHLY CONFIDENTIAL, ATTORNEYS'
10   EYES ONLY.)

11                        Seven Times Square
                          New York, New York
12                        January 30, 2024
                          10:01 a.m.
13

14          Videotaped deposition of BENNETT
     GOODMAN, pursuant to Subpoena, before Maureen
15   McCormick, a Notary Public of the State of
     New York.
16

17

18

19

20

21

22

23

24

25   Job No: 8571
```

Page 2

```
 1   A P P E A R A N C E S:

 2

 3        BROWN RUDNICK LLP

 4        Attorneys for the Plaintiff

 5             Seven Times Square

 6             47th Floor

 7             New York, New York 10036

 8        BY:  DYLAN KLETTER, ESQ.
                    dkletter@brownrudnick.com
 9             JESSICA TANG, ESQ.
                    jtang@brownrudnick.com
10

11        YANKWITT LLP

12        Attorneys for the Defendants

13             140 Grand Street, Suite 705

14             White Plains, New York 10601

15        BY:  RUSSELL YANKWITT, ESQ.
                    russell@yankwitt.com
16

17        TEIN MALONE

18        Attorneys for the Witness

19             3156 SW 27th Avenue

20             Coconut Grove, Florida 33133

21        BY:  MICHAEL TEIN, ESQ.
                    tein@teinmalone.com
22

23

24

25
```

SA-201

Page 3

1    A P P E A R A N C E S: (Cont'd)

2

3         ALSO PRESENT:

4              PAUL BAKER, Videographer

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 52

1                          B. Goodman



8          Q.      Prior to founding Hunter Point, did

9    you have any experience with NAV lending?

10         A.      Not directly.

11         Q.      How about indirectly?

12         A.      Yes.

13         Q.      What kind of experience?

14         A.      I was aware of those loans, that they

15   were being done in the marketplace.

16         Q.      Market understanding?

17         A.      Yeah, yeah.

18         Q.      Why were you interested in a GPFS

19   strategy at Hunter Point?

20         A.      It's a natural adjunct to equity stake

21   investing.

22         Q.      When you say equity stake investing,

23   you mean the GP Stakes business?

24         A.      Yes.

25         Q.      Why is the GPFS business a natural

Page 62

1              B. Goodman



11      Q.    What does PPO mean?

12      A.    Please print out.

13

14

15

16

17

18

19

20

21      Q.    Did you review the Buffalo Point memo?

22      A.    No.

23      Q.    Do you know one way or another whether

24  you read it?

25      A.    I'm sure I didn't read it.

Page 64

1                    B. Goodman



6        Q.    If you weren't interested in reading
7    someone's business plan, why did you ask Ms.
8    Presta to print out the Buffalo Point opportunity
9    memo?
10        A.    I wanted to see the resume of Dan Lee.
11        Q.    Did you read Mr. Lee's resume?
12        A.    I did.
13        Q.    Is your testimony that you read Mr.
14    Lee's resume, but not the Buffalo Point memo?
15        A.    Yes.

SA-205

Page 65



1              B. Goodman

10        MR. YANKWITT:  Object to the form of

11    the question.

12    A.    Can you rephrase that?

13    Q.    Sure.

SA-206

Page 69

```
 1                    B. Goodman

 2   this opportunity?

 3         A.    I don't remember.
```



SA-207

Page 93

1                    B. Goodman

2         A.    Yes.  I refer to all senior people as
3    partners.

4         Q.    If Mr. Lee's resume had caused you a
5    red flag in May of 2021, why are you sending him
6    an email in March of 2022 expressing your
7    excitement about building the GPFS business with
8    him as one of your partners?

9         A.    I needed Rich and Steve.  It was going
10   to be their decision whether Dan was part of this.

11        Q.    So then why is Dan in this email at
12   all?

13        A.    Because he was part of the group.

14        Q.    Part of the Project Candle team with
15   Steve and Rich?

16        A.    He was part of at the time three
17   people that we were talking to.

18        Q.    And the three people you were
19   referring to Steve, Dan and Rich, correct?

20        A.    Those are the three people that we
21   were talking to.

22        Q.    And Steve, Dan and Rich approached
23   Hunter Point together, correct?

24        A.    Yes.

25        Q.    Did you understand Steve, Dan and Rich

SA-208

Page 94

1                         B. Goodman

2    to be partners among themselves?

3         A.    No.

4         Q.    Why not?

5         A.    I was most interested in origination,

6    not marketing, and at the time I thought Rich and

7    Steve wanted Dan to be part of a group, and to

8    accommodate their desire, we would offer

9    employment to Dan.

10        Q.    Did you tell that to Dan during this

11   Project Candle courtship?

12        A.    I did not say that to him.

13        Q.    Do you know whether anyone at Hunter

14   Point said that to Dan during the Project Candle

15   courtship?

16        A.    I'm not aware of who said anything to

17   Dan.

18        Q.    I hand you Plaintiff's 96.

19             MR. TEIN:  When do you want to take

20        the next break?

21             (Plaintiff's Exhibit 96, Email, 3/11,

22        marked for identification.)

23        Q.    Plaintiff's 96 is an email from you at

24   the top on March 11, to Dan, Steve, Rich, Avi and

25   Arpey, correct?

SA-209

Page 131



1                       B. Goodman

7          MR. TEIN:  Form.

8          MR. YANKWITT:  Objection to the form

9     of the question.

14          MR. TEIN:  Form.

21          MR. TEIN:  Form.  He answered the

22     question.

Page 132

1                        B. Goodman



8               MR. TEIN:  Objection to form.

15              MR. TEIN:  Asked and answered for the

16      third time.

22              MR. YANKWITT:  Objection.

23              MR. TEIN:  Same.

Page 142

1                          B. Goodman



7                     MR. TEIN:  Form.

Page 143

16        Q.     And you talked about a cultural fit.

17        A.     Yes.

18        Q.     What did you mean by that?

19        A.     Rich and Stephen were easy cultural

20   fits, Dan less so.

21        Q.     Why were Steve and Rich easy cultural

22   fits, in your view?

23        A.     You get a feeling about the character,

24   how one conducts themselves, how they interact,

25   how they portray their capabilities.

SA-213

Page 147

1                         B. Goodman

2          Q.     Did Hunter Point propose to enter into

3    a partnership with Steve, Dan and Rich?

4          A.     No.

5          Q.     What was the next step after Avi's

6    meeting with Steve, Dan and Rich?

7          A.     I don't recall the next step.

8                 MR. KLETTER:  This is 102.

9                 (Plaintiff's Exhibit 102, Email,

10         4/14/22, marked for identification.)

11         Q.     Plaintiff's Exhibit 102 is an email

12   from you to Steve, Rich and Dan with a copy to Avi

13   and Danielle, your assistant, correct?

14         A.     Yes.

15         Q.     It's on April 14, 2022.  Do you see

16   that?

17         A.     Yes.

18         Q.     So this post dates Avi's meeting with

19   Steve, Dan and Rich regarding the financial

20   proposal.

21         A.     Yes.

22         Q.     Did Avi report back to you about how

23   that breakfast meeting went?

24         A.     I don't recall the specifics, but my

25   recollection was that it was positively received.

SA-214

Page 164

