# 25-2053-cv

## United States Court of Appeals

*for the*

## Second Circuit

DANIEL LEE,

*Plaintiff-Appellant,*

— v. —

RICHARD GOLASZEWSKI, STEPHEN SWENTZEL,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REDACTED BRIEF FOR DEFENDANTS-APPELLEES

RUSSELL M. YANKWITT
JASON M. SWERGOLD
MICHAEL H. REED
YANKWITT LLP
*Attorneys for Defendants-Appellees*
140 Grand Street, Suite 705
White Plains, New York 10601
(914) 686-1500

CP COUNSEL PRESS (800) 4-APPEAL • (390608)

## **Disclosure Statement**

Defendants-appellees Richard Golaszewski and Stephen Swentzel ("Defendants") are individuals and do not have corporate parents, subsidiaries, or affiliates.

# **Table of Contents**

**Page**

Disclosure Statement..................................................................................i

Table of Authorities ..............................................................................iv

Preliminary Statement ...........................................................................1

Counterstatement of the Issues .............................................................3

Counterstatement of the Case ...............................................................4

    I.    The Parties and Their Employment History...........................................4

    II.    Lee Writes Down An Idea For a Business ............................................5

    III.    Lee, Golaszewski, and Swentzel Consider Employment Outside of 17Capital.................................................................6

    IV.    HPC Looks to Hire Individual Employees and Holds Discussions With Plaintiff and Defendants In Furtherance of That Goal ...............................................................8

    V.    Lee, Golaszewski, and Swentzel Each Hire Michael Sabin, But Lee Never Tells Sabin He Is In a Partnership ...............................9

    VI.    Lee, Golaszewski, and Swentzel Each Explore Employment with HPS Partners and Oak Hill Advisors .........................................10

    VII.    Golaszewski and Swentzel Tell Lee They Cannot Discuss Employment Opportunities With Him After Lee Is Terminated For Cause ...........................................................10

    VIII.    HPC Offers Employment Contracts to Golaszewski and Swentzel ..............................................................11

    IX.    HPC Prepares a Model For Its GPFS Business................................13

Summary of Argument...........................................................................16

Standard of Review ...............................................................................18

Argument...............................................................................................19

    I.    The Undisputed Facts Establish That Lee and Defendants Never Entered Into a Partnership or Joint Venture ............................19

A.    The Parties Did Not Intend to Enter Into a Partnership or Joint Venture...........................................................................21

B.    The Parties Did Not Share Profits and Losses...........................25

C.    The Parties Did Not Own Assets and Did Not Combine Their Property, Skill, and Knowledge ......................................30

D.    The Parties Did Not Jointly Manage or Control Anything.................................................................................31

E.    Lee Does Not Even Attempt to Establish a Host of the *Brodsky* Factors..........................................................................33

II.    The Undisputed Facts Establish Defendants Had No Fiduciary Duty to Lee, and Thus Defendants Did Not Breach Any Fiduciary Duty to Lee..............................................................35

III.    The Undisputed Facts Establish That Even if Defendants Had an Agreement With Lee, Which They Did Not, Defendants Did Not Breach The Agreement............................................................35

A.    New York Law Permits Individual Partners to Accept Opportunities That Are Not Available to the Partnership ................................................................................36

B.    Defendants Did Not Breach Any Alleged Duty to Lee When They Accepted Job Offers From HPC ...........................38

IV.    Plaintiff Failed to Establish Damages ................................................40

V.    The District Court Did Not Abuse Its Discretion In Denying Lee's Motion to File An Oversized Rule 56.1 Statement..................45

Conclusion ..........................................................................................................49

# Table of Authorities

**Page(s)**

**Cases:**

*Am. Fed. Grp., Ltd. v. Rothenberg*,
  136 F.3d 897 (2d Cir. 1998) ................................................................45

*Ashland Mgmt. Inc. v. Janien*,
  82 N.Y.2d 395 (1993) ............................................................... 41, 42

*Barnes v. Block*,
  2025 WL 1736519 (S.D.N.Y. June 23, 2025) ......................................33

*Basri v. Gordon*,
  No. 23-CV-1170 (JGLC), 2025 WL 949578 (S.D.N.Y. Mar. 28, 2025) .............28

*Brodsky v. Stadlen*,
  526 N.Y.S.2d 478 (2d Dep't 1988) .................................... 19, 20, 33, 34

*Calcagno v. Graziano*,
  160 N.Y.S.3d 135 (3d Dep't 2021) ............................................. 25, 32

*Cement and Concrete Workers District Council Welfare Fund v. Manny P.
  Concrete Co., Inc.*,
  145 F.4th 204 (2d Cir. 2025) ................................................................47

*Cleland v. Thirion*,
  704 N.Y.S.2d 316 (3d Dep't 2000) ......................................................25

*Delidimitropoulos v. Karantinidis*,
  186 A.D.3d 1489 (2d Dep't 2020) ......................................................20

*Design Strategies, Inc. v. Davis*,
  384 F. Supp. 2d 649 (S.D.N.Y. 2005) ................................................36

*DiPace v. Figueroa*,
  637 N.Y.S.2d 222 (3d Dep't 1996) ......................................................37

*Don v. Singer*,
  939 N.Y.S.2d 363 (1st Dep't 2012) ....................................................23

*Ebker v. Tan Jay Intern. Ltd.*,
  741 F. Supp. 448 (S.D.N.Y. 1990) ............................................. 31, 35

*Emanuel v. Gap, Inc.*,
  2022 WL 3084317 (S.D.N.Y. Aug. 3, 2022) ......................................47

iv

*Fat Brands Inc. v. Ramjeet*,
  75 F.4th 118 (2d Cir. 2023) ............................................................. 28, 29

*Fruit of the Loom, Inc. v. Am. Mktg. Enters., Inc.*,
  192 F.3d 73 (2d Cir. 1999) ....................................................................47

*Griffith Energy, Inc. v. Evans*,
  925 N.Y.S.2d 282 (4th Dep't 2011) ............................................... 25, 26

*Growblox Scis., Inc. v. GCM Admin. Servs., LLC*,
  2015 WL 3504208 (S.D.N.Y. June 2, 2015) .........................................32

*Hammond v. Smith*,
  57 N.Y.S.3d 832 (4th Dep't 2017) ................................................. 32, 34

*Hodnett v. Medalist Partners Master Fund II-A, L.P.*,
  2025 WL 2607548 (S.D.N.Y. Sept. 9, 2025) ........................................33

*Holtz v. Rockefeller & Co.*,
  258 F.3d 62 (2d Cir. 2001) ....................................................................47

*In re Bernard L. Madoff Inv. Secs. LLC* (*Picard v. Sage*),
  2023 WL 5439455 (2d Cir. Aug. 24, 2023) ..........................................20

*Itel Containers Int'l Corp. v. Atlanttrafik Express Svc., Ltd.*,
  909 F.2d 698 (2d Cir. 1990) ..................................................................20

*Jacobs v. del la Maza*,
  2023 WL 5680180 (E.D.N.Y. Aug. 18, 2023) ................................. 44-45

*Jobanputra v. Kim*,
  2024 WL 2055061 (S.D.N.Y. May 8, 2024) ..........................................28

*Kenford Co. v. Erie Cnty.*,
  67 N.Y.2d 257 (1986) ..................................................................... 41, 42

*Kuo v. Kuo*,
  No. 96 CIV 5130 (CM), 1999 WL 123379 (S.D.N.Y. Mar. 4, 1999),
  *aff'd*, 216 F.3d 1072 (2d Cir. 2000) ....................................................37

*Lebedev v. Blavatnik*,
  142 N.Y.S.3d 511 (1st Dep't 2021) .......................................................29

*Lue v. JPMorgan Chase & Co.*,
  768 Fed. App'x 7 (2d Cir. 2019) ...........................................................48

*Moser v. Devine Real Est., Inc. (Fla.)*,
    839 N.Y.S.2d 843 (3d Dep't 2007) .......................................................... 36, 37, 38

*Moses v. Savedoff*,
    947 N.Y.S.2d 419 (1st Dep't 2012) ....................................................................34

*N. Am. Knitting Mills, Inc. v. Int'l Women's Apparel, Inc.*,
    2000 WL 1290608 (S.D.N.Y. Sept. 12, 2000) .................................................23

*Prince v. O'Brien*,
    650 N.Y.S.2d 157 (1st Dep't 1996) ........................................................... 24, 25

*Rafield v. Brotman*,
    690 N.Y.S.2d 263 (1st Dep't 1999) ...................................................................37

*Salve Regina Coll. v. Russell*,
    499 U.S. 225 (1991) ............................................................................... 18-19

*Schonfeld v. Hilliard*,
    218 F.3d 164 (2d Cir. 2000) ..............................................................................42

*SCS Commc'ns, Inc. v. Herrick Co.*,
    360 F.3d 329 (2d Cir. 2004) ..............................................................................33

*Stuart's LLC v. Edelman*,
    106 N.Y.S.3d 726 (table) ...................................................................................45

*Timmerman v. U.S. Bank, N.A.*,
    483 F.3d 1106 (10th Cir. 2007) .........................................................................19

*United States v. Barker*,
    723 F.3d 315 (2d Cir. 2013) ....................................................................... 35, 41

*United States v. Reyes*,
    164 F.4th 78 (2d Cir. 2026) ...............................................................................18

*United States v. Yousef*,
    327 F.3d 56 (2d Cir. 2003) ................................................................................35

*Vogel v. TakeOne Network Corp.*,
    2023 WL 5276857 (S.D.N.Y. Aug. 16, 2023) ............................................. 27-28

*Washer v. Seager ("Washer I")*,
    71 N.Y.S.2d 46 (1st Dep't 1947) ................................................................ 37, 38

*Washer v. Seager ("Washer II")*,
    297 N.Y. 918 (1948) .................................................................................... 36, 37

**Statutes & Other Authorities:**

Fed. R. Civ. P. 56 ................................................................................47

Fed. R. Civ. P. 83(b) ..................................................................... 45, 46

Hon. Philip M. Halpern, D.J., Indiv. Practices in Civil Cases, § 4(E)(v) ...............46

Indiv. Practices in Civil Cases of Hon. Alison J. Nathan, C.J., Sitting By
    Designation, ¶ 3(F)(iii) ......................................................48

Indiv. Rules of Practice of Hon. Cathy Seibel, D.J., § 2(c)(i) .................................48

N.Y. PARTNERSHIP LAW § 10 ..............................................................19

SDNY Local Rule 56.1 ................................................................ *passim*

SDNY Local Rule 56.1(a) ......................................................................46

SDNY Local Rule 56.1(b) ......................................................................46

U.S. Dist. Ct., D. Conn. Local Rule of Civ. Pro. 56(a)(1) ......................................48

U.S. Dist. Ct., S.D. Fla. Local Rule of Civ. Pro. 56.1(b)(1)(A) ...............................48

## Preliminary Statement

For years, plaintiff-appellant Dan Lee ("Plaintiff") imagined that he and two of his co-workers, Richard Golaszewski and Stephen Swentzel, had formed a partnership together (the "Alleged Partnership"). After Lee was fired for poor performance and then failed to gain new employment at the same private equity firm that ultimately hired Golasewski and Swentzel, Lee sued the two men for breach of an oral partnership agreement, breach of a joint venture agreement, and breach of fiduciary duty, claiming he was entitled to hundreds of millions of dollars in alleged damages. The undisputed facts in this case, however, did not support Lee's claims. The record was devoid of proof of the factors that courts require to find the existence of a partnership under New York law. On that basis, the District Court (Halpern, J.), in a well-reasoned decision, correctly granted summary judgment in favor of Golaszewski and Swentzel.