```
 1                   B. Goodman
 2              MR. KLETTER:  Plaintiff's 105.
 3              (Plaintiff's Exhibit 105, Email,
 4         4/29/22, marked for identification.)
 5         Q.    Plaintiff's 105 is an email from you
 6    to Stephen Swentzel on April 29, 2022, correct?
 7         A.    Yes.
 8         Q.    You say, "Avi and I are speaking again
 9    tomorrow to get back to you guys by Sunday,"
10    correct?
11         A.    Yes.
12         Q.    You go on to say, "We want to make it
13    easy for you and Rich to say yes and sort out Dan
14    later."  Do you see that?
15         A.    Yes.
16         Q.    Where -- as of April 29, where are you
17    in terms of communications with Steve and Rich
18    about Dan?
19         A.    I don't recall the exact sequences.
20         Q.    Do you think that conversation that
21    you were describing earlier with Steve and Rich
22    happened before or after this email to Stephen?
23              MR. TEIN:  Object to form.
24         A.    I think I had the conversation with
25    Rich and Stephen about the non pro rata splitting
```

Page 165

1                              B. Goodman

2    of the economics in that profit pool before this

3    email.

4         Q.    Was that the conversation where you

5    also discussed -- that's where you quote emphatic

6    about Dan not having an equal split; is that your

7    testimony?

8         A.    I said that yes, I thought that we

9    would have an economic arrangement that Dan would

10   be pleased with.

11        Q.    And had you ever formulated an

12   economic proposal to Dan on his own?

13        A.    No.

14        Q.    When you say sort out Dan later, what

15   do you mean by that?

16        A.    Sort out an economic arrangement with

17   Dan later.

18        Q.    So by the sequence, correct, you want

19   Steve and Rich to joint Hunter Point and figure

20   out Dan later; is that fair?

21        A.    No.

22        Q.    What is fair?

23        A.    Rich and Stephen were always the

24   priority, and Dan was an after -- once we get

25   those two guys done, we'll deal with Dan.

SA-216

Page 169