Lee's arguments below and on appeal rely almost exclusively on his self-serving deposition testimony. As the District Court correctly held, Lee's uncorroborated testimony was insufficient to establish the existence of a partnership or joint venture. That is because the undisputed evidence showed that the three men never executed a partnership agreement, never memorialized the terms of any supposed oral agreement, and never told anyone they were partners. It is further undisputed that Lee's imagined partnership had none of the indicia of a real business,

1

including assets, employees, or clients. Thus, the District Court properly concluded that the "proof adduced makes clear that three at-will employees . . . intended to find employment elsewhere and possibly together" and "not that they formed a partnership or joint venture to do business with other entities."

Even if the Alleged Partnership existed (and it did not), the District Court properly granted summary judgment because the undisputed facts demonstrated that Golaszewski and Swentzel did not breach the Alleged Partnership agreement or their alleged fiduciary duties. Lee conceded that the Alleged Partnership was "at will," and the District Court properly concluded that such a partnership could be dissolved at any time without legal consequence. Unable to escape that conclusion, Lee argues on appeal that Golaszewski and Swentzel usurped a partnership opportunity when they accepted employment without him. This argument ignores the undisputed facts that Golaszewski and Swentzel's new employer wanted only to hire individual employees as opposed to entering a relationship with a separate business, and were not interested in hiring Lee after he was terminated for cause from his prior job.

Finally, Lee challenges the District Court's rejection of his damages theory. The District Court, however, properly concluded that Lee's sole potential remedy for a breach of an at-will partnership would have been an accounting, which he neither demanded nor could have benefited from as it was undisputed that the Alleged Partnership had no assets to account for. Moreover, although the District Court did

2

not reach this issue, summary judgment was also appropriate because even if Lee was entitled to damages, any award of a non-zero number would have been entirely speculative and barred by well-established New York law governing lost profits.

The District Court's decision should be affirmed in its entirety.

## Counterstatement of the Issues

1. Did the District Court properly grant summary judgment in Golaszewski and Swentzel's favor when it concluded that there were no genuine disputed facts as to the existence of a partnership or joint venture where: (a) the parties never entered into a written agreement; and (b) the factors used to assess whether to recognize a partnership or joint venture in the absence of an agreement all confirm that no such partnership or joint venture existed.

2. Did the District Court properly grant summary judgment in Golaszewski and Swentzel's favor when it concluded that, because no partnership or joint venture existed, Golaszewski and Swentzel owed no fiduciary duty to Lee?

3. Did the District Court properly grant summary judgment in Golaszewski and Swentzel's favor when it concluded that the Alleged Partnership was at-will and therefore terminable without legal consequence, and where Golaszewski and Swentzel did not usurp any opportunity that was available to the Alleged Partnership?

4.     Did the District Court properly grant summary judgment in Golaszewski and Swentzel's favor when it concluded that the Alleged Partnership had no assets to account for among the parties, and Lee's claim to lost profits was purely speculative?

5.     Did the District Court abuse its discretion when it denied Lee's motion to file an oversized Rule 56.1 statement where the District Court maintains an individual rule to streamline the consideration of summary judgment motions, and the parties were afforded an equal number of pages to include their facts in the 56.1 statement?

## <u>Counterstatement of the Case</u>

## I.     **The Parties and Their Employment History**

Golaszewski and Swentzel are Managing Directors ("MD") and Co-Heads of GPFS at Hunter Point Capital ("HPC").  (Appendix ("A") at 81 ¶ 1).  Prior to joining HPC, they were MDs at a private equity firm called 17Capital, where they co-led the U.S. investment team and sourced and executed preferred equity and Net Asset Value ("NAV") transactions.  (A-81 ¶¶ 1-2.)  While at 17Capital, Golaszewski and Swentzel worked with Lee, who was the Head of Fundraising and Investor Relations, North America from March 2020 through April 22, 2022.  (A-82 ¶ 3.)  Unlike Golaszewski and Swentzel, Lee had no experience working with NAV loans or preferred equity prior to joining 17Capital.  (A-82 ¶ 3.)

4

## II.   Lee Writes Down An Idea For a Business

In January or February 2021, less than a year after joining 17Capital, Lee decided he wanted to leave 17Capital.  (A-82 ¶ 4.)  On his own, Lee drafted a memo (the "Memo") that proposed to start a business that would execute the same transactions as 17Capital, namely preferred equity and NAV.  (A-82 ¶ 4.)  The market for this business was an "emerging market," meaning it was "new" and "gaining favor."  (A-82 ¶ 4.)

In or about February 2021, while on a business trip to Florida, Lee mentioned to Golaszewski for the first time the idea of doing a NAV lending and preferred equity business outside of 17Capital.  (A-82 ¶ 5.)  On April 5, 2021, Lee invited Golaszewski and Swentzel to dinner at The Brook, a private club where Lee was a member, to discuss his business idea.  (A-82 ¶ 5.)  Lee claims that at some point prior to the dinner at The Brook, though he does not remember when, he and Golaszewski and Swentzel agreed to form a partnership (the "Alleged Partnership").  (A-82-83 ¶ 6; Supplemental Appendix ("SA") at 46-47 at 8:1-17, 9:9-18.)  According to Lee, the three men agreed to a partnership lasting for an indefinite period in which they would share profits and losses.  (A-82-83 ¶ 6; SA-48 at 10:20-21).  There is no document memorializing the formation of the Alleged Partnership, or the supposed agreement to share profits and losses.  (A-82-83 ¶ 6; SA-61 at 153:11-14).

There is no evidence that any such agreement ever existed. At no point did Golaszewski or Swentzel believe they were partners with Lee, (A-83-84 ¶ 7; SA-10-11 at 75:21-76:3; SA-32 at 145:12-19), and there is no evidence that they ever referred to Lee as their partner. While Lee, Golaszewski, and Swentzel had some common discussions with prospective employers, Golaszewski and Swentzel viewed themselves and Lee as individuals who could each make employment decisions based on their own personal circumstances. (A-83-84 ¶ 7; SA-18 at 305:4-17; SA-31 at 144:12-19.)

### III. Lee, Golaszewski, and Swentzel Consider Employment Outside of 17Capital

In March 2021, Lee sent the Memo to his friend Rory Shaw, who worked at Stone Point Capital ("SPC"). (A-88 ¶ 16; SA-102.) Shaw did not know whether the Memo referred to a legal partnership. (A-88 ¶ 16; SA-111-112 at 25:13-16, 33:2-14.) Lee, Golaszewski, and Swentzel later attended a meeting with SPC. Lee never told Shaw—not during the meeting with SPC or ever—that he was in a partnership, that he was working with others, or that he had an agreement with Golaszewski and Swentzel to split profits and losses. (A-88 ¶ 16; SA-111-112 at 25:13-16, 33:2-14.) In April 2021, Lee, Golaszewski, and Swentzel met with John Barber, who worked at Cohesive Capital and was a mentor to Plaintiff. (A-88 ¶ 18; SA-63 at 177:1-4, 21-24).) After this meeting, Golaszewski and Swentzel told Lee that they intended

to stay at 17Capital. (A-88 ¶ 18; SA-63 at 177:1-4, 21-24).) They also told Lee not to use their names in any conversations Plaintiff might have about obtaining a new business or job. (A-88 ¶ 18; SA-63 at 177:1-4, 21-24.)

On May 13, 2021, unbeknownst to Golaszewski and Swentzel, Lee emailed the Memo to HPC President Michael Arpey, a friend and mentor who was the President of HPC. (A-88 ¶ 19; SA-114.) In his email, Lee asked Arpey to send Lee's resume to another individual to refer Lee for a job, despite claiming that he was in the Alleged Partnership at this time. (A-88 ¶ 19, SA-114.) Lee did not tell Arpey that he was precluded from seeking individual employment because he was supposedly involved in a partnership. (A-89 ¶ 20.) Before Arpey received Plaintiff's email, HPC had already evaluated other potential leaders for its GPFS business. (A-89 ¶ 21, Sealed Supplemental Appendix ("SSA") at 177, 83:14-16.) Based on this pre-existing interest in NAV lending and preferred equity, Arpey forwarded the Memo to HPC CEO Avi Kalichstein and HPC Executive Chairman Bennett Goodman, neither of whom read it. (A-89 ¶ 21, SA-170, SSA-176, 178 at 82:3-7, 87:17-18, SA-200-203 at 64:21-65:2, 69:4-13.) In December 2021, when Arpey, Kalichstein, and Goodman discussed launching a business similar to GPFS, Arpey suggested hiring a professional like Lee but said nothing about hiring Golaszewski and Swentzel. (A-90 ¶ 23; SSA-221-225.)