```
 1                        B. Goodman
 2    of them without Dan?
 3          A.    Yes.
 4          Q.    What did Steve or Rich tell you in
 5    that phone or Zoom about why they wanted to join
 6    without Dan?
 7          A.    They were not comfortable having him
 8    part of the management team.
 9          Q.    In that call or Zoom, did they explain
10    why they were not comfortable having Dan as part
11    of the management team?
12          A.    It related primarily to what his
13    contribution to the effort would be.
14                They didn't think that he was
15    particularly additive in the context of Hunter
16    Point.
17          Q.    Do you recall the words Steve or Rich
18    used to communicate that to you in that phone or
19    Zoom?
20          A.    I paraphrased what I recall.
21          Q.    Do you recall any specifics of what
22    they told you in that Zoom or call, other than
23    they want to join without Dan?
24          A.    We explored what -- is there an
25    economic arrangement that we can make with Dan
```

Page 170

1                          B. Goodman

2    that makes sense for the business -- in other

3    words, not a pro rata participation equal to what

4    we were offering Rich and Steve -- and comparing

5    that to what if he didn't join Hunter Point, and

6    they concluded it would be better for the business

7    to move ahead without them.

8         Q.    And that's the conversation that was

9    had on this phone or Zoom around April 29, 2022?

10        A.    Certainly after April 29.  I don't

11   know how soon after.  I don't recall how soon

12   after.

13        Q.    Is it your recollection, then, that

14   Steve and Rich told you and others at Hunter Point

15   that they did not want Dan to join Hunter Point

16   with them in any capacity?

17        A.    No.

18        Q.    Help me understand.

19        A.    They -- they -- we said to Rich and

20   Stephen, well, we'll accommodate Dan, if you want

21   him.  It's your decision, and whatever the cost

22   is, we'll bear it, meaning whatever -- whatever

23   Dan's compensation is we'll bear it because we

24   want the two of you, but we want -- my words --

25   peace in the valley, and if you want him, you

Page 174

B. Goodman

1

2    A.    Not fair.  In that extreme example, I

3    would never accept that.

4         Q.    Sure, okay.

5              If they were in the ballpark of equal,

6    and the team felt motivated and engaged, would you

7    accept that split if they asked you to agree to

8    it?

9         A.    Can you rephrase?  Which split are you

10   referring to?

11        Q.    Yeah, let's say --

12        A.    Are you referring to the profit share?

13        Q.    Yes.

14        A.    If Rich and Stephen said we want to

15   give him a piece, a small piece, of the 20

16   percent, we would have come to grips with

17   something.

18              I don't know what the right percentage

19   would be, but yes.  Peace in the valley.

20        Q.    Sure.

21              So Steve and Rich came to you and said

22   for peace in the valley, we want Dan to have a

23   participation in the profit share pool --

24        A.    Yes.

25        Q.    -- you would have agreed to that to

Page 211

1            B. Goodman



10        Q.    Did Hunter Point ever propose to enter

11    into a partnership with Steve and Rich?

12        A.    What do you mean by partnership?

13        Q.    Do you know one way or the other?

14        A.    They joined us --

15            MR. TEIN:  Object to form.

16        A.    They joined us as employees.

SA-220

**EXHIBIT L**

| | |
|---|---|
| **From:** | dlee@hillhousecapitalholdings.com |
| **Sent:** | Tuesday, July 6, 2021 8:10 PM EDT |
| **To:** | Michael Arpey |
| **Subject:** | RE: Baypine |
| **Attachments:** | DANIEL G LEE RESUME_JUNE 2021.pdf |

Hey Mike – here is my latest resume. Fund 5 closed last week at $2.9B off an initial target of $2.1B and somewhere just around $800M when I joined.

When is a good time for you and I to chat?

# Daniel G. Lee III
## Hillhouse Capital Holdings, LLC

Greenwich, CT
Cell: ███████
*dlee@hillhousecapitalholdings.com*

**From:** Michael Arpey <marpey@hunterpointcapital.com>
**Sent:** Tuesday, July 6, 2021 4:37 PM
**To:** Dan Lee <dlee@hillhousecapitalholdings.com>
**Subject:** Re: Baypine

Hi Dan, The fellow you would meet is Brian Frank. He is based in NYC and heads Declaration. Please send to me your resume and I will make an introduction. I look forward to catching up.

Best,

Mike

Get Outlook for iOS

**From:** Dan Lee <dlee@hillhousecapitalholdings.com>
**Sent:** Tuesday, July 6, 2021 3:49:10 PM
**To:** Michael Arpey <marpey@hunterpointcapital.com>
**Subject:** Baypine

Hey Mike,

Remembering you mentioning your friends via David at Baypine. I am in Boston next week if you think I should connect with them.

Lets catch up soon!

Best,

Dan

Daniel G. Lee III
Hillhouse Capital Holdings, LLC



Cell:
dlee@hillhousecapitalholdings.com

---

Hunter Point Capital Email Notice: This email and its contents and attachments are confidential, may be privileged or otherwise subject to legal restrictions and are intended solely for the use of the intended addressee. This email is neither an offer nor the solicitation of an offer to purchase or sell any securities or investments. Securities of any Fund managed by Hunter Point Capital LP ("HPC") are offered to selected investors only by means of a complete offering memorandum and related subscription materials which contain significant additional information about the terms of an investment in the Fund (such documents, the "Offering Documents"). Any decision to invest must be based solely upon the information set forth in the Offering Documents, regardless of any information investors may have been otherwise furnished, including this presentation. This information is strictly confidential and may not be reproduced or redistributed in whole or in part nor may its contents be disclosed to any other person without the express consent of HPC. Please notify the sender immediately if you have received this email in error and promptly destroy this email and all attachments thereto. The sender is unaware of any virus or similar defect that might affect a computer system on which this email or any attachment is opened, but Hunter Point Capital LP does not assume liability by reason of sending this message for any damages that may result from its access. Please satisfy yourself as to the safety of any attachments before opening.

SA-223

# DANIEL G. LEE, III

danielglee3@yahoo.com

Greenwich, CT 06830 | ▮▮▮▮▮▮

### Private Equity & Credit | Fundraising | Investor Relations

*Senior private equity professional with experience across products, sectors, investor types, geographies, and funding structures. A diverse set of global investor relationships and a natural affinity for cultivating and enhancing them. Strong leadership and diplomacy with a proven track record of setting priorities, generating momentum, and driving fundraising results with a commitment to facilitating strategic progress.*

- **Building a market presence and executing on a fundraising pipeline** for 17Capital in North America and with large global investors. >$2.0 Billion in capital raising opportunities identified, closed or closing since March 2020.

- **Institutionalizing and optimizing** 17Capital's global and regional fundraising and investor relations strategy and team.

- **Reformulated capital formation strategy** for Aethon Energy. Beat initial fundraising target by 3x, and accelerated the firms growth and acquisition strategy, raising $1.2 billion for 13 discrete acquisitions creating one of the largest, highest margin natural gas companies in North America.

- **Beat initial target, drove fundraising strategy and investor demand** for $1.1 billion Aquiline Financial Services Fund III L.P.

## Career Experience

### Head of Fundraising and Investor Relations, North America

**17Capital LLP**, London, UK and New York, NY                    **March 2020 to present**

*$8.0 billion AUM Private Equity / Alternative Private Credit Firm*

**Developing the firms capital base in North America and enhancing the global fundraising and investor relations strategy.**

- Building and executing on a fundraising pipeline for 17Capital in North America and with large global investors.

- Closed first significant US based institutional capital for the firm, including an influential gatekeepers and large customized mandates.

- >$2.0 Billion in capital raising opportunities identified, closed or closing since March 2020.

- Secured extension on $2.1 billion target Fund 5 and ability to increase hard-cap to meet growing opportunity set.

- Fund 5 closed on $2.9 billion in July 2021.

- Launching 17Capital's first credit fund, targeting E1.5 billion.

- Entreprenurialy drive business development by sourcing investment opportunities from and building partnerships with North American GP and LPs.

### Head of Fundraising and Investor Relations

**AETHON ENERGY MANAGEMENT, LLC**, New York, NY and Dallas, TX                    **2015 to 2020**

*$2.5 billion AUM Energy Private Equity Firm / Operating Platform*

**Reformulated capital formation strategy for Aethon. Beat initial fundraising target by 3x, and accelerated the firms acquisition strategy, raising $1.2 billion to fund 13 discrete acquisitions.**

- Joined Aethon in April 2015 to lead strategy development and execution for all private equity capital formation initiatives.

- Set forth the plan to transform a historically family-backed business into a hybrid private equity firm / energy operating platform with institutional scale.

- Raised $1.2 billion in private equity capital, funding 13 discrete asset acquisitions, and creating one of the largest, highest margin natural gas companies in North America.

- Closed over $550 million in committed capital in 2019 to establish a new direct investment vehicle.

- Previously developed and executed a direct and co-investment fundraising strategy, generating substantial interest, and raising in excess of $600 million through 2016 to pursue a basin consolidation opportunity.

                    HUNTERPOINT00000181

SA-224

# DANIEL G. LEE, III  Greenwich, CT 06830 | ████

PG 2 of 2

- Created value through conceiving and leading GP led secondary sale opportunities, cultivation of anchors, investors, and placement agents for follow on vehicles, co-investments, and separate accounts.

### Director of Investor Relations
**AQUILINE CAPITAL PARTNERS, LLC**, New York, NY                          **2013 to 2015**
*$4.5 billion AUM financial services Private Equity firm*
**Beat initial target, drove fundraising strategy and investor demand for $1.1 billion Aquiline Financial Services Fund III L.P.**

- Responsible for leading fundraising and investor relations.
- Cultivated and maintened relationships with new and existing limited partners, investment consultants, and placement agents.
- Set and executed fundraising strategy for $1.1 billion Fund III including: premarketing, placement agent selection, target identification and overall process management.
- Secured and closed new investors.
- Stewarded and strengthened existing relationships leading to upsized commitments.
- Created value through conceiving and leading co-investment syndication and complex secondary transfer opportunities.

### Director of Investor Relations & Business Development
**FALCONHEAD CAPITAL**, New York, NY                          **2011 to 2012**
*$500 million AUM Consumer focused Private Equity firm*
**Created and executed fundraising strategy, generating initial interest in $350 million Falconhead Capital Partners III, L.P.**

- Responsible for fundraising, investor relations, and business development for a $500 million middle market private equity firm.
- Primary fundraising contact for $350 million Fund III.
- Led responses to detailed investor inquiries and managed an Associate and a Vice President.
- Established internal investor relations infrastructure, created and maintained marketing materials, streamlined the LP due diligence responses, actively managed investor communications protocols.

### Vice President, Distribution and GP Origination
**Champlain Advisors**, Greenwich, CT                          **2009 to 2010**
*Boutique Private Equity Placement Agent*
**Sourced mandate with a $315 million capital raising opportunity**

- Responsible for developing and maintaining relationships with North American limited partners.
- Assisted in general partner origination duties including sourcing, screening, and analysis.
- Executed project management and advisory duties including document preparation and due diligence.

### Analyst
**Fox-Pitt, Kelton**, Chicago, IL                          **2005 to 2008**
*Financial Institutions Investment Banking*
**Supported deal execution and origination efforts for global financial services M&A advisory business**

- Performance of fundamental quantitative and qualitative analysis in support of both live and prospective M&A and capital raising transactions in the insurance and financial services sectors.
- Supported origination and execution efforts for the U.S. Equity Capital Markets business.

## Education

**B.A., Government & Religious Studies**— St. Lawrence University, Canton, NY                          **2005**

## Nonprofit Leadership

**Alumni Executive Council, ST. LAWRENCE UNIVERSITY, Canton, NY**                          **2014 to 2020**
Chairman of the Membership Committee

SA-225

**EXHIBIT M - FILED UNDER SEAL**

SA-226

**EXHIBIT N**

From:    dlee@hillhousecapitalholdings.com
Sent:    Thu 1/13/2022 1:33 PM (GMT-00:00)
To:      Michael Arpey
Cc:
Bcc:
Subject: RE: Midocean

Mike – Thanks for this. Setting up a call. What's your view on their need? New head and a long time senior guy there. Curious as to where I would I fit in?

17C Review was positive, comp discussion forthcoming….

One potential buyer/partner may be West coast based….


# Daniel G. Lee III
## Hillhouse Capital Holdings, LLC

Greenwich, CT
Cell: ▆▆ ▆▆▆▆
*dlee@hillhousecapitalholdings.com*

**From:** Michael Arpey <marpey@hunterpointcapital.com>
**Sent:** Tuesday, January 11, 2022 4:50 PM
**To:** dlee@hillhousecapitalholdings.com
**Cc:** Tim Percarpio <TPercarpio@midoceanpartners.com>; Shelley Guiley <sguiley@barrettcove.com>
**Subject:** Midocean

Hi Dan,
Hope you are well and that the new year has gotten off to a good start for you.  As you know, Hunter Point has taken a stake in MidOcean Partners and is working with them on a few IR
initiatives.  MidOcean is currently looking for a senior IR person and I thought of you.  Tim Percarpio, MidOcean's Head of IR, is copied here.  I encourage you to reach out to him if you have an interest in learning more about this opportunity.
Thx,
Mike



Mike Arpey
President
Hunter Point Capital
Email:  marpey@hunterpointcapital.com
Cell:  ▆▆ ▆▆▆▆
Web:  www.hunterpointcapital.com

CONFIDENTIAL

SA-228

Hunter Point Capital Email Notice: This email and its contents and attachments are confidential, may be privileged or otherwise subject to legal restrictions and are intended solely for the use of the intended addressee. This email is neither an offer nor the solicitation of an offer to purchase or sell any securities or investments. Securities of any Fund managed by Hunter Point Capital LP ("HPC") are offered to selected investors only by means of a complete offering memorandum and related subscription materials which contain significant additional information about the terms of an investment in the Fund (such documents, the "Offering Documents"). Any decision to invest must be based solely upon the information set forth in the Offering Documents, regardless of any information investors may have been otherwise furnished, including this presentation. This information is strictly confidential and may not be reproduced or redistributed in whole or in part nor may its contents be disclosed to any other person without the express consent of HPC. Please notify the sender immediately if you have received this email in error and promptly destroy this email and all attachments thereto. The sender is unaware of any virus or similar defect that might affect a computer system on which this email or any attachment is opened, but Hunter Point Capital LP does not assume liability by reason of sending this message for any damages that may result from its access. Please satisfy yourself as to the safety of any attachments before opening.

CONFIDENTIAL

**EXHIBIT O**

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------x
DANIEL LEE,

                        Plaintiff,


            -against-        Case No:
                            7:23-cv-10695-PMH



RICHARD GOLASZEWSKI and STEPHEN
SWENTZEL,

                        Defendants.
---------------------------------------------x
```

EXAMINATION of a Non-Party Witness, MICHAEL ARPEY, taken by the Plaintiff, pursuant to Notice, held at the law offices of Brown Rudnick LLP, 7 Times Square, New York, New York 10036, on January 22, 2024, at 10:00 a.m., before a Notary Public of the State of New York.