7

In July 2021, Lee again sent Arpey his resume so Arpey could pass it along to an investment firm called Declaration Partners. (A-89 ¶ 22, SA-221.) Again, Lee made no mention of his Alleged Partnership and made no attempt to get Arpey to pass along the resumes of Lee's alleged partners. (A-89 ¶ 22; SA-68 at 195:2-5.) Similarly, when Arpey emailed Lee in January 2022 about an opportunity at MidOcean Partners, Lee did not tell Arpey he could not accept the position because he was in the Alleged Partnership, or that the opportunity had to be afforded to his alleged partners. (A-90 ¶ 25; SA-69 at 205:9-15; SA-227.)

## IV. HPC Looks to Hire Individual Employees and Holds Discussions With Plaintiff and Defendants In Furtherance of That Goal

In late January 2022, 17Capital's impending sale became public knowledge. (A-90-91 ¶ 26.) In light of that, Golaszewski and Swentzel decided to entertain discussions about possible employment. (A-90-91 ¶ 26; SA-14 at 193:11-18; SA-30 at 138:21-23.) At that time, Lee, Golaszewski, and Swentzel began to speak with HPC about employment opportunities. (A-91 ¶ 27.) Lee never told HPC about the Alleged Partnership, and HPC did not believe that Lee, Golaszewski, and Swentzel were partners. (A-91 ¶¶ 27-28; SA-71 at 218:5-8; SA-207-208 at 93:25-94:3.) HPC never proposed a partnership between itself and Lee, Golaszewski, and Swentzel. (A-92 ¶ 29; SSA-186 at 191:23-25; SA-213 at 147:2-4.) On the contrary, HPC understood its conversations to be with three individuals, not with a single

partnership.  (A-92 ¶ 29; SA-237 at 199:12-16.)  HPC was unwilling to enter a contract with another business to create GPFS; it wanted to hire employees to build the business internally, based on individual hiring decisions.  (A-92-93 ¶ 30; SSA-236 at 182:11-17; SA-289-290, 292, 295-296.)

### V.  Lee, Golaszewski, and Swentzel Each Hire Michael Sabin, But Lee Never Tells Sabin He Is In a Partnership

In February 2022, the parties each signed a legal services agreement (the "Agreement") with Clifford Chance to advise them regarding their potential separation from 17Capital and employment opportunity with HPC.  (A-93 ¶ 31; SSA-239-242.)  The Agreement stated that Clifford Chance would "represent each of you [Lee, Golaszewski, and Swentzel] in your individual capacity."  (A-84; A-93 ¶ 31; SSA-239.) The parties never discussed reimbursement of the fees paid to Clifford Chance. (A-93 ¶ 33; SA-55 at 22:5-19.)

Lee never told Michael Sabin, the lawyer assigned to the matter, that the parties were in an alleged partnership, and Sabin never asked.  (A-93 ¶ 32; SA-74 at 242:7-13.)  Indeed, it is undisputed that Golaszewski and Swentzel never discussed any sort of partnership with Sabin, nor did Lee ever ask Sabin to prepare a partnership agreement.  (A-93 ¶ 32; SA-33 at 169:4-5; A-93 ¶ 33; SA-73 at 240:13-15).

## VI. Lee, Golaszewski, and Swentzel Each Explore Employment with HPS Partners and Oak Hill Advisors

In March 2022, while they were also talking to HPC, the parties began conversations with HPS Partners about potential employment. HPS Partners evaluated each of them individually. (A-93 ¶ 34; SSA-249 at 27:15-24.) Lee never told anyone at HPS Partners that he, Golaszewski, and Swentzel were in an alleged partnership. (A-93 ¶ 34; SA-75 at 245:15-22.) Thus, like HPC, HPS Partners had no idea whether Lee, Golaszewski, and Swentzel were in an alleged partnership or had any type of formal relationship. (A-93 ¶ 34; SA-245-247 at 27:25, 42:20-43:6.) HPS Partners ultimately ███████████████████████████████ ███ (A-94 ¶ 34; SSA-252-253 at 34:9-35:3.)

Also in March 2022, the parties had conversations with Oak Hill Advisors ("OHA") about potential employment. During those conversations, none of the three individuals ever told OHA that they had formed an alleged partnership. (A-94 ¶ 35; SA-257-258 at 20:18-24, 45:4-11.) OHA made individual employment offers to all three individuals. (A-94 ¶ 35; SA-19 at 309:16-17; SA-259 at 55:12-14.)

## VII. Golaszewski and Swentzel Tell Lee They Cannot Discuss Employment Opportunities With Him After Lee Is Terminated For Cause

In his role at 17Capital, Lee was expected to "find new investors to raise capital from those investors into a fund and to also help support, build the investor

relations and fund-raising team within North America." (A-101 ¶ 48; SA-92 at 22:7-11.) Lee failed to meet those expectations. Zero percent of the capital raised during Lee's time at 17Capital was attributable to his efforts, and Lee did not bring a single new investor to 17Capital. (A-101 ¶ 48; SA-95-97 at 61:21-62:3, 65:9-10.) As a manager, Lee was "difficult to get on with." (A-101-102 ¶ 49; SA-93-94 at 32:23-33:5.) Lee's management style was "quite dictatorial," "quite blunt," "quite rude," and "quite pushy." (A-101-102 ¶ 49; SA-93-94 at 32:23-33:5.) Accordingly, on April 22, 2022, 17Capital terminated Lee's employment because of inadequate performance and inability to manage others. (A-101 ¶ 47, SA-98 at 100:15-22, SSA-472.) After 17Capital fired Lee, Golaszewski and Swentzel told Lee they could not speak with him about employment opportunities ███████████████████████ ███████████████████████████████████████ (A-102 ¶ 50; SA-8-9 at 71:24-72:3; SA-36 at 255:7-17; SA-76-77 at 251:21-252:4; SSA-99-100 at 107:6-108:3.)

## VIII. HPC Offers Employment Contracts to Golaszewski and Swentzel

Prior to Lee's for-cause termination, HPC had been willing to find a role and an acceptable compensation structure for Lee if it was necessary to secure Golaszewski and Swentzel's employment, even though Lee was a poor cultural fit for HPC and HPC already had an excellent team of fundraisers. (A-102-103 ¶¶ 51-52; SA-191 at 190:14-19; SSA-190 at 223:12-18; SSA-206-207 at 142:8-12, 143:7-

11

11.) As noted above, Lee never told HPC that he was in an alleged partnership with Golaszewski and Swentzel, and HPC did not believe the parties were partners. (A-91 ¶¶ 27-28; SA-71 at 218:5-8; SA-207-208 at 93:25-94:3.) After Lee's for-cause termination, HPC determined it would be impossible to hire Lee from a reputational and risk perspective. (A-103 ¶ 52; SSA-189 at 221:2-8, SSA-192 at 248:10-16; SA-289; SA-295.)

On May 2, 2022, HPC sent Golaszewski and Swentzel separate offer letters for "at-will employment." (A-103 ¶ 53; SSA-474-479, 494-498.) On May 25, 2022, Golaszewski and Swentzel called Lee and informed him that they had resigned from 17Capital and intended to join HPC. (A-104 ¶ 55.) According to Lee, the Alleged Partnership ended during this phone call. (A-104 ¶ 56; SA-50 at 12:8-16.) On August 29, 2022, Golaszewski and Swentzel, as individuals, signed final offer letters for "at-will employment" with HPC. (A. 104-105 ¶ 57; SSA-515-551, 553-571, 573-591.) On February 27, 2023, Golaszewski and Swentzel each joined HPC as employees, not as partners in a legal partnership with HPC. (A-105 ¶ 59; SSA-24 at 333:9-25; SSA-216 at 211:10-16.) As of January 31, 2024, ███████████ ████████████████████████████████████████████████████████████ (A-105 ¶ 59; SSA-175, 197, 232-235.)

Before he alleges the Alleged Partnership was terminated, Lee emailed OHA. In this email, Lee proposed finding time to speak "about a variation of our prior

discussions" that Lee and OHA "had been speaking about over the last week or so," which was the possibility of hiring Lee if OHA was unable to hire Lee, Golaszewski, and Swentzel.  (A-104 ¶ 54; SA-260 at 81:11-20, SSA-513.)  In October 2022, Plaintiff joined OHA as an employee, where he was hired to create a GP solutions financing business similar to GPFS.  (A-82 ¶ 58.) ████████████████

████████████████████████████████████████████████

████████████ (*Id.*) ████████████████████████████████

████████████████████████ (*Id.*)

## IX.    HPC Prepares a Model For Its GPFS Business

During HPC's discussions with Plaintiff and Defendants, HPC created a financial model for GPFS (the "Model").  (A-94-95 ¶ 37).  According to HPC's then-Head of Investments, Melvin Hibberd, who oversaw the development of the Model, the purpose of the Model was to ████████████████████████████

████████████████████████ (A-94-95, ¶ 37; SSA-261 at 72:22-24.) Hibberd explained that the Model was ████████████████████████████

████████████████████████████████████████████████

████████████ (*Id.*)  The Model was "more for support than illumination . . . it's not like you put in the model and be like, oh, wow, this is a profitable business, but if you think it's profitable, it helps you prove that out and then communicate that to other people."  (*Id.*; SSA-262 at 73:9-14.)

13



████████████████████████████████████████████ (A-100-101
¶ 46; SSA-87 at 301:3-4; SSA-263 at 113:7-10.)  The ██████████ is consistent
with how long it typically takes any new platform to become profitable.  (*Id.*; SSA-
257 at 71:2-7.)  But HPC viewed the Model as ████████████ and based on
███████████████████████ (A-96, 99 ¶¶ 39, 44; SSA-6-7 at 62:16-63:6;
SSA-183-184 at 176:21-24, 183:7.)  ████████████████████████████████
███████████████████████████████████████████████████████
████████████████ (A-99 ¶ 44; SSA-6-7 at 62:16-63:6.)  The Model was
depicting not just a brand new firm but a █████████████████████████
(*Id.*; SSA-16-17 at 286:18-287:3.)  Moreover, the Model had assumptions about
██████████████████████ (*Id.*; SSA-6-7 at 62:16-63:6.)

One particularly speculative aspect of the Model was its assumption about
deployment.  In order to deploy capital, a firm must first raise capital.  (A-99.)
Different versions of the Model made different deployment assumptions.  ███████
███████████████████████████████████████████████████████
███████████████ (A-98.)  ███████████████████████████████████
███████████████████████████████████████████████████████
███████████████ (*Id.*)  █████████████████████████████████
████████████████████████ (A-99 ¶ 43; SSA-180-181 at 128:8-
129:7.)