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


Reported by:

TENEJA THWEATT

Job no: 8570

Page 2

```
 1          A P P E A R A N C E S:

 2          BROWN RUDNICK
                    Attorneys for Plaintiff
 3                  7 Times Square
                    New York, New York 10036
 4                  (212)209-4800

 5          BY:    DYLAN KLETTER, ESQ.
                    Dkletter@brownrudnick.com
 6

 7

 8

            YANKWITT LLP
 9                  Attorneys for Defendants
                    140 Grand Street, Suite 705
10                  White Plains, New York 10601
                    (914)686-1500
11
            BY:    RUSSELL M. YANKWITT, ESQ.
12                  Russell@yankwitt.com

13

14

15          ALSO PRESENT:

16          PAUL BAKER, VIDEOGRAPHER, TRANSPERFECT LEGAL

17          JASON SWERGOLD, ESQ., YANKWITT LLP

18

19

20

21

22

23

24

25
```

Page 3

```
 1              S T I P U L A T I O N S :
 2    IT IS STIPULATED AND AGREED by and between the
      attorneys for the respective parties herein, and in
 3    compliance with Rule 221 of the Uniform Rules for
      the Trial Courts:
 4
      THAT the parties recognize the provision of Rule
 5    3115 subdivisions (b), (c) and/or (d).  All
      objections made at a deposition shall be noted by
 6    the officer before whom the deposition is taken,
      and the answer shall be given and the deposition
 7    shall proceed subject to the objections and to the
      right of a person to apply for appropriate relief
 8    pursuant to Article 31 of the C.P.L.R.;
 9    THAT every objection raised during a deposition
      shall be stated succinctly and framed so as not to
10    suggest an answer to the deponent and, at the
      request of the questioning attorney, shall include
11    a clear statement as to any defect in form or other
      basis of error or irregularity.  Except to the
12    extent permitted by CPLR Rule 3115 or by this rule,
      during the course of the examination persons in
13    attendance shall not make statements or comments
      that interfere with the questioning.
14
      THAT a deponent shall answer all questions at a
15    deposition, except (i) to preserve a privilege or
      right of confidentiality, (ii) to enforce a
16    limitation set forth in an order of a court, or
      (iii) when the question is plainly improper and
17    would, if answered, cause significant prejudice to
      any person.  An attorney shall not direct a
18    deponent not to answer except as provided in CPLR
      Rule 3115 or this subdivision.  Any refusal to
19    answer or direction not to answer shall be
      accompanied by a succinct and clear statement on
20    the basis therefore.  If the deponent does not
      answer a question, the examining party shall have
21    the right to complete the remainder of the
      deposition.
22
      THAT an attorney shall not interrupt the deposition
23    for the purpose of communicating
      with the deponent unless all parties consent or the
24    communication is made for the purpose of
      determining whether the question should not be
25    answered on the grounds set forth in Section
```

Page 4

1        221.2 of these rules, and, in such event, the
         reason for the communication shall be stated for
2        the record succinctly and clearly.

3        THAT the failure to object to any question or to
         move to strike any testimony at this examination
4        shall not be a bar or waiver to make such objection
         or motion at the time of the trial of this action,
5        and is hereby reserved; and

6        THAT this examination may be signed and sworn to by
         the witness examined herein before any Notary
7        Public, but the failure to do so or to return the
         original of the examination to the attorney on
8        whose behalf the examination is taken, shall not be
         deemed a waiver of the rights provided by Rule 3116
9        and 3117 of the C.P.L.R, and shall be controlled
         thereby; and
10
         THAT the certification and filing of the original
11       of this examination are hereby waived.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 58

1          general partner.   The portfolio companies of a

2          general partner.

3          Q.      And what is the preferred equity strategy?

4          A.      It lends to the management companies of the

5          general partners.

6          Q.      Now, when you were at Carlyle, did you --

7          did Carlyle have an NAV lending strategy?

8          A.      At the time I was there, no.

9          Q.      And while you were at Carlyle, did they

10         have a preferred equity strategy?

11         A.      At the time I was there, no.

12         Q.      Prior to Mr. Swentzel and Golaszewski

13         joining Hunter Point, did Hunter Point have an NAV

14         lending strategy?

15         A.      No.

16         Q.      Prior to Mr. Swentzel and Mr. Golaszewski

17         joining Hunter Point, did Hunter Point have a

18         preferred equity strategy?

19         A.      No.

22                         MR. YANKWITT:  We're going to

23                 designate this entire part of the -- the

24                 transcript as confidential, and you can

25                 answer that question.

SA-235

Page 59

```
 1                    THE WITNESS:  Okay.
██          ██        ██
██          ██        ████████
 4                    MR. YANKWITT:  This -- this entire
 5              thing, we're actually going to designate as
 6              highly confidential, attorneys eyes only,
 7              so it cannot be shared with your client.
 8              And you can answer the question.
 9                    THE WITNESS:  Okay.
██          ██        █████████████
11       Q.     And --
12       A.     Let -- let me define -- just define when
13              you say "raised" --
14       Q.     Okay.
██          ██        ████████████████████████
██          ██        ██████████████████
██          ████████████████
██          ██        ████████████████████
██          ██        ████████████████████
██          ████████████████████████
██          ██        ████████████████████
██          ██████████
██          ██        ██████████████████████
██          ████████████████████████
██          ██████████
```



Page 199

1    A.    I think Dan had a -- I think Dan had a

2    belief around something that didn't exist, and I

3    think he -- I think there was a misalignment of

4    what Dan had in his own mind to what the rest of

5    the world believed.  And I think, you know, it was

6    one of those things where -- you know, you -- where

7    you kind of try to will something to be.  I guess

8    it's called manifesting.  He tried to manifest

9    something.  And despite his best efforts of

10   manifesting, it didn't come true.

11   Q.    What didn't come true?

12   A.    Dan's -- Dan's -- in his own mind, Dan's --

13   thought that there was some partnership, but there

14   was no partnership.  There were individual

15   conversations; there was no -- there was no

16   agreement; there was no anything associated with --

17   with this.  And, you know -- but Dan believed that.

18   In his heart of hearts, Dan believed that, but that

19   was not the reality.

20   Q.    Were you a party to the conversations that

21   Steve, Dan, and Rich had had internally among

22   themselves?

23   A.    No.

24          MR. YANKWITT:  Object to the form

25          of the question.

SA-238

**EXHIBIT P - FILED UNDER SEAL**

SA-239

**EXHIBIT Q**

SA-240

ORIGINAL

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
DANIEL LEE,

                              PLAINTIFF,


          -against-    Case No.:
                       7:23-cv-10695-PMH


RICHARD GOLASZEWSKI and
STEPHEN SWENTZEL,

                       DEFENDANTS.
----------------------------------------X



          DATE:  January 4, 2024

          TIME:  10:12 A.M.