The Model's features made it unreliable for additional reasons. ██████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████ (A-98 ¶ 40; SSA-17 at 287:13-15; SSA-184 at 132:7-20.)  In the real world, however, there is no assurance that a new business will succeed.  (A-100 ¶ 46; SSA-274, at 236:3-24.)  The success of a new business can be affected by several factors, including the valuation of private equity portfolios and rising interest rates, macroeconomic factors, factors specific to the management company and the funds, the competitive landscape, and factors impacting the ability to raise and deploy capital.  (A-98 ¶ 41; SA-243-244 at 15:10-16:2; SA-273-275 at 102:2-22, 103:2-104:14.)

Further undermining the Model's reliability was its sensitive dependence on its various assumptions.  For the Model's conclusions to come true, all of the Model's assumptions would need to hold.  (A-96 ¶ 39; SA-15 at 269:18-21; SA-268 at 261:4-13; SA-276-277 at 158:21-159:9; SSA-86-87 at 300:21-301:6.)  Plaintiff's expert conceded that the likelihood of this was "probably close to zero."  (*Id.*)

The Model also said nothing about how any profit generated by GPFS would be allocated to the people who worked on the business.  (A-100 ¶ 45; SA-34-35 at 231:14-232:4; SSA-204-205 at 131:11-132:11.)  In fact, at the time that HPC had shared the results of the Model with Plaintiff and Defendants, HPC had not decided

how any pool of compensation would be split among the individuals running the GPFS business. (*Id.*) HPC's Executive Chairman testified without contradiction that had Plaintiff and Defendants been hired, HPC did not intend for them to be compensated equally. (*Id.*; SSA-204-205 at 131:11-132:11.) It is further undisputed that the ██████████████████████████████████████████████ ██████████████████████████████████ (A-100-101 ¶ 46; SSA-274 at 236:3-24.)

## Summary of Argument

The District Court correctly granted summary judgment and dismissed the Complaint in its entirety.

1.     The District Court correctly concluded that the undisputed facts demonstrated that Lee, Golaszewski, and Swentzel never entered into a partnership or joint venture. (Special Appendix ("Sp. A") at 21, Opinion at 13). It is undisputed that the parties never entered into a written partnership or joint venture agreement of any kind. In the absence of such an agreement, courts consider whether a partnership or joint venture was nonetheless created by considering a host of factors, including whether the individuals shared profits and losses, whether they jointly owned assets, whether they jointly controlled and managed a business, and whether they contributed capital. Every single one of the relevant factors here confirms that the parties never entered into a partnership or joint venture. For these reasons, the

16

District Court properly granted summary judgment on Count I (breach of partnership) and Count II (breach of joint venture).

2.    The District Court correctly concluded that because the parties never entered into a partnership or joint venture, Defendants did not owe a fiduciary duty to Lee.  For this reason, the District Court properly granted summary judgment on Count III (breach of fiduciary duty).

3.    The District Court also correctly granted summary judgment because, even if Lee had established a partnership or joint venture, Golaszewski and Swentzel "met their burden to establish the absence of any disputed issue of fact as to any breach of such agreement."  (Sp. A-20-21, Opinion at 12-13, n.6.)  Lee conceded that the Alleged Partnership, if it existed, was an at-will partnership and, therefore, Golaszewski and Swentzel could dissolve the partnership "at any time" and "without legal consequence."  (*Id.*).  Unable to avoid this well-settled law, Lee claims that Golaszewski and Swentzel usurped an opportunity of the Alleged Partnership when they accepted employment at HPC.  But it is undisputed that HPC refused to hire Lee after he was fired for cause from 17Capital and wanted only to hire individual employees as opposed to entering into a relationship with a separate business.  Thus, the District Court's grant of summary judgment on Counts I through III should be affirmed.

17

4. The District Court properly concluded that Lee could not establish any damages and therefore summary judgment was appropriate on both his breach of partnership and joint venture claims, and his breach of fiduciary duty claim. (Sp. A-22, Opinion at 14, n. 7.) As the District Court found, Lee's only remedy for the dissolution of an at-will partnership (assuming one existed) was an accounting, and the Alleged Partnership had no assets to account for. Moreover, Lee's claim that he suffered millions of dollars in damages was not legally cognizable because it was based on pure speculation. The District Court's grant of summary judgment on all claims should be affirmed.

5. The District Court did not abuse its discretion in enforcing its page-limit for Rule 56.1 statements and denying Lee's Motion for Excess Pages. The page-limit rule was consistent with both federal law and the District's local rule, and Lee was not prejudiced by the District Court's decision.

## Standard of Review

The District Court granted summary judgment for Defendants. The standard of review for that decision is *de novo*. *United States v. Reyes*, 164 F.4th 78, 84 (2d Cir. 2026).

The District Court applied its Individual Practices to require the parties to submit a joint Rule 56.1 statement limited to 25 pages. The standard of review for that decision is abuse of discretion. *See Salve Regina Coll. v. Russell*, 499 U.S. 225,

233 (1991) ("[I]t is especially common for issues involving supervision of litigation to be reviewed for abuse of discretion.") (internal quotations and citations omitted); *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1112 (10th Cir. 2007) (applying abuse of discretion standard of review to rule regarding page limitations).

## **Argument**

### I.    **The Undisputed Facts Establish That Lee and Defendants Never Entered Into a Partnership or Joint Venture**

The District Court properly granted summary judgment because Lee failed to establish the existence of a partnership or a joint venture.

Under New York law, a partnership is "an association of two or more persons to carry on as co-owners [of] a business for profit."  N.Y. PARTNERSHIP LAW § 10. Legal partnerships are typically created through a written partnership agreement.  It is undisputed that Lee and Defendants never signed such an agreement.

In the absence of a written partnership agreement, courts can sometimes impose a "partnership in fact" based on "conduct, intention, and relationship between the parties."  *Brodsky v. Stadlen*, 526 N.Y.S.2d 478, 479 (2d Dep't 1988). To determine whether to impose a partnership in fact, courts consider the following "*Brodsky* factors":

> (1) sharing of profits, (2) sharing of losses, (3) ownership of partnership assets, (4) joint management and control, (5) joint liability to creditors, (6) intention of the parties, (7) compensation, (8) contribution of capital, and (9) loans to the organization.

19

*Id.*[1]  No one factor is dispositive in the analysis.  *Id.*

The test for a joint venture is closely related to the test for a partnership.  A plaintiff asserting a joint venture must establish that: (1) two or more parties entered an agreement to create an enterprise for profit; (2) the agreement evidences the parties' mutual intent to be joint venturers; (3) each party contributed property, financing, skill, knowledge, or effort to the venture; (4) each party had some degree of joint management control over the venture; and (5) there was a provision for the sharing of both profits and losses.  *Itel Containers Int'l Corp. v. Atlanttrafik Express Svc., Ltd.*, 909 F.2d 698, 701 (2d Cir. 1990).

Because Lee failed to satisfy any of the above factors, the District Court correctly determined that he failed to establish a partnership or joint venture as a matter of law.

---

[1] Because Lee knows he cannot come close to satisfying these factors, he asks the Court to ignore *Brodsky* and instead apply the limited set of factors identified in an unpublished summary order, *In re Bernard L. Madoff Inv. Secs. LLC* (*Picard v. Sage*), 2023 WL 5439455, at *4 (2d Cir. Aug. 24, 2023).  (Br. at 25-27.)  *Madoff* states that "while courts consider the intentions of the parties, they also look to other factors, including the sharing of profits and losses, as well as the ownership, joint management, and control of partnership assets."  *Madoff*, 2023 WL 5439455, at *4.  When it suits him, Lee asks the Court not to rely on non-precedential Second Circuit orders like *Madoff*. (Br. at 45.)  Regardless, *Madoff* does not recognize a change in the governing law set forth in *Brodsky*.  On the contrary, *Madoff* cites a single case for its partnership test, and that case is *Brodsky*.  *Madoff*, 2023 WL 5439455, at *4.  Moreover, while Lee attempts to diminish *Brodsky* as outdated based on a 2011 case from the Fourth Department, he omits to inform the Court of *Delidimitropoulos v. Karantinidis*, 186 A.D.3d 1489, 1490 (2d Dep't 2020), a 2020 decision from the Second Department that applies the *Brodsky* factors.

**A.     The Parties Did Not Intend to Enter Into a Partnership or Joint Venture**

The undisputed facts establish that the parties did not intend to enter into a partnership or joint venture.

<u>First</u>, there is no evidence that Lee ever told Defendants he intended to form a legal partnership with them.  (SA-284 at 280:7-24.)

<u>Second</u>, just as there was no written partnership agreement, there is no documentary evidence—no email, no text message, no document of any kind—reflecting an oral agreement to become legal partners, even though the parties were sophisticated members of the financial services industry who regularly utilized writings to document business transactions.  (A-82-83, 85-86 ¶¶ 6, 8, 9; SA-48-49, 53, 61-62, 80-81 at 10:20-21, 11:10-12, 11:24-12:7, 17:4-7, 153:11-14, 158:6-13, 275:8-22, 276:10-13.)  Lee's appeal to the "Buffalo Point Memo," (Br. at 28), fails to establish an intention to enter into a legal partnership because the document says nothing about a legal partnership.

<u>Third</u>, Lee's own conduct reveals that he had no intention to form a partnership.  On several occasions, while Lee was supposedly part of the Alleged Partnership, Lee sought out employment opportunities for himself, without trying to include his supposed "partners."  (A-88, 89, 90, 104 ¶¶ 19, 20, 22, 25, 54; SA-64-66, 68-69 at 185:10-12, 186:12-187:5,195:2-5, 205:9-15; SA-260 at 81:11-20.)