     DEPOSITION of a Non-Party Witness,

PAUL KNOLLMEYER, taken by the respective

parties, pursuant to a Subpoena and to the

Federal Rules of Civil Procedure, held at

the offices of MoloLamken, LLP, 430 Park

Avenue, New York, New York 10022, before

Jennifer Schwartz, a Notary Public of the

State of New York.



2

```
 1
 2    A P P E A R A N C E S:
 3
 4    BROWN RUDNICK, LLP
         Attorneys for the Plaintiff
 5       Times Square Tower
         47 7th Avenue, Suite 6536
 6       New York, New York 10036
         BY:  DYLAN P. KLETTER, ESQ.
 7
 8
      YANKWITT, LLP
 9       Attorneys for the Defendants
         140 Grand Street, Suite 705
10       White Plains, New York 10601
         BY:  JASON SWERGOLD, ESQ.
11
12
      MOLOLAMKEN, LLP
13       Attorneys for the witness
         430 Park Avenue
14       New York, New York 10022
         BY:  JUSTIN M. ELLIS, ESQ.
15
16
      ALSO PRESENT:
17       Josh D. Bloom
         Steven Schuh
18
19
20            *          *          *
21
22
23
24
25
```



3

1

2      F E D E R A L   S T I P U L A T I O N S

3

4

5      IT IS HEREBY STIPULATED AND AGREED by and

6    between the counsel for the respective

7    parties herein that the sealing, filing and

8    certification of the within deposition be

9    waived; that the original of the deposition

10    may be signed and sworn to by the witness

11    before anyone authorized to administer an

12    oath, with the same effect as if signed

13    before a Judge of the Court; that an

14    unsigned copy of the deposition may be used

15    with the same force and effect as if signed

16    by the witness, 30 days after service of

17    the original & 1 copy of same upon counsel

18    for the witness.

19

20      IT IS FURTHER STIPULATED AND AGREED that

21    all objections except as to form, are

22    reserved to the time of trial.

23

24            *     *     *     *

25



800.DAL.8779
dalcoreporting.com
DALCO

SA-243

15

```
1              P. KNOLLMEYER
2    years, do you have a sense of how many
3    years you think that -- like, how many
4    years, in your mind, are you thinking is
5    the horizon for substantial growth of that
6    market?
7         A.    Well, I think that the market
8    can grow for the foreseeable future, the
9    next ten years.
10        Q.    Are there any factors that you
11   would consider that might limit the growth
12   of the NAV lending market in the
13   foreseeable future?
14        A.    There can always be factors
15   that limit the growth.  I think the biggest
16   issue would be the value associated with
17   the private equity portfolios, that they're
18   not as good as people think and you don't
19   want to extend credit.
20        Q.    What might be some other
21   factors that would also limit the growth?
22        A.    Rates.  Rates go up, cost of
23   capital becomes too expensive.  That might
24   be another reason why they don't want to
25   borrow on that front.  Those would be the
```



SA-244

16

```
 1                    P. KNOLLMEYER
 2   primary reasons.
 3        Q.    And you said that you see a lot
 4   of your peers doing NAV lending now?
 5        A.    Yes.
 6        Q.    You said it's difficult to
 7   estimate the size of the market, but from
 8   where HPS sits, about how many firms are
 9   doing this kind of lending or competing for
10   a piece of the market?
11        A.    I don't know how many, but it's
12   certainly our direct peers, which would
13   include Apollo, Aries, Blackstone, amongst
14   others, but I can't give you a specific
15   number.
16             (Whereupon, March 10, 2022
17         e-mail chain was marked as HPS
18         Exhibit 1 for identification as of
19         this date by the Reporter.)
20        Q.    I marked HPS 1, which is a
21   document with a Bates number HPS 00000007.
22   It's an e-mail chain on March 10, 2022.  So
23   I'll ask you -- you can of course review
24   the whole thing, but I'll ask you to start
25   at the very first e-mail in the chain, so
```



SA-245

27

```
 1                    P. KNOLLMEYER
 2   on them in advance?
 3        A.    No.
 4        Q.    And you said that Scott told
 5   you that there was an opportunity to hire
 6   one or more people?
 7        A.    Correct.
 8        Q.    So your understanding going
 9   into that lunch was, there could be one,
10   there could be more, but it wasn't, like,
11   this is a package deal of people that we
12   are taking?
13            MR. KLETTER:  Objection to
14        form.
```

████    ██   ████████████████████
████  ████████████████████████████
████  ██████████████████████████
████  ████████████████████████
████  ████████████████████████████
████  ████████████████████████
████  ████████████████████████████
████  ██████████████████████████████
████  ████████████████████████████
████  ████████████████

```
25        Q.    At any point, did you ever
```



```
 1                    P. KNOLLMEYER
 2     believe that you were -- when you were
 3     speaking with Dan or Rich or Steve, did you
 4     ever at any point believe you were
 5     negotiating with a legal partnership or
 6     that you were talking to individuals?
 7              MR. ELLIS:  I'm going to object
 8         to the extent this calls for a legal
 9         conclusion.
10              MR. SWERGOLD:  You can still
11         answer the question.
12              MR. KLETTER:  Objection to
13         form, too, for me.
14         Q.    Okay.  You can answer.
15         A.    I have no idea.  Maybe they had
16     a partnership, maybe they didn't have a
17     partnership, but I'm not in a position to
18     opine as to whether or not they had a
19     partnership.
20         Q.    What I'm saying is:  Nothing
21     was ever presented to you that led you to
22     believe they had a partnership?
23              MR. KLETTER:  Objection to
24         form.
25              MR. ELLIS:  Same objection.
```



SA-247

```
 1                    P. KNOLLMEYER
 2         A.    I have no idea.
 3         Q.    Do you know whether anybody at
 4   HPS had any views on whether they were a
 5   partnership or not, whether -- sorry.  To
 6   make that clear:  Whether Dan, Rich, and
 7   Steve were a partnership?
 8         A.    I can't speak for them.
 9         Q.    Nobody has said that to you?
10         MR. KLETTER:  Objection.
11         A.    No, not to my knowledge.
12         Q.    Okay.  Tell us about the lunch
13   at the Naples Yacht Club.
14         A.    Four of us met for lunch, Dan,
15   Rich, Scott, me.  It lasted probably about
16   an hour fifteen, hour and a half.  We
17   probably talked about what happened with
18   17Capital being sold, the fact that neither
19   of them participated in that transaction
20   and got any value for it.  We talked about
21   the market on two fronts, sourcing an
22   origination and structuring, which is more
23   Rich, more investment.  What's the market
24   opportunity, what kind of returns, how do
25   you think about leverage, how do you think
```



SA-248

34



9        Q.      Jumping ahead a little bit.

10   Ultimately, HPS made offers to Richard

11   Golaszewski and Stephen Swentzel; correct?

12       A.      Yes, we did.

13       Q.      Did HPS make an offer to Dan

14   Lee?

15       A.      Not at that stage.

16       Q.      Why not?



SA-249

35

■          ████████
■   ████████████████████████
■   ██████████████████

4        Q.    And did anybody at HPS

5   communicate that to Dan?

6        A.    I don't know.

7        Q.    So you didn't have any

8   conversations with him?

9        A.    I did not.

10        Q.    Okay.  Do you know if Scott had

11   any conversations telling him, We're not

12   hiring you right now?

13        A.    I don't know.

■        ■   ████████████████
■   ██████████████████████████
■   ██████████████████████
■   ████████████████
■   ████████████████████
■   ██████████████████
■   ████████████████████
■   ██████████
■        ■   ████████████████
■   ██████████████

24        Q.    Anything else about the yacht

25   club meeting that you remember?