21

Fourth, dealings with third-parties further confirm that Lee and Defendants did not intend to enter into a partnership. Neither Lee nor Defendants ever once told anyone that they were partners. (A-88-91, 93-94 ¶¶ 16, 20, 25, 27-28, 32, 35; SA-33 at 169:4-5; SA-65, 68-72, 74 at 186:9-11, 186:12-14, 195:2-5, 205:9-15, 211:5-24, 218:5-8, 219:11-20, 242:7-13; SA-111-112 at 25:13-16, 33:2-14; SA-207-208 at 93:25-94:3; SA-257-258 at 20:18-24, 45:3-11.) There is no evidence that Defendants ever used the word "partners" to describe themselves and Lee. Not surprisingly, the various businesses with which the three individuals discussed employment opportunities did not understand them to be partners. (A-91, 93-94 ¶¶ 28-29, 34-35; SA-19 at 309:16-17; SA-75 at 245:15-22; SA-207-208, 213 at 93:25-94:3, 147:2-4; SA-237 at 199:1-16; SA-257-259 at 20:18-24, 45:4-11, 55:12-14; SSA-186 at 191:23-25; SSA-249-254 at 27:15-24, 27:25-29:2, 34:9-35:3, 42:20-43:6.) Consistent with that understanding, HPC, HPS Partners, and OHA extended individual employment offers rather than a contract with the Alleged Partnership. (A-93-94, 103-105 ¶¶ 34, 53, 57, 59; SSA-24 at 333:9-25; SSA-214 at 211:10-16; SSA-249-254 at 27:15-24, 27:25-29:2, 34:9-35:3, 42:20-43:6; SSA-474-492; SSA-494-511; SSA-515-551; SA-75 at 245:15-22.) Lee attempts to flip his burden when he argues that Defendants, by saying nothing about the non-existent Alleged Partnership, supposedly revealed their intention to enter into the Alleged Partnership. (Br. at 29.) That is nonsensical.

22

In order to distract from the above, Lee relies heavily on an engagement agreement with Clifford Chance. (*Id.* 30-31.) But that agreement confirms the opposite of an intention to enter into a partnership. The engagement agreement is not between Clifford Chance and the Alleged Partnership, but between Clifford Chance, on the one hand, and Lee, Golaszewski, and Swentzel as individuals, on the other hand. (A-93 ¶ 31; SSA-239-240.) While the agreement states that the firm "will be taking instructions from one single representative of the partners" (*id.*), "it is well settled that calling an organization a partnership does not make it one." *See N. Am. Knitting Mills, Inc. v. Int'l Women's Apparel, Inc.*, 2000 WL 1290608, at *2 (S.D.N.Y. Sept. 12, 2000). The use of the term "partner" in the engagement agreement could not have been other than colloquial since no one ever told Clifford Chance about the Alleged Partnership. (A-93 ¶ 32; SA-33 at 169:4-5; SA-74 at 242:7-13.)

Citing *Don v. Singer*, 939 N.Y.S.2d 363 (1st Dep't 2012), Lee contends that by failing to object to the term "partner" in an agreement drafted by their lawyer, Defendants somehow accepted the existence of the Alleged Partnership. (Br. at 30-31.) In *Don*, the court inferred an intent to enter into a joint venture from an unsigned joint venture agreement. That is a far cry from inferring an intent to enter into a legal partnership from an engagement agreement for three individuals drafted by a

law firm that was never told its clients were purported partners. (A-93 ¶¶ 32-33; SA-33 at 169:4-5; SA-73-74 at 240:13-15, 242:7-13.)

Lee also attempts to create intention where there was none by quoting a text message from Golaszewski, "get us paid danno." (Br. at 31.) The entire text message, ignored by Lee, makes clear that the "us" in "get us paid" was 17Capital, which was up for sale, not the Alleged Partnership. (*See* A-271-275 (referring to meetings with "PAS," who is 17Capital founder Pierre-Antoine de Selancy); SA-5, 12-13 at 31, 188-89.) Similarly, Lee claims the parties "exchanged text messages about hiring an architect" to build an office for their Alleged Partnership, (Br. at 31). But like all of Plaintiff's purported proof, the text message was a one-way conversation between Plaintiff and himself. (A-220-223.) It is undisputed that the parties "never discussed" an office. (SA-29 at 113.)

Finally, Lee attempts to establish an intention to create a legal partnership based on self-interested, uncorroborated testimony that he and Defendants agreed to share profits and losses. (Br. at 39.) As discussed *infra*, that testimony cannot defeat summary judgment. Moreover, the case Lee cites in support of his argument, *Prince v. O'Brien*, 650 N.Y.S.2d 157, 158 (1st Dep't 1996), is easily distinguishable. In *Prince*, the court found a disputed fact issue about whether the parties intended to enter into a legal partnership because the record contained "circumstantial evidence" of a partnership, including that plaintiff financed defendant's living expenses and

"contributed services related to defendant's artistic development." *Id.* Here, the Alleged Partnership had no money and did no business. (A-86-87 ¶¶ 11-12; SA-51-53, 55-56, 80 at 15:8-22, 16:3-21, 17:12-20, 22:20-24, 23:1-20, 275:6-7.) In sum, the undisputed evidence establishes that the parties did not intend to enter into a partnership or joint venture.

## B. The Parties Did Not Share Profits and Losses

The undisputed facts establish that Lee and Defendants did not share profits and losses.

The Alleged Partnership never did any business and, thus, never had profits or losses. *See Cleland v. Thirion*, 704 N.Y.S.2d 316, 318 (3d Dep't 2000) (finding no partnership in fact where "there never was any sharing of profits or losses"). Accordingly, Lee falls back on his uncorroborated say-so that he and Defendants agreed to share profits and losses. But absent corroboration, which does not exist here, a plaintiff's self-serving testimony about an oral agreement to share profits and losses is insufficient to survive summary judgment. *See Calcagno v. Graziano,* 160 N.Y.S.3d 135, 143 (3d Dep't 2021) ("[A]side from Calcagno's conclusory assertions, plaintiffs failed to produce any evidence demonstrating an agreement to share in the losses of Broadway Garage, so as to raise a question of fact in that regard.").[2]

---

[2] The lone Appellate Division case Lee relies upon, *Griffith Energy, Inc. v. Evans*, 925 N.Y.S.2d 282, 283 (4th Dep't 2011), is distinguishable. (*See* Br. at 40.) There, the Fourth Department affirmed a trial verdict finding that the parties agreed to share profits and losses. Unlike here, the

Because Lee cannot point to a document reflecting an agreement among Lee and Defendants to split profits—as no such document exists—Lee asks the Court to infer such an agreement based on a third-party proposal. Here, he points to the HPC Project Candle proposal document, which he believes envisioned "the exact same salary and bonus" for Lee and Defendants. (Br. at 41.) The District Court correctly recognized the weakness of that argument, pointing out: "The proposal does not reflect how compensation would be split among Plaintiff and Defendants, and it is not itself an agreement among Plaintiff and Defendants. Further, the executive chairman of HPC [Goodman] testified concerning the proposal, his understanding that profits were 'never going to be split equally' among Plaintiff and Defendants, and Plaintiff does not cite any record evidence setting forth what any split would have been." (Sp. A-19, Opinion at 11.)

Lee rejects this reasoning but offers no convincing justification for his position. He begins by arguing that Defendants agreed to share profits through the act (or inaction) of not objecting to the Project Candle proposal. (Br. at 41-42.) But whether Defendants objected has no bearing on whether they agreed to share profits of the Alleged Partnership with Lee, which they never did. Furthermore, there is no evidence Defendants understood the Project Candle proposal to equally compensate

---

defendant and her husband had "concentrated their joint assets in defendant's name to avoid paying on the judgment entered in a civil action arising from an assault committed by her husband." *Griffith Energy*, 925 N.Y.S.2d at 284. The Alleged Partnership had no assets at all.

themselves and Lee. Defendants could not be expected to object to an arrangement they did not know was on the table. Lee also argues, incorrectly, that because HPC supposedly believed that he and Defendants were legal partners, HPC documents would have reflected the terms of the Alleged Partnership. (*Id.* at 16, 40-41.) That argument is wrong: HPC did not believe the three individuals were legal partners, (A-91 ¶¶ 27-28; SA-71 at 218:5-8; SA-207-208 at 93:25-94:3), and even if it did, there is no reason why its proposal to the supposed "partners" would mirror the terms of the Alleged Partnership. Lee also faults the District Court for accepting Goodman's testimony that HPC never contemplated paying Lee and Defendants equally. (Br. at 43.) Lee argues that the District Court should have rejected Goodman's testimony because, Lee claims, Goodman is biased. (*Id.* at 43.) If Lee believes the Court should reject biased testimony, his own self-interested testimony would be the natural place to begin.

Next, Lee argues that Defendants supposedly agreed to share losses because: (1) they split Clifford Chance's fee; (2) Lee testified the three individuals agreed to share "setup costs" such as meals; and (3) Defendants referenced "start-up costs" in an email written one month after Lee claims the Alleged Partnership was terminated. (*Id.* at 44.) Even if one were to assume Defendants agreed to share all of these expenses, sharing expenses differs from sharing losses, and it is sharing losses that is "required to establish a partnership." *Vogel v. TakeOne Network Corp.*, 2023 WL

5276857, at *5 (S.D.N.Y. Aug. 16, 2023). Lee asks the Court to reject this principle on the ground that it is derived from an unpublished Second Circuit case and instead adopt a contrary rule that derives from an unpublished District Court case. (Br. at 45.) The Court should decline to do so. Regardless, *Fat Brands*, a published Second Circuit case Lee emphasizes in his brief, refutes Lee's position. *Fat Brands* held that "losses [for] unrecouped overhead expenses" did not constitute "losses" for purposes of the implied partnership analysis. *Fat Brands Inc. v. Ramjeet*, 75 F.4th 118, 130 (2d Cir. 2023); *accord Basri v. Gordon*, No. 23-CV-1170 (JGLC), 2025 WL 949578, at *9 (S.D.N.Y. Mar. 28, 2025) ("[M]erely agreeing to share expenses is insufficient to show an agreement to share losses."); *Jobanputra v. Kim*, 2024 WL 2055061, at *6 (S.D.N.Y. May 8, 2024) ("Allegations of sharing expenditures in setting up a venture are not sufficient to satisfy the loss sharing element of a joint venture.").