800.DAL.8779
dalcoreporting.com

SA-250

42

```
 1                    P. KNOLLMEYER
 2         you like, you can answer just a "yes"
 3         or "no".  Do you know, yes or no?
 4              THE WITNESS:  No.
 5              MR. SWERGOLD:  Okay, then we
 6         don't need a break.  Unless you still
 7         need a break?
 8              THE WITNESS:  No, I'm good
 9         right now.
10              MR. ELLIS:  We should take one
11         in 10, 15 minutes.  We're coming up
12         on an hour.
13              MR. SWERGOLD:  Sure, just
14         remind me.
15         Q.    Just to be clear:  At the
16    Greenwich meeting, did anybody, Dan, Rich,
17    or Steve, ever bring up the term "buffalo
18    point"?
19         A.    I do not remember that term.
20         Q.    Did anybody at that meeting,
21    Dan, Rich, or Steve, ever say to HPS, We
22    have a partnership together?
23         A.    I don't remember anyone saying
24    that.
25         Q.    Did they ever say that we have
```



```
1                    P. KNOLLMEYER

2    an agreement to share profits and losses

3    together?

4              MR. KLETTER:  Objection to

5        form.

6        A.    I don't remember that either.

7        Q.    Once HPS decided to move

8    forward with exploring with launching this

9    business, what steps did HPS take

10   internally?
```



SA-252

71

11    Q.    You testified earlier that you

12    sent the model to Steve and Rich to get

13    their agreement on the model before you

14    sent them an economic offer; is that fair?

15    A.    Correct.

16    Q.    Did you come to an agreement

17    with Steve and Rich on the models that

18    we've looked at today?

19    A.    Yes.  I don't know if these are

20    the final models, but yes, we agreed upon

21    the assumptions that went into the model,

22    yes.

23    Q.    Maybe if you go to Exhibit 8.

24    A.    Hold on.  Okay.

25    Q.    Do you know if this was the



SA-253

**EXHIBIT R**

SA-254

ORIGINAL

1

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT
- - - - - - - - - - - - - - - - - - - - - -X
DANIEL LEE,

                          Plaintiff,

          -against-                Case No.:
                                   3:23-cv-00400-OAW

RICHARD GOLASZEWSKI and
STEPHEN SWENTZEL,

                          Defendants.
- - - - - - - - - - - - - - - - - - - - - -X
                          February 14, 2024
                          2:05 p.m.


                 -- CONFIDENTIAL --




VIDEOTAPED DEPOSITION of WILLIAM BOHNSACK,

a Third-Party witness herein, taken pursuant

to Court Order, and held at the offices of

Yankwitt, LLP, 140 Grand Street, Suite 705,

White Plains, New York 10601, before

Angela Marcuccilli, a Court Reporter and

Notary Public of the State of New York.



SA-255

2

```
 1   A P P E A R A N C E S :

 2

 3        BROWN RUDNICK, LLP
               Attorneys for Plaintiff
 4             185 Asylum Street
               Hartford, Connecticut 06103
 5        BY:  DYLAN P. KLETTER, ESQ.

 6


 7

 8        YANKWITT, LLP
               Attorneys for Defendants
               140 Grand Street, Suite 705
 9             White Plains, New York 10601
10        BY:  JASON SWERGOLD, ESQ.

11

12        PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP
               Attorneys for Oak Hill Advisors,
13             William Bohnsack,
               1285 Avenue of the Americas
14             New York, New York 10019
15        BY:  ANDREW J. EHRLICH, ESQ.

16

17

18

19

20        ALSO PRESENT:
               JAMES BRADY, VIDEOGRAPHER
21

22

23

24
```



SA-256

**WILLIAM BOHNSACK**                                    **3**

```
1              IT IS HEREBY STIPULATED AND AGREED, by and
2    between the attorneys for the respective parties
3    hereto, that:
4              All rights provided by the C.P.L.R., and
5    Part 221 of the Uniform Rules for the Conduct of
6    Depositions, including the right to object to any
7    question, except as to form, or to move to strike
8    any testimony at this examination is reserved; and
9    in addition, the failure to object to any question
10   or to move to strike any testimony at this
11   examination shall not be a bar or waiver to make
12   such motion at, and is reserved to, the trial of
13   this action.
14        This deposition may be sworn to by the witness
15   being examined before a Notary Public other than the
16   Notary Public before whom this examination was
17   begun, but the failure to do so or to return the
18   original of this examination to counsel, shall not
19   be deemed waiver of the rights provided by Rule 3116
20   of the C.P.L.R., and shall be controlled thereby.
21             The filing of the original of this
22   deposition is waived.
23
24
```



SA-257

**WILLIAM BOHNSACK**                    20

1    Q.    Sure.   What are the take-aways of your
2    collective conversations with Dan about Rich
3    Golaszewski?
4    A.    That Dan was deeply aggrieved by Rich and
5    Steve, because it's hard for me to differentiate
6    between the two, for them taking the deal at Hunter
7    Point and cutting him out of it.
8    Q.    And when you say "cutting him out of it,"
9    that's based on what -- that's based on what Dan has
10   said to you?
11   A.    Yes, that's based on my discussions with
12   Dan.
13   Q.    Did you ever see any documents to suggest
14   that Rich, Steve, and Dan had a business together?
15       MR. EHRLICH:  Objection to the form.  You
16       can answer.
17   A.    I did not see any documents.
18   Q.    Did you ever see a partnership agreement
19   among Rich, Steve, and Dan?
20   A.    I did not see any documents.
21   Q.    Did anyone ever say to you that Rich,
22   Steve, and Dan had a legal partnership?
23       MR. KLETTER:  Objection to form.
24   A.    I don't recall.



SA-258

**WILLIAM BOHNSACK**                    45

1    US's -- the US team in its entirety, I guess, which
2    I believe Rich and Steve were two senior members of
3    that.
4         Q.    In this first call that you had -- or not
5    this first -- the call that you had with Dan that
6    then prompted you to write this email, did he ever
7    tell you that he and Richard and Stephen had formed
8    a legal partnership?
9         MR. EHRLICH:    Objection to form.  You can
10        answer.
11        A.    No, he did not.
12        Q.    If you flip the page and you look at the
13   middle paragraph that starts with "from what I have
14   been."  A little bit later you say, "It also has the
15   benefit of being a strategy that most investors
16   don't currently have in their portfolios."  Do you
17   see that?
18        A.    Yes.
19        Q.    What did you mean by that?
20        A.    That most LPs, currently, did not have an
21   allocation or access to GP Solutions in their
22   portfolios.
23        Q.    And is that sort of consistent with what
24   we talked about a little while ago, with this being



WILLIAM BOHNSACK                          55

1    means, in this case, sort of a participation in the
2    upside and having that participation effectively
3    locked in.
4         Q.    Does Dan have that now in his current
5    compensation package?
6         A.    No.
7         Q.    Why not?
8         A.    In -- in large part because it became less
9    of building a business and team -- team lift out,
10   and became more about hiring an individual to help
11   build the business.
12        Q.    Did -- did Oak Hill ever make an offer to
13   Rich or Steve?
14        A.    We made an offer to the three of them.
15        Q.    To the three of them.  When was that?
16        A.    I want to say in the second quarter of
17   2022, don't recall the exact date, but we made an
18   offer for the three of them to join us.
19        Q.    Was it -- was it one offer, or was it
20   three individual offers?
21        A.    It was one offer, and it was for the three
22   of them.
23        Q.    If Rich and Steve had said, we want to
24   join and Dan said he decided not to, would you have



SA-260

**WILLIAM BOHNSACK**                              81

1      A.   I believe that the -- at this point from
2  my perspective, the opportunity to bringing the
3  three of them on board to OHA had ended and that --
4  that Steve and Rich had decided to go someplace
5  else.
6      Q.   Okay.  Do you know one way or the other,
7  though, whether or not by the time this email was
8  sent, Dan has heard from Rich and Steve about their
9  plans to go to Hunter Point?
10     A.   I don't know.
11     Q.   And then he says, "About a variation of
12 our prior discussions that he and I had been
13 speaking about over the last week or so."  So what
14 were the discussions that you and Dan had been
15 having over the last week, so call it in this middle
16 part of May?
17     A.   I -- as I recall relatively quickly
18 thought about hey, maybe we could hire Dan if the --
19 the team lift out didn't work out.  So I think that
20 was probably what I had talked to him about.
21     Q.   And did you start to have those -- did you
22 start to think about that before Dan told you that
23 hey, I heard Rich and Steve are going elsewhere?
24     A.   Let me try to answer the question:  I



SA-261

**EXHIBIT S**

SA-262

HIGHLY CONFIDENTIAL

Page 1

HIGHLY CONFIDENTIAL

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
---------------------------------x

DANIEL LEE,

                    Plaintiff,

          -against-              Civil Action No.
                                 3:23-cv-00400

RICHARD GOLASZEWSKI and STEPHEN
SWENTZEL,

                    Defendants.