Finally, Lee asks to be excused from having to prove an agreement to share losses because, he claims, the Alleged Partnership had "no reasonable expectation of losses." (Br. at 46 (quoting *Fat Brands*, 75 F.4th at 129-30).) Lee is precluded from making this argument given his testimony, which is insufficient to defeat summary judgment, (*see* Section I.B, *infra*), that the parties agreed to share losses equally. (SA-49 at 11:3-7.) Lee's testimony aside, this case does not fall into the category of "rare case[s]" where a plaintiff can establish a partnership in the absence

28

of an agreement to share losses. *Lebedev v. Blavatnik*, 142 N.Y.S.3d 511, 519 (1st Dep't 2021).

The Alleged Partnership was a new business with no assets, employees, or clients. (A-86-87 ¶¶ 11-12; SA-51-53, 55-56, 80 at 15:8-22, 16:3-21, 17:12-20, 22:20-24, 23:1-20, 275:6-7.) It had no track record. It was planning to work in an "emerging" area of finance. (A-82 ¶ 4; SA-58 at 94:6-16; A-99 ¶ 44; SSA-6-7, 16-17 at 62:16-63:6, 286:18-287:3; *see Lebedev*, 142 N.Y.S.3d at 520 (rejecting argument that losses could not be reasonably expected where business could be affected by "ever-changing, and often unanticipated, vagaries").) Unlike in *Fat Brands*, where there was a business model that "did not include . . . any losses other than unrecouped overhead expenses," *Fat Brands*, 75 F.4th at 130, the Alleged Partnership did not have a "business model." Given his inability to prove the Alleged Partnership had no reasonable expectation of losses, Lee seeks to confuse the issue by arguing that GP Solutions had no reasonable expectation of losses. (Br. at 46.) The Alleged Partnership, if it existed, was supposedly independent of GP Solutions and HPC. Indeed, Lee and Defendants interviewed with multiple companies other than HPC. So HPC's expectations of profit cannot be transformed into the Alleged Partnership's expectations. But even if the Court could equate the Alleged Partnership with HPC, which it cannot, HPC's GP Solutions business was never guaranteed to succeed. While Lee disputes this on the ground that the GP

Solutions model failed to reflect losses, the undisputed evidence confirms that the

model was ███████████████████████████████████████████████████

███████████████████████████████████████████████████ (A-

98 ¶ 40; SSA-17 at 287:13-15; SSA-182 at 132:7-20.)  Accordingly, the evidence

failed to establish an agreement to share profits and losses.

### C.    The Parties Did Not Own Assets and Did Not Combine Their Property, Skill, and Knowledge

The undisputed facts also establish that Lee and Defendants did not own assets

or combine their property, skill, and knowledge.

The Alleged Partnership did not have: an office, a website, an email address,

an accountant, books and records, stationary, a logo, a line of credit, debt, a telephone

number, a payroll company, a chief financial officer, a human resources director,

employees, contracts with other individuals or businesses, an agent for service of

process, a federal or state tax ID number, an employee handbook, or any profits.  (A-

86 ¶ 11; SA-51-53, 55-56, 80 at 15:8-22, 16:3-21, 17:12-15, 17:18-20, 22:20-24,

23:3-4, 275:6-7.)  The Alleged Partnership did not own property, file a tax return,

register to do business in New York or any other state, register with the Securities

and Exchange Commission or take steps to prepare such a registration.  (A-87 ¶ 12;

SA-53, 56 at 17:16-17, 23:1-2, 23:5-20.)

Because of that, Lee weakly argues that the Alleged Partnership had property

in the form of "collective knowledge and experience."  (Br. at 32.)   As Defendants

argued in the District Court, "collective knowledge and experience are not partnership assets because individual partners retain their knowledge even after a partnership concludes." (Defs.' Brief In Support of Summary Judgment, ECF No. 81 at 15 (citing *Ebker v. Tan Jay Intern. Ltd.*, 741 F. Supp. 448 (S.D.N.Y. 1990) (holding that a partner's name, reputation, and expertise are not partnership property).[3]) If the rule was stated otherwise, anyone claiming to be someone's legal partner would be able to satisfy this factor of the partnership analysis, because one can always appeal to knowledge and experience. It follows that Lee failed to establish that he and Defendants combined their property, skill, and knowledge.

### D. The Parties Did Not Jointly Manage or Control Anything

The District Court correctly ruled that the record was bereft of any evidence establishing joint management or control.

As discussed *supra*, Lee and Defendants did not jointly manage or control anything because there was nothing to manage or control. Accordingly, Lee retreats to his uncorroborated testimony that he and Defendants agreed to jointly manage and control their non-existent partnership. (Br. at 21, 36.) When Lee was asked to explain how he and Defendants would supposedly divide among themselves the power to hire, fire, write checks, issue invoices, and enter into contracts, Lee had no

---

[3] The District Court erred when it stated that Defendants were "silent" as to property, skill, and knowledge. (Sp. A-15-16., Opinion at 7-8).

idea because he could not recall a single discussion about any of those issues. (SA-82 at 277:5-21; *see Hammond v. Smith*, 57 N.Y.S.3d 832, 835-836 (4th Dep't 2017) (recognizing control manifested through hiring, paying bills, establishing relationships with vendors and developing management controls).) Lee's testimony cannot defeat summary judgment given its lack of corroboration. *See Calcagno,* 160 N.Y.S.3d at 143 (uncorroborated, self-serving testimony is insufficient to create fact issue with respect to partnership formation).

Lee also attempts to establish joint management and control over an imagined business based on: a group chat among the three individuals, Lee's memorandum, some back and forth on talking points, and some meetings with HPC and correspondence about working at HPC. (Br. at 36-38.)[4] None of this constitutes joint control. *See Growblox Scis., Inc. v. GCM Admin. Servs., LLC*, 2015 WL 3504208, at *8 (S.D.N.Y. June 2, 2015) (recognizing the identifying "joint liability for debts, shared access to [] bank accounts, authority to sign checks on the partnership's behalf, or the filing of partnership tax returns" as the "traditional indicia of a partnership"). Similarly, the fact that Lee and Defendants together interviewed lawyers to advise them as individuals fails to establish joint control

---

[4] Lee also claims, falsely, that he and Defendants "worked together on a 'business plan.'" (Br. at 38.) Lee told Kalichstein in an email, "we are going to keep chipping away at the business plan." (A-305.) Even if he was referring to an internal plan for the Alleged Partnership, which would have been none of Kalichstein's concern, as opposed to a plan for work with HPC, there is no evidence that any such plan for the Alleged Partnership ever existed.

given that the representation was for each of them in their "individual capacity," not as an alleged partnership. (A-246-48.)

Indeed, the very cases on which Lee relies confirm there was no joint management or control here. (*See* Br. at 26-49 (citing *SCS Commc'ns, Inc. v. Herrick Co.*, 360 F.3d 329, 342 (2d Cir. 2004) (finding joint management and control where contract required approval by each party for acquisition and financing terms); *Hodnett v. Medalist Partners Master Fund II-A, L.P.*, 2025 WL 2607548, at **16-17 (S.D.N.Y. Sept. 9, 2025) (finding joint control where individual designated as the "President" executed a contract, another individual conducted lease negotiations, a third individual was responsible for hiring, and each of them had the power to bind the company); *Barnes v. Block*, 2025 WL 1736519, at *8 (S.D.N.Y. June 23, 2025) (finding joint control based on joint contributions to investigative report sold to investment fund).)[5] It follows that Plaintiff failed to establish joint management and control.

### E. Lee Does Not Even Attempt to Establish a Host of the *Brodsky* Factors

As in the District Court, Lee does not even attempt to argue that he satisfies four of the nine *Brodsky* factors: contribution of capital, compensation, joint liability

---

[5] To the extent the District Court ruled that there was no evidence of joint management and control because Lee was supposedly "primarily in charge," the District Court adopted an argument that Defendants did not make, and it erred. (Sp. A-18, Opinion at 10.)

to creditors, and loans to the organization.  (Sp. A-14-20, Opinion at 6-12.)

Most importantly, Lee and Defendants never even so much as discussed capital contributions.  (A-87 ¶ 13; SA-82-83 at 277:22-728:10.)  "Where there is undisputed evidence that a party never made a capital contribution to the business, such evidence strongly suggests that no partnership existed." *Hammond v. Smith*, 57 N.Y.S.3d 832, 835 (4th Dep't 2017) (internal quotations and citations omitted); *accord Brodsky v. Stadlen*, 526 N.Y.S.2d at 480  ("[T]he failure of a party to contribute capital is strongly indicative that no partnership exists."); *see Moses v. Savedoff*, 947 N.Y.S.2d 419, 423 (1st Dep't 2012) (affirming summary judgment on oral partnership claim where plaintiff failed to make a capital contribution).

Furthermore, neither Lee nor Defendants ever received compensation from the Alleged Partnership since the Alleged Partnership never did business and made no money.  (A-87 ¶¶ 11-12; SA-51-53, 55-56, 80 at 15:18-22, 16:3-21, 17:12-20, 22:20-24, 23:1-20, 276:6-7.)  Moreover, the Alleged Partnership had no creditors or loans.  (A-87 ¶ 11, SA-52.)  Accordingly, the District Court correctly ruled that Lee failed to establish a partnership or joint venture as a matter of law.  This Court should affirm the grant of summary judgment in Defendants' favor on Lee's claims for breach of partnership and breach of joint venture.

## II. The Undisputed Facts Establish Defendants Had No Fiduciary Duty to Lee, and Thus Defendants Did Not Breach Any Fiduciary Duty to Lee

The parties agree that Lee's claim for breach of fiduciary duty depends on whether he established a partnership or joint venture. Because Lee failed to establish either, the District Court properly granted summary judgment in Defendants' favor on Lee's claim for breach of fiduciary duty. This Court should affirm.

## III. The Undisputed Facts Establish That Even if Defendants Had an Agreement With Lee, Which They Did Not, Defendants Did Not Breach The Agreement

Summary judgment was also proper based on Lee's failure to establish breach.