---------------------------------x

November 6, 2023

Deposition of MELVIN HIBBARD

Reported by: Joseph Danyo V

SY8195

SA-263

HIGHLY CONFIDENTIAL

Page 2

```
1

2                           November 6, 2023
                            10:10 a.m.
3

4

5        Deposition of MELVIN HIBBARD, taken by

6   Plaintiff, held at the offices of Brown Rudnick

7   LLP, 7 Times Square, New York, New York, before

8   Joseph Danyo V, a Shorthand Reporter and Notary

9   Public within and for the State of New York.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**SA-264**

HIGHLY CONFIDENTIAL

```
                                              Page 3

 1

 2          A P P E A R A N C E S :

 3

 4          BROWN RUDNICK LLP
            Attorneys for Plaintiff
 5             7 Times Square
            New York, New York 10036
 6
            By:   DYLAN KLETTER, ESQ.
 7     dkletter@brownrudnick.com

 8
            YANKWITT LLP
 9          Attorneys for Defendants and the Witness
              140 Grand Street, Suite 705
10          White Plains, New York 10601

11          By:   JASON M. SWERGOLD, ESQ.
       jason@yankwitt.com
12

13       Also Present:

14          DMITRY ZVONKOV

15                    ~oOo~

16

17

18

19

20

21

22

23

24

25
```

SA-265

HIGHLY CONFIDENTIAL



SA-266

HIGHLY CONFIDENTIAL

```
                                          Page 73
 1                 Hibbard - Highly Confidential
 2         to accomplish that?
 3                 A.   I mean otherwise you're not really
 4         got much to -- like there's not much to -- like
 5         there's nothing informing your views.  I like the
 6         phrase, you know, you don't want to get too hung
 7         up on it.  Models can say all kind of crazy
 8         things.  I like the phrase that a financial model
 9         is like a lamppost to a drunk man.  It's more for
10         support than illumination.  So it's not like you
11         put in the model and be like, oh, wow, this is a
12         profitable business, but if you think it's
13         profitable, it helps you prove that out and then
14         communicate that to other people.
15                 Q.   Okay.  Like third parties?
16                 A.   Well, mainly internally.
17                 Q.   Internally, right, so you --
18                 A.   As an example, I don't -- this is, I
19         don't know if this happened, but I can easily
20         imagine a situation where Bennett said okay, but
21         shouldn't we just focus on finishing our
22         fundraise, and this is an awful lot of noise,
23         what's the point, and being able to say like,
24         well, the business could look like this.  Things
25         like that are just helpful to kind of have
```

SA-267

HIGHLY CONFIDENTIAL

Page 113

1                    Hibbard - Highly Confidential

2           Q.    That's Hunter Point's investment,

3    yes?

4           A.    Yes.   Yes.

SA-268

HIGHLY CONFIDENTIAL

Page 261

1                Hibbard - Highly Confidential

4         Q.   But you're aware that what was

5    presented to Steve, Rich and Dan reflected that

6    they would receive $848 million over ten years?

7         A.   Or they could.

8              MR. SWERGOLD:  Object to form.

9         Q.   Could.

10        A.   They could.

11        Q.   If the assumptions in the model were

12   ultimately achieved, is that correct?

13        A.   Correct, and I hadn't fucked up the

14   model.

15        Q.   Okay.  Did you believe that you had

16   fucked up the model?

17        A.   No.

SA-269

**EXHIBIT T**

1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------X
DANIEL LEE,

                      Plaintiff,

        -against-                         Case No.:
                                     7:23-cv-10695-PMH

RICHARD GOLASZEWSKI and STEPHEN
SWENTZEL,

                      Defendants.
----------------------------------------------------X
                      March 28, 2024
                      9:46 a.m.
```

PORTIONS OF THIS TRANSCRIPT ARE DEEMED CONFIDENTIAL

VIDEOTAPED DEPOSITION of JAIME D'ALMEIDA, an

Expert Witness on behalf of the Plaintiff herein,

taken pursuant to Notice, and held at the offices

of Yankwitt, LLP, 140 Grand Street, White Plains,

New York, before Ilana Brown, a Court Reporter and

Notary Public of the State of New York.



2

```
 1    A P P E A R A N C E S:

 2

 3

 4        BROWN RUDNICK
               Attorneys for Plaintiff
 5             185 Asylum Street
               Hartford, Connecticut 06103
 6        BY: DYLAN KLETTER, ESQ.

 7

 8
          YANKWITT, LLP
 9             Attorneys for Defendants
               140 Grand Street, Suite 705
10             White Plains, New York 10601
          BY: JASON M. SWERGOLD, ESQ.
11             RUSSELL YANKWITT, ESQ.

12

13
          ALSO PRESENT:
14        DAVID TABAK (via telephone)
          JIM BRADY, Videographer
15

16

17

18

19

20

21

22

23

24
```



SA-272

**JAIME D'ALMEIDA**                                        **3**

1      IT IS HEREBY STIPULATED AND AGREED, by and

2    between the attorneys for the respective parties

3    herein, that filing and sealing be and the same are

4    hereby waived.

5

6      IT IS FURTHER STIPULATED AND AGREED that all

7    objections, except as to the form of the question,

8    shall be reserved to the time of the trial.

9

10      IT IS FURTHER STIPULATED AND AGREED that the

11    within deposition may be signed and sworn to before

12    any officer authorized to administer an oath, with

13    the same force and effect as if signed and sworn to

14    before the Court.

15

16

17

18

19

20

21

22

23

24



SA-273

**JAIME D'ALMEIDA**                                    102

1   raise capital and you deploy that capital.

2       Q.   Okay.  And what are some of the things

3   that could affect whether or not they can

4   successfully raise capital?

5       A.   If the company has litigation surrounding

6   it would certainly have an impact.

7       Q.   What else?

8       A.   Whether they're successful at raising

9   the -- raising the capital.  All things that go into

10  successfully raising capital.

11      Q.   Okay.  So explain:  What are the things

12  that go into whether or not you can successfully

13  raise capital?

14      A.   Your relationships, the historical

15  experience that the individuals or the management

16  company has with raising capital, relationships it

17  has in -- relationships it has with current

18  investors and what kind of services or what kind of

19  funds are currently being marketed to those

20  investors.  Right?  There's other funds that are

21  similar to that.  So those are the kinds of things

22  that can influence your ability to raise capital.