The Alleged Partnership was at-will, and at-will partnerships can be terminated at any time, for any reason. *See Ebker*, 741 F. Supp. at 469 (recognizing that termination of at-will partnership is "not legally actionable"). Accordingly, Lee does not claim that the Alleged Partnership was breached at the time it was supposedly terminated. Instead, Lee claims that Defendants breached the Alleged Partnership by supposedly "usurp[ing]" a "partnership opportunity." (Br. at 51.) The undisputed facts establish that Defendants did not usurp anything, let alone an opportunity that belonged to the Alleged Partnership.[6]

---

[6] While the District Court did not address the usurpation of corporate opportunity argument, this Court is "free to affirm an appealed decision on any ground which finds support in the record, regardless of the ground upon which the trial court relied." *United States v. Barker*, 723 F.3d 315, 319 (2d Cir. 2013) (quoting *United States v. Yousef*, 327 F.3d 56, 156 (2d Cir. 2003)).

35

### A.  New York Law Permits Individual Partners to Accept Opportunities That Are Not Available to the Partnership

For almost 80 years, it has been the law in New York that a partner is free to accept opportunities that do not belong to his partnership.

"Under the doctrine of corporate opportunity, corporate fiduciaries and employees cannot, without consent, divert and exploit for their own benefit any opportunity that should be deemed an asset of the corporation." *Design Strategies, Inc. v. Davis*, 384 F. Supp. 2d 649, 671-72 (S.D.N.Y. 2005) (internal citations and quotations omitted). "A corporate opportunity is defined as any property, information, or prospective business dealing in which the corporation has an interest or tangible expectancy or which is essential to its existence or logically and naturally adaptable to its business." *Moser v. Devine Real Est., Inc. (Fla.)*, 839 N.Y.S.2d 843, 848 (3d Dep't 2007). "Tangible expectancy has been defined as something much less tenable than ownership, but, on the other hand more certain than a desire or a hope." *Design Strategies*, 384 F. Supp. 2d at 672 (internal quotations and citations omitted).

When an opportunity is unavailable to a company, there can be no tangible expectancy in the opportunity. In such cases, the doctrine of corporate opportunity does not bar a fiduciary from taking the opportunity for himself. *Washer v. Seager ("Washer II")*, 297 N.Y. 918 (1948), is directly on-point. There, a client did business with a particular company "only because of its confidence" in one of the company's

co-owners. *Washer v. Seager* ("*Washer I*"), 71 N.Y.S.2d 46, 52 (1st Dep't 1947). After the favored co-owner left the company, the client had no interest in working with the remaining owner. The client transitioned its business to the favored co-owner's new company. The First Department rejected a claim that the favored co-owner breached his fiduciary duty to the remaining co-owner. The court held that once the client "made its decision not to deal further with" the remaining co-owner, *Washer II*, 297 N.Y. at 919, "there no longer existed any corporate opportunity or expectancy." *Washer I*, 71 N.Y.S.2d at 52. The Court of Appeals affirmed.

"*Washer* is still good law in New York." *Kuo v. Kuo*, No. 96 CIV. 5130 (CM), 1999 WL 123379, at *5 (S.D.N.Y. Mar. 4, 1999), *aff'd*, 216 F.3d 1072 (2d Cir. 2000); *see Moser*, 839 N.Y.S.2d at 848 ("[E]vidence that the third party would not have done business with the corporation, but only the employee or officer individually would have, is sufficient to preclude the finding that a corporate opportunity existed); *Rafield v. Brotman*, 690 N.Y.S.2d 263, 265 (1st Dep't 1999) (no breach of fiduciary duty where corporate shareholder went to work for client of corporation because client had "determined to phase out its relationship" with corporation); *DiPace v. Figueroa*, 637 N.Y.S.2d 222, 224 (3d Dep't 1996) ("The sale cannot be considered a corporate opportunity, for the sellers unequivocally aver that they would not have sold to the corporation, or to [one of the fiduciaries], but only to [a different fiduciary] individually.").

### B.    Defendants Did Not Breach Any Alleged Duty to Lee When They Accepted Job Offers From HPC

Under *Washer* and its progeny, Defendants did not breach any purported duty to Lee when they accepted employment offers from HPC, for three reasons.

First, if the imagined Alleged Partnership existed, it did not have a "corporate opportunity" with HPC.  HPC's business was not "essential to [the Alleged Partnership's] existence or logically and naturally adaptable to its business." *Moser*, 839 N.Y.S.2d at 848.  If it existed, the Alleged Partnership existed prior to any discussions with HPC.  The Alleged Partnership did not do business and had no assets.  Without HPC's business, the Alleged Partnership was in the same position it had been in before talks with HPC began.

Second, the undisputed evidence establishes that the prospect of employment at HPC was not a corporate opportunity for the Alleged Partnership because HPC did not want to enter into a deal with another business, it wanted to hire its own employees.  (A-92-93, 105 ¶¶ 30, 59; SA-289-290, 292, 295-296; SSA-24 at 333:9-25; SSA-214 at 211:10-16; SSA-236 at 182:11-17.)   Indeed, HPC hired both Defendants as at-will employees.  (A-103 ¶ 53; SSA-474-479, 494-498.)[7]

---

[7] In the District Court, Lee argued that Defendants understood their relationship with HPC as "much more than an offer of employment," (District Court Opp. Brief, ECF No. 85, at 19)), because Defendants emailed one another about getting a lawyer for the "business formations nature of these agreements (not just new hire docs)." (A-445).  But in that very email, Swentzel confirmed that he and Golaszewski were going to be HPC's employees.  (*See id.* (referring to the possibility that Defendants are "no longer employed by HPC").)  The "business formation" documents would memorialize a term sheet that governed Defendants' compensation.  (SSA-20-23 at 317:9-320:13,

Third, Defendants did not "usurp" anything from HPC when it hired Defendants. At one point, HPC was willing to find a role and an acceptable compensation structure for Lee if it was necessary to secure Golaszewski and Swentzel's employment (A-103 ¶ 52; SA-191 at 190:14-19, SA-208-209 at 142:8-12, 143:7-11.) However, that changed after 17Capital fired Lee for cause. (*See* A-103 ¶ 52; SSA-189, 192 at 221:2-8, 248:10-16; SA-289, 295). Indeed, one week after Lee was fired for cause by 17Capital, at a time Lee claims Defendants "ousted him" from a potential role at HPC, HPC had not made up its mind about what to do with Lee. (A-555.) At that time, HPC "didn't know any of the details" related to Lee termination, and accordingly there was "a process that was unfolding about figuring out whether Stephen and Rich really wanted Dan, and our telling Stephen and Rich that we didn't really care for Dan." (SA-193-94 at 219:3-220:7.)

HPC's process ended when HPC decided that Defendant's for-cause termination disqualified him as a potential employee. Kalichstein explained, "We take our reputations incredibly seriously and wouldn't want to risk damaging our—relationships within investors or our—in public by hiring someone who was tainted." (A-103 ¶ 52; SSA-188-189 at 220:21-221:8; *see* SSA-194 at 248:3-16 ███████

---

SSA-37, 40-41 at 288:16-290:7, 297:13-298:15.) Lee also argued that Defendants were not employees because in December 2021, months before Defendants were hired by HPC, Arpey made the ████████ that HPC ███████████████████ (A-464-465). HPC ultimately rejected that suggestion.

39

████████████████████████████████████████

████████████████████████

Lee surmises that Defendants had the power to deny him employment at HPC—which they did not—because they supposedly "conspired" with HPC to "lull Lee." (Br. at 50.) That makes no sense. HPC did not need Defendants' permission to hire Lee. Moreover, HPC was reluctant to share its decision with Lee given Lee's character. Indeed, when Lee learned he would not receive the position he had hoped for, he "spewed the most vile ad hominem attacks" that Kalichstein had "experienced in 30 years in business." (SA-197 at 243.)

Ultimately, because the undisputed facts demonstrate that Defendants did not usurp a corporate opportunity from the Alleged Partnership, it follows that Plaintiff failed to establish a breach. For that reason, the decision to grant summary judgment should be affirmed.

## IV.    Plaintiff Failed to Establish Damages

The District Court's decision should also be affirmed because the undisputed record proves that Lee cannot establish damages. In finding that Lee was not entitled to damages, the District Court first properly found that the only available remedy for the dissolution of an at will partnership was an accounting, which Lee had not requested. (Sp. A-22, Opinion at 14, n.7.) The District Court then properly found that Lee could not prove damages because "[w]here the alleged partnership has no

joint assets of its own, no goodwill, and no compensation due the partners, there are no assets to account for and, therefore, no available relief." (*Id.*) Lee does not contest the District Court's finding that an accounting would entitle Lee to one third of nothing, nor can he. Instead, he argues that he was entitled to lost profits. Although the District Court did not address this argument, the record is sufficient for this Court to reject Lee's argument as purely speculative. *See Barker*, 723 F.3d at 319.

Under New York law, it is well established that lost profits are recoverable only if they are "capable of proof with reasonable certainty." *Ashland Mgmt. Inc. v. Janien*, 82 N.Y.2d 395, 404 (1993). But where, as here, a lost profits projection employs a "multitude of assumptions" that "require speculation and conjecture," it is "beyond the capability of even the most sophisticated procedures to satisfy the legal requirements of proof with reasonable certainty." *Kenford Co. v. Erie Cnty.*, 67 N.Y.2d 257, 262 (1986) (holding that expert analysis of lost profits constituted a speculative projection). Moreover, in the case of a new business, "a stricter standard is imposed because there is no experience from which lost profits may be estimated with reasonable certainty." *Ashland*, 82 N.Y.2d at 404.

Lee argues that he proved lost profits with reasonably certainty based on a model prepared by HPC and expert reports prepared in this case. In the first instance, Lee conveniently ignores that the GPFS business is a quintessential new business.