23      Q.   And what about, like, market factors?

24      A.   Sure, market factors can have some impact.



800.DAL.8779
dalcoreporting.com    DALCO

JAIME D'ALMEIDA                                103

1    Yes.
2         Q.    And what would be some of the market
3    factors that might have an impact?
4         A.    If there was a Great Depression or a Great
5    Recession and all liquidity dried up in the market,
6    then that could have an impact, or if it exploded,
7    that could have an impact.
8         Q.    What about, like, interest rates, could
9    that have an impact?
10        A.    Yes, that could have an impact, for sure.
11   It could also have an impact on -- you know,
12   positively and negatively.
13        Q.    Right.  And I'm asking you -- we're just
14   going through all the factors that could impact the
15   success, right, either successful or not successful.
16        A.    Sure.
17        Q.    Okay.  Are there others?
18        A.    Yeah.  There's macroeconomic factors, like
19   you mentioned, specific factors to the management
20   company, to the fund.  Yeah.
21        Q.    And I think one of the things you said was
22   if there's other funds being raised by other
23   companies that are seeking to do the same thing.  Is
24   that something that could affect -- could impact the



**SA-275**

**JAIME D'ALMEIDA**                                104

1   success of fundraising?

2        A.    Yeah, sure.  The competitive -- the

3   competitive environment could have an impact

4   positively or negatively.

5        Q.    And then what about on the deployment

6   side?  Same question:  What are the kinds of things

7   that could impact whether or not they're able to

8   deploy the capital or not?

9        A.    Well, finding and sourcing those

10  investment opportunities, certainly.  The

11  environment at funds in terms of whether those funds

12  need capital, want capital or not.  That would be a

13  part of it, certainly.  Potentially the interest

14  rate environment.

15       Q.    Anything else you can think of?

16       A.    I'm sure there's other aspects to it.

17       Q.    But any -- I'm just asking if there's any

18  that you can think of right now, sitting here.

19       A.    I mean, that's not an exhaustive list.

20       Q.    I know, and that's why I'm just asking you

21  if there's any more that you can think of.

22       A.    Yeah, nothing else comes to mind.  Again,

23  there's macroeconomic and there's, sort of, issues

24  specific to the, you know, micro -- microeconomic



SA-276

**JAIME D'ALMEIDA**                                    158



```
21        Q.    Okay.   What do you think the probability
22   is that all of the assumptions in those two models
23   hold true?
24        A.    Every single assumption?
```



SA-277

**JAIME D'ALMEIDA**                                      159

1      Q.    Uh-huh.

2      A.    Probably close to zero.  But that is

3  irrelevant because, you know, the actual world is

4  rarely exactly what you project.  In hindsight,

5  sometimes it's much better.  Sometimes it's much

6  worse.  Sometimes it's a little bit better.

7  Sometimes it's a little bit worse.  But these models

8  have so many inputs.  It's very difficult for the

9  actual world to be exactly what you projected.

10     Q.    Right.  And so inputs -- like, changes in

11  inputs can have a drastic effect on the output;

12  right?

13     A.    Depends what the input is.  Sure.

14     Q.    Yeah.

15     A.    That's why you're trying to come up

16  with -- again, you have so many people thinking

17  about this and trying to figure out, what do we

18  think is going to happen?  And we have such a robust

19  amount of information here and sophisticated people

20  putting their heads together as to what to expect

21  for this business.  It's pretty rare to have this

22  much effort and level of analysis done on

23  projections like these.

24     Q.    Are you saying that you -- have you ever



**JAIME D'ALMEIDA**                                                    236



```
21       Q.    So what are -- is it possible that a
22  business doesn't come out of the bottom of the
23  J-curve?
24       A.    Sure.   That's possible.
```

800.DAL.8779
dalcoreporting.com

DALCO

SA-279

**EXHIBIT U - FILED UNDER SEAL**

SA-280

**EXHIBIT V - FILED UNDER SEAL**

SA-281

**EXHIBIT W - FILED UNDER SEAL**

SA-282

**EXHIBIT X - FILED UNDER SEAL**

SA-283

**EXHIBIT Y - FILED UNDER SEAL**

SA-284

**EXHIBIT AA - FILED UNDER SEAL**

SA-285

**EXHIBIT BB - FILED UNDER SEAL**

SA-286

**EXHIBIT FF - FILED UNDER SEAL**

SA-287

**EXHIBIT GG - FILED UNDER SEAL**

SA-288

**EXHIBIT HH**

SA-289

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DANIEL LEE,

          Plaintiff,

   v.

RICHARD GOLASZEWSKI and STEPHEN
SWENTZEL,

          Defendants.

Case No. 7:23-cv-10695-PMH

## <u>DECLARATION OF BENNETT GOODMAN</u>

BENNETT GOODMAN makes the following declaration pursuant to 28 U.S.C. § 1746:

1.     I am the co-founder and Executive Chairman of Hunter Point Capital ("HPC").

2.     The information contained in this declaration is based on my personal knowledge.

3.     On January 30, 2024, I was deposed in this case pursuant to a third-party subpoena.

4.     During my deposition, I was not asked whether HPC would have hired Dan Lee after Lee's employment was terminated by 17Capital.

5.     Once Lee was terminated from his position at 17Capital, HPC was unwilling to hire him.

6.     During my deposition, I was not asked whether HPC was willing to enter into a contract with another business to establish its GP Financing Solutions business.

7.     HPC was not willing to enter into a contract with another business to establish its GP Financing Solutions business.

1

8.     Instead, HPC wanted to hire individual employees to staff its GP Financing Solutions business, which is what HPC ultimately did.

9.     I declare under penalty of perjury that the foregoing is true and correct.

Date:  New York, New York
       May 23, 2024

                                        _____
                                        Bennett Goodman

**EXHIBIT II**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DANIEL LEE,

                     Plaintiff,

        v.

RICHARD GOLASZEWSKI and STEPHEN
SWENTZEL,

                    Defendants.

Case No. 7:23-cv-10695-PMH

### DECLARATION OF AVSHALOM KALICHSTEIN

AVSHALOM KALICHSTEIN makes the following declaration pursuant to 28 U.S.C. §

1746:

1.      I am the co-founder and Chief Executive Officer of Hunter Point Capital ("HPC").

2.      The information contained in this declaration is based on my personal knowledge.

3.      On January 31, 2024, I was deposed in this case pursuant to a third-party subpoena.

4.      During my deposition, I was not asked whether HPC was willing to enter into a contract with another business to establish its GP Financing Solutions business.

5.      HPC was not willing to enter into a contract with another business to establish its GP Financing Solutions business.

6.      Instead, HPC wanted to hire individual employees to staff its GP Financing Solutions business, which is what HPC ultimately did.

7.      I declare under penalty of perjury that the foregoing is true and correct.

1

SA-293

Date:  New York, New York
       May 23, 2024

SA-294

**EXHIBIT JJ**

SA-295

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DANIEL LEE,

        Plaintiff,

    v.

RICHARD GOLASZEWSKI and STEPHEN
SWENTZEL,

        Defendants.

Case No. 7:23-cv-10695-PMH

## <u>DECLARATION OF MICHAEL ARPEY</u>

MICHAEL ARPEY makes the following declaration pursuant to 28 U.S.C. § 1746:

1.     I am the President of Hunter Point Capital ("HPC").

2.     The information contained in this declaration is based on my personal knowledge.

3.     On January 22, 2024, I was deposed in this case pursuant to a third-party subpoena.

4.     During my deposition, I was not asked whether HPC would have hired Dan Lee after Lee's employment was terminated by 17Capital.

5.     Once Lee was terminated from his position at 17Capital, HPC was unwilling to hire him.

6.     During my deposition, I was not asked whether HPC was willing to enter into a contract with another business to establish its GP Financing Solutions business.

7.     HPC was not willing to enter into a contract with another business to establish its GP Financing Solutions business.

1

SA-296

DocuSign Envelope ID: FDA36DC1-23D6-4D76-8A5E-B55CF5101441

8.    Instead, HPC wanted to hire individual employees to staff its GP Financing Solutions business, which is what HPC ultimately did.

9.    I declare under penalty of perjury that the foregoing is true and correct.

Date:  New York, New York
       May 23, 2024

_____
Michael Arpey

2