41

When it was launched in March 2023, GPFS was a ██████████ ██████████ operating in an "emerging" area of finance.  (A-82; A-99 ¶¶ 4, 44; SA-58 at 94:6-16; SSA-16-17 at 286:18-287:3.)  It had no assets, clients, or history of prior deals.  (A-87 ¶¶ 11-12; SA-51-53, 55-56, 80 at 15:18-22, 16:3-21, 17:12-20, 22:20-24, 23:1-20, 276:6-7.)  HPC, the business in which GPFS was housed, was itself a young company, having been founded in 2020.  (A-99 ¶ 44; SA-6-7 at 62:16-63:6.) In other words, it had absolutely no track record on which to build a reasonable estimate of lost profits for the GPFS business.  While Lee argues that the Alleged Partnership's strategy was "well established," (Br. 54 n.5), the undisputed evidence showed that Lee himself conceded it was a "new business" where the "investment strategy is new."  (SA-59-60 at 134:2-13, 109:7-23); *see Schonfeld v. Hilliard*, 218 F.3d 164, 173 (2d Cir. 2000) (holding that new collaboration involving existing business constituted a "new business" for purposes of *Ashland*).)  Against this backdrop, Lee cannot establish lost profits with any reasonable certainty for several reasons.[8]

First, the Model on which Lee relies contains multiple speculative assumptions, which he conceded all had to hold true in order to achieve the Model's

---

[8] In the District Court and now on appeal, Lee argues that the lost profits could be based on the Model because it was "highly sophisticated."  (Br. at 54 n.5.)  This argument is refuted by *Kenford Co. v. Erie Cnty.*, 67 N.Y.2d 257, 261-62 (1986), where the New York Court of Appeals held that damages were speculative even though the damages were based on "the industry's most advanced and sophisticated method for predicting the probable results of contemplated projects."

projected results.  (A-96-97 ¶ 39; SA-15 at 269:18-21; SA-268 at 261:4-13; SSA-86-87 at 300:21-301:6.).  But as Lee's own expert conceded, there is "probably" a "close to zero" probability of this happening.  (*Id.*; SSA-272-273 at 158:21-159:9.)  Relatedly, the Model was ███████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████ (A-98 ¶ 40; SSA-17 at 287:13-15; SSA-182 at 132:7-20.)

Indeed, the record showed that some of the speculative assumptions in the Model had already been proven false.  Critically, ████████████████████████

████████████████████████████████████████████████████████████████

██  (A-98, 105 ¶¶ 42, 59; SSA-175 at 52:10-17; SSA-197 at 52:5-7; SSA-234-235 at 58:20-59:10; SSA-454-70.)  Lee further relied ████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████ (A-98 ¶ 42, SSA-276.)  Thus, the speculative assumptions underpinning the Model on which relied had already proven to not hold true.

<u>Second</u>, Lee made further assumptions about fundraising and valuation over the course of five years or ten years.  His own expert, however, acknowledged that the success of launching a new business can be affected by several factors, including

macroeconomic factors, factors specific to the management company and the fund, the competitive landscape, and factors impacting the ability to raise and deploy capital. (A-98 ¶ 40; SSA-17 at 287:13-15; SSA-182 at 132:7-205.) Because Lee's assumptions about 2023 and 2024 were wrong, it cannot be said with reasonable certainty that his assumptions about these additional factors are accurate.

Third, Lee's damages calculation failed to account for additional variables. Even if the Model were to properly calculate the value of GPFS, Lee would not be entitled to his claim for one-third of that value. Had HPC hired Lee, Golaszewski, and Swentzel, HPC would not have given them an equal split of compensation from the profits of the business, and there is no evidence of what Lee's share would have been. (A-100 ¶ 45 SSA-204-205 at 131:11-132:11; *see also id.* at SSA-209-213 at 164:20-165:17, 169:21-170:7, 174:5-19).) In addition, ███████████████

███████████████████████████████████

████████████████████████████ (A-100 ¶ 45; SSA-34-35 at 231:14-232:4.) Moreover, because there is no evidence of what Lee would earn in his role at OHA, where he is competing for the same business as GPFS, it is impossible to calculate mitigation.

Lee's cited cases do not support his position. (*See* Br. at 52-53.) On the contrary, they establish that lost profits require more than mere speculation, especially for a new business. For example, in *Jacobs v. del la Maza*, 2023 WL 5680180

(E.D.N.Y. Aug. 18, 2023), the court awarded lost profits where there was a breach of a distribution contract based on actual evidence of lost sales for a particular time period. *Id.* at *11. However, where plaintiff sought to recover lost profits for years for which there was no evidence of sales, the Court refused to "ultimately speculate as to the amount of lost profits" because it was "a step too far given New York's heightened scrutiny for new businesses and the need for lost profits to be reasonably certain." *Id.*; *see also Stuart's LLC v. Edelman*, 106 N.Y.S.3d 726 (table), at *57-58 (Supr. Ct. Nassau Cnty. Apr. 9, 2018) (awarding lost profits based on "actual sales figures"). And in *Am. Fed. Grp., Ltd. v. Rothenberg*, 136 F.3d 897 (2d Cir. 1998), the court affirmed an award of lost profits for "an established business" in a case involving the diversion of earnings from a claimant by culpable conduct of another. *Id.* at 913.

Accordingly, even if Lee was entitled to damages in the form of lost profits, he failed to prove them with any reasonable certainty required under New York law for a new business.

## V.  The District Court Did Not Abuse Its Discretion In Denying Lee's Motion to File An Oversized Rule 56.1 Statement

Judge Halpern did not abuse his discretion when he denied Lee's motion to file an oversized Rule 56.1 Statement.[9]  Federal Rule of Civil Procedure 83(b)

---

[9] Though Lee's Standard of Review section references only *de novo* review, he concedes that the application of the District Court's rule is properly reviewed under an abuse of discretion standard. (Br. at 56.)

45

authorizes judges to "regulate practice in any manner consistent with federal law . . . and the district's local rules." FED. R. CIV. P. 83(b).  In the Southern District of New York, Local Rule 56.1 requires the movant on summary judgment to include "a separate, short, and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried," and the opposing party must then include "a correspondingly numbered paragraph admitting or denying, and otherwise responding to, each numbered paragraph in the statement of the moving party."  S.D.N.Y. Local Rule 56.1(a), (b).  To streamline this process and help narrow the issues on summary judgment, Judge Halpern's individual practices provide that "[t]he Rule 56.1 Statement with responses (combined, including any counterstatement and responses) shall not exceed 25 double-spaced pages without prior permission of the Court."  Hon. Philip M. Halpern, D.J., Indiv. Practices in Civil Cases, § 4(E)(v).

Here, the parties initially filed a Joint Rule 56.1 Statement that totaled 53 pages, only 14 of which contained Golaszewski and Swentzel's facts.  (A-35-79).  Lee did not include a counterstatement of facts in the initial Joint Rule 56.1 Statement.  After Judge Halpern rejected the Joint Rule 56.1 Statement as violative of his individual rules, the parties met and conferred and agreed that each party would be allotted 12.5 pages.  (Sp. A-7-8).  Thereafter, Golaszewski and Swentzel provided Lee with their 12.5 page statement.  (*Id.*)  Just two days before the parties'

46

Rule 56.1 Statement was due, Lee sought an additional ten pages and, for the first time, an opportunity to submit a counterstatement of facts. Judge Halpern denied the request. (Sp. A-6.) That decision did not constitute an abuse of discretion.

As this Court has observed, "[d]istrict court judges are bound by the Federal Rules of Civil Procedure and may not apply their individual practice rules in a manner that is inconsistent with the Federal Rules." *Fruit of the Loom, Inc. v. Am. Mktg. Enters., Inc.*, 192 F.3d 73, 75 (2d Cir. 1999). Judge Halpern's individual practice regarding Rule 56.1 statements is both consistent with federal law and the district's local rules, and Lee does not argue otherwise. Federal Rule of Civil Procedure 56 does not set forth a particular vehicle for presenting material facts to the court, and "[t]he purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001), *abrogation recognized on other grounds*, *Cement and Concrete Workers District Council Welfare Fund v. Manny P. Concrete Co., Inc.*, 145 F.4th 204, 210 (2d Cir. 2025); *see Emanuel v. Gap, Inc.*, 2022 WL 3084317, at *4 (S.D.N.Y. Aug. 3, 2022) ("A Rule 56.1 statement is intended to whittle down the *material facts* that the Court needs in order to adjudicate the motion.") (emphasis in original). Lee makes much of the fact that Judge Halpern is the only judge in the Southern District of New York to impose a page limit for a combined Rule 56.1

47

Statement, but several judges in the district impose page limitations on the Rule 56.1 Statement, as do many other districts in their local rules. *See, e.g.*, Indiv. Rules of Practice of Hon. Cathy Seibel, D.J., § 2(c)(i) (25 pages); Indiv. Practices in Civil Cases of Hon. Alison J. Nathan, C.J., Sitting By Designation, ¶ 3(F)(iii) (25 pages); U.S. Dist. Ct., D. Conn. Local Rule of Civ. Pro. 56(a)(1) (12 double spaced pages); U.S. Dist. Ct., S.D. Fla. Local Rule of Civ. Pro. 56.1(b)(1)(A) (10 pages). Tellingly, Lee cites no authority for his argument that Judge Halpern's denial of Lee's request to exceed the page limitation was an abuse of discretion.

Lee's final argument is that he was prejudiced because he could not include more information in the Rule 56.1 statement. (Br. at 56). Lee was not prejudiced: he concedes that he was not prohibited from presenting the facts he wished to present. (*Id.*) Had Lee wished to include additional facts, he could have removed the enormous amount of unnecessary verbiage he included in his Rule 56.1 response. (*See, e.g.*, A-83-84, 91-92, 95-96, 97-98 ¶¶ 7, 28, 38, 39.) Even if this Court were to consider the additional points Lee believes he needed to include in the Rule 56.1 statement, (Br. at 58), summary judgment would still be proper. Accordingly, this Court should affirm Judge Halpern's decision to require both parties to comply with his individual practices. *See Lue v. JPMorgan Chase & Co.*, 768 Fed. App'x 7, 9 (2d Cir. 2019) (no abuse of discretion for imposition of page limit on summary judgment where party "made no attempt to comply with the district court's

instructions and has not shown that she could not adequately oppose summary judgment within the court's limits").

## Conclusion

For all the foregoing reasons, the District Court's decision should be affirmed in its entirety.

Dated: White Plains, New York
     February 23, 2026

                YANKWITT LLP

                Russell M. Yankwit
                Jason M. Swergold
                Michael H. Reed
                140 Grand Street, Suite 705
                White Plains, New York 10601
                Tel.:   (914) 686-1500
                Fax:   (914) 487-5000
                russell@yankwitt.com
                jason@yankwitt.com
                michael@yankwitt.com

## **CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i), and the word limit of Fed. R. App. P. 32(a)(7)(A), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 11,853 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word with 14 characters per inch and Times New Roman.

Dated: February 23, 2026

_____
Russell M. Yankwitt